# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

LISA A. KENNICOTT; LISA A. GARCIA
and SUE C. PHELPS, on behalf of
themselves and a class of those similarly
situated,

       Plaintiffs,

vs.                                No. CIV 17-0188 JB/GJF

SANDIA CORPORATION,

       Defendant.

## MEMORANDUM OPINION[1]

**THIS MATTER** comes before the Court on the Defendant's Motion to Dismiss State

Law Claims, filed March 17, 2017 (Doc. 14)("Motion").  The Court held hearings on June 12,

2017 and January 19, 2018.  The primary issues are: (i) whether the federal enclave doctrine

applies to state-law employment discrimination claims if the employer makes allegedly

discriminatory decisions off the enclave; (ii) whether the federal enclave doctrine bars Plaintiffs

Lisa A. Kennicott's, Lisa A. Garcia's, and Sue Phelps' claims against Defendant Sandia

Corporation ("Sandia Labs") under the New Mexico Human Rights Act, N.M. Stat. Ann

§ 28-1-7(A) ("NMHRA"), and the New Mexico Fair Pay for Women Act, N.M. Stat. Ann.

§ 28-23-3(A) ("NMFPWA"); and (iii) whether Sandia Labs made the employment decisions

underlying those claims on the Kirtland Air Force Base.  The Court concludes that: (i) the federal

enclave doctrine applies to state employment discrimination claims when a plaintiff works on a

---

[1]The Court previously entered an Order that granted the Defendant's Motion to Dismiss State Law Claims, filed March 17, 2017 (Doc. 14).  See Order, filed March 31, 2018 (Doc. 106). In that Order, the Court stated that it would "issue a Memorandum Opinion at a later date more fully detailing its rationale for this decision."  Order at 1 n.1.  This Memorandum Opinion is the promised opinion and details the Court's rationale for the previous Order.

federal enclave, no matter where the employer makes the decisions underlying those claims; (ii) the federal enclave doctrine bars the Plaintiffs' NMHRA and NMFPWA claims, because the Plaintiffs worked on the Kirtland Air Force Base, and those state statutes do not apply in that federal enclave[2]; and (iii) Sandia Labs has not established that it made the employment decisions underlying the Plaintiffs' claims on Kirtland Air Force Base, so if the Court were to decide -- which it does not -- that the federal enclave doctrine applies only when the challenged employment decisions are made on an enclave, then the Plaintiffs' NMHRA and NMFPWA would survive the Motion. Accordingly, the Court grants the Motion and dismisses the Plaintiffs' NMHRA and NMFPWA claims with prejudice.[3]

## FACTUAL BACKGROUND

In the Motion, Sandia Labs moves the Court to dismiss the Plaintiffs' NMHRA and NMFPWA claims for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When deciding rule 12(b)(6) motions, the Court generally may not consider "matters

---

[2]The Court also concludes that the federal enclave doctrine would apply when an employer makes discriminatory employment decisions on a federal enclave even if those decisions impact individuals who do not work on the enclave. See infra at n.22.

[3]The Court dismisses the Plaintiffs' state claims with prejudice, because, when the federal enclave doctrine applies, "only federal law applies to the claims at issue." Hallak v. L3 Commc'ns Corp., No. CV 10-00794 R (JCX), 2010 WL 11518537, at *1 (C.D. Cal. Apr. 27, 2010)(Real, J.)("Plaintiffs' state law claims fail to state a claim upon which relief can be granted and, therefore, the Court dismisses those claims with prejudice, because only federal law applies to the claims at issue."), aff'd, 490 F. App'x 2 (9th Cir. 2012). Because federal law applies to the Plaintiffs' employment discrimination claims against Sandia Labs, the Plaintiffs cannot state a NMHRA or NMFPWA claim for which the Court can soundly grant relief. See also Shurow v. Gino Morena Enterprises, LLC, No. 3:16-CV-02844, 2017 WL 1550162, at *4 (S.D. Cal. May 1, 2017)(Lorenz, J.)(dismissing with prejudice state claims that the federal enclave doctrine bars); Smelser v. Sandia Corp., No. CIV 17-388, 2018 WL 1627214, at *9 (D.N.M. Mar. 30, 2018) (Yarbrough, M.J.)(same); Stiefel v. Bechtel Corp., 497 F. Supp. 2d 1138, 1148–49 (S.D. Cal. 2007)(Huff, J)(same); Mersnick v. USProtect Corp., No. C-06-03993 RMW, 2007 WL 2669816, at *4 (N.D. Cal. Sept. 7, 2007)(Whyte, J)(not reported)(same).

outside the pleadings." Fed. R. Civ. P. 12(d). The parties have also done some discovery, however, and the parties have consented to the Court converting the Motion into one for summary judgment under rule 56 of the Federal Rules of Civil Procedure. Thus, the Court will give two factual sections. First, it will explain what the Complaint alleges as relevant background of the case. Second, it will set out the undisputed facts to help it determine whether there is a genuine dispute as to a material fact.

### 1. **The Complaint's Facts.**

Sandia Labs is a "federally-funded research and development contractor operating under contract for the Department of Energy." Class Action Complaint ¶ 2, at 1-2, filed February 7, 2017 (Doc. 1)("Complaint"). Kennicott worked for Sandia Labs as a member of Technical Staff from January, 1995, to February, 1998. See Complaint ¶ 50, at 11. She returned to Sandia Labs in 1999 as a Senior Member of Technical Staff, and, in 2005, was promoted to Principal Member of Technical Staff. See Complaint ¶ 50, at 11. She has a master's degree in computer science from the University of New Mexico and a master's degree from Harvard University. See Complaint ¶ 51, at 11.

Garcia started working at Sandia Labs in 1988 as a custodian, and advanced through the mailroom, the payment processing department, and the Radiation Protection department's administrative section. See Complaint ¶ 64, at 14. Eventually, she worked as a Health Physics Technologist in Dosimetry[4] within Radiation Protection, was promoted to Senior Health Physics Technologist in Dosimetry, made a "lateral move" to Electromechanical Senior Technologist in Secure Transportation, and then made another lateral move to Electronics Senior Technologist in

---

[4]"Dosimetry is the study, measurement, method of measurement, or instrument of measurement of radiation dose." Radiation Safety Division, United States Department of Agriculture, Dosimetry, https://www.dm.usda.gov/ohsec/rsd/dosimetry.htm.

Satellites.  Complaint ¶ 64, at 14.  In 2008, she was promoted to Principal Technologist in Satellites, and, a year later, made a lateral move to Principal Technologist in Telemetry,[5] where she still works.  See Complaint ¶ 64, at 14.  Garcia has a bachelor's degree in business from the College of Santa Fe and a Certificate in Electronics from what was then known as the Technical Vocation Institute of New Mexico.[6]  See Complaint ¶ 65, at 15.

Phelps began working at Sandia Labs in May, 1989, as a member of Technical Staff, Scientific Computing, and, in 1997, was promoted to Senior Member of Technical Staff, Scientific Computing.  See Complaint ¶ 71, at 16.  Since then, she has made several lateral movies, first to Senior Member of Technical Staff, High Performance Computing Research, then to "Senior Member of Technical Staff within the division of Defense Systems and department of Missile Defense," and then to "Senior Member of Technical Staff within the division of Defense Systems and department of Phenomenology & Sensor Sciences."  Complaint ¶ 71, at 16.  In 2013, she was promoted to Principal Member of Technical Staff in the Division of Defense Systems and Department of Phenomenology & Sensor Sciences, before retiring in 2016.  See Complaint ¶ 71, at 16.  Phelps has a B.S. in Mathematics from Purdue University, a master's degree in computer science from the University of Illinois, Champaign-Urbana, and a Ph.D. in computer science from the New Mexico Institute of Mining and Technology.  See Complaint ¶ 72, at 16.

---

[5]Telemetry is "an automated communications process by which measurements and other data are collected at remote or inaccessible points and transmitted to receiving equipment for monitoring."  Telemetry, https://en.wikipedia.org/wiki/Telemetry.

[6]The Technical Vocation Institute of New Mexico is now known as Central New Mexico Community College.  See Central New Mexico Community College, https://en.wikipedia.org/wiki/Central_New_Mexico_Community_College.

## 2.     **The Undisputed Facts.**

Rule 12(d) of the Federal Rules of Civil Procedure states that, if a court considers matters outside the pleadings on a rule 12(b)(6) motion to dismiss, it must convert the motion to one for summary judgment under rule 56 of the Federal Rules of Civil Procedure.  See Fed. R. Civ. P. Rule 12(d).  In this Memorandum Opinion, the Court will consider matters outside the pleadings when determining whether Sandia Labs made its employment decisions on Kirtland Air Force Base, so it will convert the Motion into a rule 56 motion for summary judgment regarding that issue.[7]  Accordingly, the Court presents these undisputed of facts based on the parties' additional pleadings and evidence.[8]

Sandia Labs' Talent Acquisition group -- also called Talent Acquisition & Strategies -- "partner[s] with the compensation department as well as the hiring manager to set an appropriate salary based on experience and market."[9]  Deposition of Yvonne Baros at

---

[7]In the January 18, 2018 hearing, see Draft Hearing Transcript (taken January 19, 2018) ("2018 Tr."), the parties orally consented to the Court converting the Motion into a rule 56 motion for summary judgment.  See 2018 Tr. at 21:2-4 (Shaver)("We can consent to the idea of submitting this as a Rule 56 decision."); id. at 22:16-17 (Gordon)("I do think it's appropriate, if Your Honor chooses to, to convert this to a Rule 56 motion.").

[8]Because Sandia Labs filed a motion to dismiss, it did not comply with D.N.M.LR-Civ 56.1(b) ("The [movant's] Memorandum must set out a concise statement of all the material facts as to which the movant contends no genuine issue exists."), nor did the Plaintiffs, in their Response, comply with D.N.M.LR-Civ 56.1(b) ("The Response must contain a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist.").  Thus, the Court is somewhat hindered by not having the numbered paragraphs listing the material facts to determine whether there is a genuine issue of material fact.  The Court has to determine the undisputed facts the old-fashioned way -- by reading all the evidence in the record and making a commonsense determination without the benefit of targeted pleadings.

[9]The Plaintiffs assert that the Talent Acquisition group "set[s] and approv[es] starting salaries for all new employees."  Supp. Submission at 3.  Sandia Labs responds that Baros testified that the Talent Acquisition group performs those roles in collaboration with other groups.  See Supp. Response at 3.  The Baros Depo. clearly indicates that the Talent Acquisition group is not alone in setting and approving starting salaries.  See Baros Depo. at 216:25-217:3

216:8-12, (taken October 5, 2017)(Baros), filed October 24, 2017 (Doc. 61-2)("Baros Depo.").[10]

Talent Acquisition is located off the Kirtland Air Force Base. See Supp. Submission at 3-4; Human Resources Organization Chart at 10, filed October 24, 2017 (Doc. 61-1)("HR Chart") (stating that Talent Acquisition is located at "IPOC").[11] From February, 2012, to February 2013, Sandia Labs' Talent Management & Employee Engagement organization was located in Tech Area 1 on the Kirtland Air Force Base. See HR Chart at 1-5. From March, 2013, to June, 2014, the Talent Management & Employee Engagement organization was located off the Kirtland Air Force Base, at the Innovation Parkway Office Center ("IPOC"). HR Chart at 5-10. From July, 2014, to the present, the Talent Management & Employee Engagement organization was again located in Tech Area 1. See HR Chart at 10-12.

Talent Management & Employee Engagement trains Sandia Labs' employees on policies regarding antidiscrimination and investigating discrimination complaints. See Supp. Submission at 7.; Baros Depo. at 207:5-21, 208:7-11 (Levin-Gesundheit, Baros). From 2014 to 2015, a "subdivision of HR known simply as Human Resources" ("Human Resources Group") was located off the Kirtland Air Force Base. Supp. Submission at 3-4; HR Chart at 8-12 (indicating that the Human Resources Group was located at IPOC). Talent Management & Development and Talent Acquisition report to the Human Resources Group. See Division 3000 HR &

_____

(Baros)("It is their function to partner with the compensation department as well as the hiring manager to set an appropriate salary based on experience and market.").

[10]The Plaintiffs "requested a Rule 30(b)(6) deposition regarding Sandia's corporate and HR organizational structure." Supp. Submission at 2. On October 5, 2017, the Plaintiffs deposed Yvonne Baros, Sandia Labs' "Manager, Business Strategy and Early Career Foundation." Supp. Submission at 2.

[11]According to the Plaintiffs, "IPOC" is not on Kirtland Air Force Base. Supp. Submission at 3. See Innovation Parkway Office Center (IPOC) webpage, filed March 31, 2017 (Doc. 18-4)(listing the IPOC's address as 1611 Innovation Pkwy. SE, Albuquerque, New Mexico, 87123).

Communications Organization Chart at 1, filed October 24, 2017 (Doc. 61-3)("HR. Org. Chart"); Baros Depo. at 199:8-11 (Levin-Gesundheit, Baros)(establishing that the HR Org. Chart's "vertical lines . . . indicate reporting relationships").

HR & Communications is located on the Kirtland Air Force Base.  See HR Chart at 1-20 (indicating that, for each month between January, 2012, to April, 2017, HR & Communications is listed as being on the Kirtland Air Force Base).  In May, 2017, HR & Communications Vice President's location is not listed on the HR Chart.  See HR Chart at 21.[12]  In June, 2017, a HR & Communications Director was located at the IPOC.  See HR Chart at 21.[13]  HR & Communications is listed two other times for that month, and both of those entries indicate that they were on the Kirtland Air Force Base.  See HR Chart at 21.  The Vice President of HR & Communications is tasked with final approval of "compensation policy," Baros Depo. at 104:23-105:1 (Baros), and "antidiscrimination policies," Baros Depo. at 107:20-23 (Baros), and is responsible "for the promotion, compensation, performance evaluations, antidiscrimination polices, including investigation of employee complaints," Baros Depo. at 108:2-11 (Baros).

The Compensation Group is located on Kirtland Air Force Base.  See Supp. Response at 2; HR Chart at 1-20.  The Compensation Group "conducts gender-based disparate impact analysis of performance evaluation scores."  Supp. Submission at 6; Baros Depo. at 85:14-86:7 (Levin-Gesundheit, Baros).  The Compensation Group "administer[s]" Sandia Labs' performance evaluation process.  Bars Depo. at 53:11-3 (Baros)("The function of the

_____

[12]HR & Communications is listed two other times for May, 2017, and both of those entries indicate that they were on the Kirtland Air Force Base.  See HR Chart at 21.

[13]Sandia Labs asserts that this June, 2017, entry "pertain[s] to a single director who was transitioning from the Communications center to another position outside of the HR & Communications division at that time."  Supp. Response at 3.  In any event, HR & Communications is listed two other times for that month, and both of those entries indicate that they were on the Kirtland Air Force Base.  See HR Chart at 21.

compensation department was to . . . administer compensation job evaluation for the labs"); id. at 53:4-9 (Baros)(agreeing that the Compensation Group "has a role in administering the performance evaluation system"). "Administering" a policy includes "draft[ing]" and/or "crafting" the policy. Baros Depo. at 220:16-25 (Levin-Gesundheit, Baros)(stating that those who administrate policies "are the drafters of the policy," and that they are "the ones that are responsible for crafting the policy and overseeing [it] when there [are] questions").[14]

The Vice President of HR worked on Tech Area 1 at Kirtland Air Force Base during all relevant time periods. See Supp. Response at 5; HR Chart at 1-20 (indicating that the HR & Communications' "Vice Pres" worked at "Tech Area 1," which is on the Kirtland Air Force Base).[15] The Vice President of HR has "final approval over compensation, performance evaluation, and promoting policies." Supp. Response at 6. Baros Dep. at 104:23-105:1 (Baros) (stating that HR & Communications' Vice President has final approval of Sandia Labs' compensation policy); id. 105:2-10 (Levin-Gesundheit, Baros)(establishing that HR &

---

[14]The Plaintiffs assert that the Compensation Group "creat[es]" Sandia Labs' promotion policy, Supp. Submission at 6, and "creat[es]" the performance evaluation policy, Supp. Submission at 5. Sandia Labs responds that the record to which the Plaintiffs cite for those propositions do not indicate that the Compensation Group creates those policies. See Supp. Response at 2. The Plaintiffs reply that the record to which it cites for that proposition states that the Compensation Group administers the performance evaluation policy, and, elsewhere in the record, Baros states generally that "administering" means "crafting" or "draft[ing]" a policy. Supp. Reply at 3 (citing Baros Depo. at 220:22-25 (Levin-Gesundheit, Baros)). Although Baros does not state specifically that the Compensation Group crafts, drafts, or otherwise creates the performance evaluation policy, it is clear that Mr. Michael Ian Levin-Gesundheit, the Plaintiffs' attorney, asks Baros what she means generally when she says that a group "administers" a policy. Baros Depo. at 220:18-21 (Levin-Gesundheit, Baros)("You used the term administer before, not that terribly long ago. You said that compensation administers the compensation policy, for example. So what do you mean by 'administer'?"). Nothing in Baros' deposition testimony suggests that her general characterization for "administering" a policy does not apply to the Compensation Group's administration of Sandia Labs' employee performance evaluation policies.

[15]The HR Chart's entry for May, 2017, however, does not list any location for H&R Communications' Vice President. See HR Chart at 21; supra at 4.

Communications' Vice President is responsible for Sandia Labs' performance evaluation policy); id. at 105:25-106:2-3 (Levin-Gesundheit, Baros)(establishing that HR & Communications' Vice President has final approval of Sandia Labs' promotions policy).

From January, 2012, to August, 2015, the Sandia Labs' Equal Employment Opportunity/Affirmative Action ("EEO/AA") organization was located in Tech Area 1. See HR Chart from 1-14. From September, 2015, to the present, the EEO/AA has been located off-base. See Supp. Submission at 8; HR Chart at 14-22.[16] The EEO/AA addresses employee discrimination complaints and is responsible for "complying with the antidiscrimination regulations of the Office of Federal Contract Compliance Programs, including auditing for systemic discrimination." Supp. Submission at 8. See Baros Depo. at 55:21-56:1; id. at 57:3-7; id. at 219:21-24. The EEO/AA organization reports to Sandia Labs' Diversity & Inclusion organization. See Supp. Submission at 8; Baros Depo. at 134:14-16. The Diversity & Inclusion organization is responsible for diversity training across Sandia. See Supp. Submission at 8; Baros Depo. at 67:2-4. From January, 2012, to April, 2015, the Diversity, Inclusion & EEO/AA organization was located on Kirtland Air Force Base. See HR Chart at 1-13. From May, 2015, to August, 2015, Diversity and Inclusion was located on Kirtland Air Force Base. See HR Chart at 13-14. From September, 2015, to October, 2016, Diversity and Inclusion was located off the Kirtland Air Force Base. See HR Chart at 14-19. From November, 2016, to present, Diversity and Inclusion returned to Kirtland Air Force Base. See HR Chart at 19-21.

### PROCEDURAL BACKGROUND

In the Complaint, the Plaintiffs allege that Sandia Labs violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 ("Title VII"), the NMHRA, and the NMFPWA.

---

[16]A group called "EEO/AA, EMP Labor Relations & HRBP," however, has remained on Kirtland Air Force Base. HR Chart at 14-22.

Complaint ¶ 1, at 1. Specifically, they allege that Sandia Labs discriminates against female employees in performance evaluations, compensation, and promotions. See Complaint ¶ 23, at 5.

### 1. **The Motion to Dismiss**.

In its Motion, Sandia Labs contends that the federal enclave doctrine bars the Plaintiffs' state-law claims. See Motion at 2. According to Sandia Labs, Congress has "exclusive authority" over federal enclaves, including Kirtland Air Force Base, where Sandia Labs is located. Motion at 3. Sandia Labs notes that neither the NMHRA nor the NMFPWA existed when Kirtland Air Force Base was established in 1954. See Motion at 3-4. Accordingly, Sandia Labs contends, the Court should dismiss the Plaintiffs' NMHRA and NMFPWA claims, because those statutes do not apply on the Kirtland Air Force Base. See Motion at 4-5.

### 2. **The Response**.

The Plaintiffs respond to the Motion. See Plaintiffs' Opposition to Motion to Dismiss State Law Claims and Motion to Conduct Jurisdictional Discovery, filed March 31, 2017 (Doc. 18)("Response"). In the Response, the Plaintiffs assert that "Sandia is not a federal enclave for the classwide, common policies at issue." Response at 1. The Plaintiffs contend that federal enclave's application depends on "the locus of relevant decisions-making," i.e., "where the employment policies are practices were made." Response at 1. See id. at 5-6. The Plaintiffs argue that, "[a]t this early stage, Plaintiffs understand that at least some of the female employees covered by this lawsuit worked outside of federal land, and that Sandia substantially conducted its common human resources functions off-base." Response at 2. See id. at 6-7. The Plaintiffs move for jurisdictional discovery. See Response at 4-5; id. at 7-8.

### 3. **The Reply**.

Sandia Labs filed a reply. See Reply in Support of Defendant's Motion to Dismiss State

Law Claims, filed April 14, 2017 (Doc. 20)("Reply").  Sandia Labs argues that the Plaintiffs'

Response allegations -- that Sandia Labs set its discriminatory policies off of Kirtland Air Force

Base -- is inconsistent with the Complaint's contention that relevant actions occurred at Sandia

Labs.  See Reply at 3-4.  Sandia Labs contends that the Court cannot soundly consider these new

alleged facts in a rule 12(b)(6) motion to dismiss.  See Reply at 4-5 ("At this stage . . . the only

question is whether Plaintiffs' state law claims are barred by the federal enclave doctrine based

on the allegations in the one and only complaint that has been filed in this lawsuit.").

4.    **The First Hearing.**

The Court held a hearing on June 12, 2017.  See Transcript (taken June 12, 2017), filed

August 8, 2017 (Doc. 50)("2017 Tr.").  The Court stated that it is "very likely" that the federal

enclave doctrine bars the Plaintiffs' state law claims.  See 2017 Tr. at 6:8-10 (Court).  Sandia

Labs stated that, at this point, "it makes more sense to us to dismiss the state law claims, let them

ask whatever questions they want about jurisdictional issues in the meantime, and then just see

where it takes us."  2017 Tr. at 6:20-24 (Gordon).  The Plaintiffs shared their concern that

> if you were to dismiss the state claims, and then, downstream, reinstate them,
> there might be some question as to when the state class period starts.  And . . . if
> the state class period would only start at the time that the claims were added to the
> amended complaint, obviously, we would be very concerned about the prejudice
> to the class.

2017 Tr. at 9:5-22 (Dermody).  The Court stated that, although it was inclined to grant the

Motion, it would not enter an order immediately.  See 2017 Tr. at 10:2-6 (Court).  The Court

stated that the Plaintiffs may provide the Court with additional material or information it might

secure in discovery relating to the federal enclave question.  See 2017 Tr. at 10:8-19 (Court).

5.    **The Plaintiffs' Supplemental Submission.**

After conducting discovery, the Plaintiffs filed a Supplemental Submission in Support of

Plaintiffs' Opposition to Defendant's Motion to Dismiss State Law Claims, filed October 24,

2017 (Doc. 60)("Supp. Submission").  The Plaintiffs allege that, based on depositions and discovered documents, Sandia Labs' "decision-making occurs within the state of New Mexico but outside the Kirtland Air Force Base with respect to the administration and development of core human resources policies and corporate practices at issue in this lawsuit."  Supp. Submission at 2.

6.  **Response to the Supplemental Submission.**

Sandia Labs filed its Response to Plaintiffs' Supplemental Submission in Support of Plaintiffs' Opposition to Defendant's Motion to Dismiss State Law Claims, filed November 7, 2017 (Doc. 65)("Supp. Response").  Sandia Labs contends that the Plaintiffs improperly focus on where policies are "administered" when the critical issue is "where the relevant decision-making occurred."  Supp. Response at 1.  According to Sandia Labs, the Plaintiffs, in the Complaint, challenge decisions that were each made on the federal enclave.  See Supp. Response at 4-5. Sandia Labs also contends that the Plaintiffs "misrepresent and misconstrue the evidence in the record" in various respects.  Supp. Response at 1-2.  Sandia Labs also states that, to the extent that the Plaintiffs continue to challenge policies created in the federal enclave, there is nothing in the record indicating that the Court should not dismiss the state claims.  See Supp. Response at 6-7.

7.  **Supplemental Submission Reply.**

The Plaintiffs replied to the Supp. Response.  See Plaintiffs' Reply to Sandia's Response to Plaintiffs' Supplemental Submission in Support of Plaintiffs' Opposition to Sandia's Motion to Dismiss State Law Claims, filed December 1, 2017 (Doc. 70)("Supp. Reply").  The Plaintiffs state that "it cannot be disputed that the core HR policies challenged in this action have been administered off-base during virtually the entire discovery period (since at least 2013)."  Supp. Reply at 1.  The Plaintiffs contend that, in their Supp. Submission, they do not misrepresent the

discovery evidence. <u>See</u> Supp. Reply at 2-5. They also contend that the location where the named Plaintiffs' and the proposed class' workplaces is irrelevant to their challenge to Sandia Labs' "common policies." Supp. Reply at 5.

8.     **The Second Hearing.**

The Court held another hearing on January 19, 2018. <u>See</u> Hearing Transcript (taken January 19, 2018)(Doc. 78)("2018 Tr."). The Court began by expressing surprise that Sandia Labs would agree with the Plaintiffs that the standard -- expressed in <u>Camargo v. Gino Morena Enterprises, L.L.C.</u>, No. EP-10-CV-242-KC, 2010 WL 3516186, at *2 (W.D. Tex. Sept. 2, 2010) (Cardone, J.)("<u>Camargo</u>") -- that the federal enclave doctrine applies to state claims when the locus of decisionmaking is on the federal enclave. <u>See</u> 2018 Tr. at 3:15-4:6 (Court). The Court stated that it would have imagined that the standard

> would be where the damage [or] injury occurred, and where the employees worked, in an employment case. So it would be much like analogizing it to a choice of law, in that you don't look to necessarily where the decision was made; you would look at where the injury occurred. And so, particularly in New Mexico, being a Restatement 1 situation, you would look at where the injury occurred. And it seemed to me in an employment case it would be where the employee is housed. And so that would be what would govern is where does the employee work? Where did the injury occur?

2018 Tr. at 4:7-20 (Court).

Sandia Labs began arguing for its Motion, stating that there are three reasons why the federal enclave doctrine "applies here to preempt the state law claims." 2018 Tr. at 6:21-23 (Gordon). The first reason that Sandia Labs asserted is that the three named Plaintiffs worked on the Kirtland Air Force Base, and they challenge decisions made on the Kirtland Air Force Base. <u>See</u> 2018 Tr. at 6:24-7:2 (Gordon). Second, Sandia Labs asserted that its promotion, compensation, and evaluation policies "originated from inside Kirtland Air Force Base." 2018 Tr. at 7:7:9-14 (Gordon). Sandia Labs contends that "either way you look at it, the locus of the

decisionmaking is inside Kirtland Air Force Base, and it's the locus of decisionmaking that matters." 2018 Tr. at 7:15-17 (Gordon). Sandia Labs explained that it agreed with the Camargo standard, because Sandia Labs wished to find common ground with the Plaintiffs and, under Camargo, the facts supported Sandia's position. See 2018 Tr. at 8:3-7 (Gordon). Sandia Labs asserted that its human resources' Vice President approves the challenged policies and that the vice-president, during the relevant time period, worked "inside Tech Area 1 inside Kirtland Air Force Base." 2018 Tr. at 8:8-14 (Gordon). Sandia Labs recognized that there are human resources employees who work off of Kirtland Air Force Base, but they are not "the decisionmakers either with respect to the three named plaintiffs or with respect to issuing the policies that are at issue." 2018 Tr. at 8:15-21 (Gordon). Sandia Labs illustrated its argument with an example:

> You could be a mid-level manager in human resources and draft a policy in an airplane flying over Kansas, or [drafting a policy] on the back of a napkin at the Frontier on Central.[17] That Policy isn't issued or finally approved until it comes inside Kirtland Air Force Base, and goes to the desk of the vice-president of human resources, and gets vetted and reviewed and revised, and then it's approved. And there is no question here that these policies they're trying to challenge were finally approved by the vice-president of human resources from inside Kirtland Air Force Base.

2018 Tr. at 8:22-9:5 (Gordon). Sandia Labs argued that, even if the challenged policies are enforced outside of Kirtland Air Force Base, "the people who apply . . . or administer these policies [are not] decisionmakers, nor does it change the locus of the decisionmaking." 2018 Tr. at 9:10-19 (Gordon).

The Court asked why it should look to federal common law in interpreting whether the

---

[17]The Frontier Restaurant is located on Albuquerque's Central Avenue near the University of New Mexico, and is known for its New Mexican food and John Wayne portraits adoring the walls. See Zora O'Neill, 36 Hours in Albuquerque, N.Y. Times, Oct. 20, 2011, https://www.nytimes.com/2011/10/23/travel/36-hours-in-albuquerque.html.

federal enclave doctrine applies to state claims.  See 2018 Tr. at 11:24-12:2 (Court).  Sandia Labs replied that the federal enclave doctrine is "procedural law that says: if the state cause of action -- whatever it is, statutory [or] common law -- if it was created after the federal enclave was created, then the federal enclave doctrine preempts them."  2018 Tr. at 12:3-13 (Gordon).

The Plaintiffs argued that, on a rule 12 motion, the Court must view all facts in the light most favorable to the plaintiff, and, in this case, they have alleged facts that "the locus of the relevant decisionmaking off base [sufficient] to survive a motion to dismiss."  2018 Tr. at 16:9-15 (Shaver).  The Plaintiffs contended that there is a factual dispute where the Vice President of human resources worked, because a chart provided by Sandia leaves blank an entry describing where the vice-president of human resources worked in 2017.  See 2018 Tr. at 16:16-17:3 (Shaver).  Moreover, the Plaintiffs contended that there is "no dispute" that the human resources and communications division is listed as being not on the Kirtland Air Force Base.  2018 Tr. at 17:4-11 (Shaver).

The Court asked the Plaintiffs if they would consent to the Court converting the motion to a motion for summary judgment, if the Court ultimately decides doing so is necessary.  See 2018 Tr. at 20:8-11 (Court).  The Plaintiffs said that they would consent to the Court converting the motion to one for summary judgment.  See 2018 Tr. at 20:12-16 (Court, Shaver).  Sandia Labs also said that it would consent.  See 2018 Tr. at 22:16-17 (Sandia).

### 9. Post-Hearing Supplemental Brief.

Sandia Labs submitted Sandia's Supplemental Post-Hearing Brief in Support of Sandia's Motion to Dismiss State Law Claims, filed January 31, 2018 (Doc. 83)("Post-Hearing Brief").  Sandia Labs states that the Post-Hearing Brief "clarifies Sandia's position regarding how the federal enclave doctrine should be applied in this case."  Post-Hearing Brief at 1.  Sandia Labs asserts that it "continues to maintain that the determining factor for applying the federal enclave

doctrine is the place where a plaintiff worked because that is the place where the alleged injury occurred." Post-Hearing Brief at 2. According to Sandia Labs, its arguments relating to Camargo "were simply intended to convey that even if *Camargo* set forth the applicable standard, dismissal is still appropriate because all relevant decisions occurred on [the Kirtland Air Force Base]." Post-Hearing Brief at 2. Sandia contends that the United States Court of Appeals for the Tenth Circuit and the Court have determined that "state law claims are precluded when the plaintiff worked on [the Kirtland Air Force Base]." Post-Hearing Brief at 3 (citing Benavidez v. Sandia National Laboratories, 212 F. Supp. 3d 1039, 1094-97 (D.N.M. 2016) (Browning, J.)("Benavidez"); Allison v. Boeing Laser Tech. Servs., 689 F.3d 1234, 1236 (10th Cir. 2012)(Tymkovich, J); Perkins v. Chugach Management Servs., 2015 WL 13666993 (D.N.M. Feb. 18, 2015)(Herrera, J)). Sandia contends that the federal enclave doctrine bars the state claims whether the Court looks to the place where a plaintiff worked or where the decisions are made. See Post-Hearing Brief at 4-5.

**10.    The Plaintiffs' Post-Hearing Supplemental Brief Response.**

The Plaintiffs respond to the Post-Hearing Brief. See Plaintiffs' Response to Sandia's Supplemental Post-Hearing Brief Regarding Sandia's Motion to Dismiss State Law Claims, filed February 15, 2018 (Doc. 84)("Post-Hearing Response"). The Plaintiffs contend that the Court's decision in Benavidez is consistent with Camargo, "and both cases support denial of Sandia's motion." Post-Hearing Response at 1. According to the Plaintiffs, "an employee's job site is not determinative of where the employment discrimination claim arises." Post-Hearing Response at 2. Moreover, the Plaintiffs contend that the Supreme Court of New Mexico instructs courts to look at Title VII federal law for guidance on where a discrimination claim arises, see Post-Hearing Response at 2 (citing Garcia v. Hatch Valley Pub. Sch., 2016-NMCA-034, ¶ 11, 369 P.3d 1, 4, rev'd, No. S-1-SC-35641, 2018 WL 1099030 (N.M. March. 1, 2018)), and, in the

Tenth Circuit, a discrimination claim arises where the discriminatory decisions are made, see Post-Hearing Response at 2 (citing Reid v. D.P. Curtis Trucking, Inc., No. CIV 12-134, 2012 WL 5409786, at *1 (D.N.M. Oct. 31, 2012)(Molzen, M.J.); Tipnis v. Emery Tel., No. CIV A06CV02402WYDCBS, 2007 WL 1306495, at *1 (D. Colo. May 3, 2007)(Daniel, J.)).

The Plaintiffs assert that the Court's decision in Benavidez is consistent with Camargo, because, in Benavidez, the Court asked "'whether the events giving rise to this lawsuit took place at the Kirtland Air Force Base.'" Post-Hearing Response at 4 (quoting Benavidez, 2016 WL 9777419, at *40). The Plaintiffs contend that, in Benavidez, there was no question that the challenged decisions occurred on the Kirtland Air Force Base, whereas here, there is dispute whether the challenged decisions were made elsewhere. See Post-Hearing Response at 4-5.

## LAW REGARDING RULE 12(b)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994). The complaint's sufficiency is a question of law, and, when considering a rule 12(b)(6) motion, a court must accept as true the complaint's well-pled factual allegations, view those allegations in the light most favorable to the nonmoving party, and draw all reasonable inferences in the plaintiff's favor. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations

in a complaint and view these allegations in the light most favorable to the plaintiff.")(citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006)).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. Ashcroft v. Iqbal, 556 U.S. at 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 550 U.S. at 555.

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted). The United States Court of Appeals for the Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if

assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(citations omitted)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570).  See Gallegos v. Bernalillo Cty. Board of Cty. Comm'rs, 278 F. Supp. 3d 1245, 1258, 2017 WL 4402422, at *9 (D.N.M. 2017)(Browning, J.).

"When a party presents matters outside of the pleadings for consideration, as a general rule 'the court must either exclude the material or treat the motion as one for summary judgment.'"  Brokers' Choice of America, Inc. v. NBC Universal, Inc., 861 F.3d 1081, 1103 (10th Cir. 2017)(quoting Alexander v. Oklahoma, 382 F.3d 1206, 1214 (10th Cir. 2004)).  There are three limited exceptions to this general principle: (i) documents that the complaint incorporates by reference, see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); (ii) "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," Jacobsen v. Deseret Book Co., 287 F.3d at 941; and (iii) "matters of which a court may take judicial notice," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322.  See Brokers' Choice of America, Inc. v. NBC Universal, Inc., 861 F.3d at 1103 (holding that the district court did not err by reviewing a seminar recording and a TV episode on a rule 12(b)(6) motion, which were "attached to or referenced in the amended complaint," central to the plaintiff's claim, and "undisputed as to their accuracy and authenticity").  "[T]he court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record."  Van Woudenberg v. Gibson, 211 F.3d 560, 568 (10th Cir. 2000), abrogated on other grounds by McGregor v. Gibson, 248 F.3d 946, 955 (10th Cir. 2001).

In Gee v. Pacheco, 627 F.3d 1178 (10th Cir. 2010), the defendants "supported their motion with numerous documents, and the district court cited portions of those motions in

granting the [motion to dismiss]." 627 F.3d at 1186. The Tenth Circuit held that "[s]uch reliance was improper" and that, even if "the district court did not err initially in reviewing the materials, the court improperly relied on them to refute Mr. Gee's factual assertions and effectively convert the motion to one for summary judgment." 627 F.3d at 1186-87. In other cases, the Tenth Circuit has emphasized that, "[b]ecause the district court considered facts outside of the complaint, however, it is clear that the district court dismissed the claim under Rule 56(c) and not Rule 12(b)(6)." Nard v. City of Okla. City, 153 F. App'x 529, 534 n.4 (10th Cir. 2005)(unpublished). In Douglas v. Norton, 167 F. App'x 698 (10th Cir. 2006)(unpublished), the Tenth Circuit addressed an untimely filed charge with the Equal Employment Opportunity Commission -- which the Tenth Circuit analogized to a statute of limitations analysis -- and concluded that, because the requirement was not jurisdictional, the district court should have analyzed the question under rule 12(b)(6), and "because the district court considered evidentiary materials outside of Douglas' complaint, it should have treated Norton's motion as a motion for summary judgment." 167 F. App'x at 704-05.

The Court has previously ruled that, when a plaintiff references and summarizes defendants' statements in a complaint, the Court cannot rely on documents containing those statements that the Defendant's attach in their briefing. See Mocek v. City of Albuquerque, 2013 WL 312881, at *50-51 (D.N.M. Jan. 14, 2013)(Browning, J.). The Court reasoned that the statements were neither incorporated by reference nor central to the plaintiff's allegations in the complaint, because the plaintiff cited the statements only to attack the Defendant's reliability and truthfulness. See 2013 WL 312881, at *50-51. The Court has also previously ruled that, when determining whether to toll a statute of limitations in an action alleging fraud and seeking subrogation from a defendant, the Court may not use interviews and letters attached to a motion

to dismiss, which show that a plaintiff was aware of the defendant's alleged fraud before the statutory period expired.  See Great Am. Co. v. Crabtree, 2012 WL 3656500, at *3, *22-23 (D.N.M. Aug. 23, 2012)(Browning, J.)("Crabtree").  The Court in Crabtree determined that the documents did not fall within any of the Tenth Circuit's exceptions to the general rule that a complaint must rest on the sufficiency of its contents alone, as the complaint did not incorporate the documents by reference or refer to the documents. See 2012 WL 3656500, at *22-23; Mocek v. City of Albuquerque, 2013 WL 312881, at *50 (refusing to consider statements that were not "central to [the plaintiff's] claims").

On the other hand, in a securities class action, the Court has ruled that a defendant's operating certification, to which plaintiffs referred in their complaint, and which was central to whether the plaintiffs adequately alleged a loss, fell within an exception to the general rule, so the Court could consider the operating certification when ruling on the defendant's motion to dismiss without converting the motion into one for summary judgment.   See Genesee Cty. Emps.' Retirement Sys. v. Thornburg Mortg. Secs. Trust 2006-3, 825 F. Supp. 2d 1082, 1150-51 (D.N.M. 2011)(Browning, J.); Mata v. Anderson, 760 F. Supp. 2d 1068, 1101 (D.N.M. 2009)(Browning, J.)(relying on documents outside of the complaint, because they were "documents that a court can appropriately view as either part of the public record, or as documents upon which the Complaint relies, and the authenticity of which is not in dispute"); S.E.C. v. Goldstone, 952 F. Supp. 2d 1060, 1217-18 (D.N.M. 2013)(Browning, J.)(considering, on a motion to dismiss, electronic mail transmissions referenced in the complaint as "documents referred to in the complaint," which are "central to the plaintiff's claim" and whose authenticity the plaintiff did not challenge).

## LAW REGARDING TITLE VII EMPLOYMENT DISCRIMINATION CASES

"Title VII of the Civil Rights Act of 1964 forbids employment discrimination based on race, color, religion, sex, or national origin." Brown v. Gen. Servs. Admin., 425 U.S. 820, 825 (1976)(citing 42 U.S.C. §§ 2000e-2, 2000e-3). The Court has noted that Title VII generally protects individuals from employers' improperly motivated adverse treatment in the workplace: "Title VII of the Civil Rights Act of 1964 prohibits an employer from failing or refusing to hire or discharging any individual, or otherwise discriminating against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." Farley v. Leavitt, No. CIV 05-1219, 2007 WL 6364329, at *6 (D.N.M. Dec. 31, 2007)(Browning, J.)(quoting 42 U.S.C. § 2000e-2(a)(1)) (internal quotation marks omitted)(alterations omitted). With the 1972 amendments to the statute, Title VII's protections apply to federal and private employees. See Brown v. Gen. Servs. Admin., 425 U.S. at 825-26 (citing 42 U.S.C. § 2000e(b)); Walton v. New Mexico State Land Office, 113 F. Supp. 3d 1178, 1184 (D.N.M. 2015)(Browning, J.); Gerald v. Locksley, 785 F. Supp. 2d 1074, 1098 (D.N.M. 2011)(Browning, J.).

### 1. Disparate Treatment Discrimination.

"To prevail on a disparate treatment claim under Title VII of the Civil Rights Act, a plaintiff must show that [the] employer intentionally discriminated against [the plaintiff] for a reason prohibited by the statute." Jaramillo v. Colo. Judicial Dep't, 427 F.3d 1303, 1306 (10th Cir. 2005). Courts apply the burden-shifting framework that the Supreme Court established in McDonnell Douglas Corp. v. Green, which initially places the burden on the plaintiff to prove a prima facie case of discrimination. See, e.g., EEOC v. PVNF, LLC, 487 F.3d 790, 800-01 (10th Cir. 2007).

The elements that the Supreme Court established in <u>McDonnell Douglas Corp. v. Green</u> address only a refusal to rehire.  Accordingly, the articulation of a plaintiff's prima facie case "varies depending on the type of adverse action the employee alleges was discriminatory." <u>EEOC v. PVNF, LLC</u>, 487 F.3d at 800 (citing <u>Plotke v. White</u>, 405 F.3d 1092, 1099 (10th Cir. 2005)).  <u>See</u> 1 Lex K. Larson, <u>Employment Discrimination</u> § 8.08[1], at 8-103 (2d ed. 2012)("[C]ourts have applied the <u>McDonnell Douglas</u> prima facie case, sometimes modifying the proof requirements to fit the specific facts of the case, to cases involving promotion, discharge, demotion, discipline, layoffs, and other types of employer actions.").  Generally, to prove a disparate-treatment discrimination claim at the summary judgment stage, "a prima facie case of discrimination must consist of evidence that (1) the victim belongs to a protected class; (2) the victim suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination."  <u>EEOC v. PVNF, LLC</u>, 487 F.3d at 800.  <u>See</u> <u>Sorbo v. United Parcel Serv.</u>, 432 F.3d 1169, 1173 (10th Cir. 2005)(holding that a "prima facie case for discrimination" requires the "plaintiff to show that (1) he belongs to the protected age group; (2) his job performance was satisfactory; (3) adverse employment action was taken against him; . . . [in (4)] 'circumstances giving rise to an inference of discrimination'" (quoting <u>Salguero v. City of Clovis</u>, 366 F.3d 1168, 1175 (10th Cir. 2004))(citing <u>Plotke v. White</u>, 405 F.3d at 1101; <u>Hysten v. Burlington N. & Santa Fe Ry. Co.</u>, 296 F.3d 1177, 1181 (10th Cir. 2002))); <u>Jones v. Denver Post Corp.</u>, 203 F.3d 748, 753 (10th Cir. 2000)).  A prima facie case of disparate discipline may be established if the plaintiff proves by a preponderance of the evidence that: (1) the plaintiff is a racial minority, (2) the plaintiff was disciplined by the employer, and (3) the employer imposed the discipline under circumstances giving rise to an inference of racial discrimination.  <u>Cf.</u> <u>Mathews v. Denver Newspaper Agency LLP</u>, 649 F.3d

1199, 1208 (10th Cir. 2011)("[The plaintiff] bears the initial burden of . . . presenting evidence that (i) he is a member of a protected class, (ii) he was qualified for the job as Unit Supervisor, (iii) he was demoted from that job, and (iv) the position was not eliminated."  (citing Jones v. Denver Post Corp., 203 F.3d at 753)).[18]  See Walton v. New Mexico State Land Office, 113 F. Supp. 3d at 1188.

---

[18]The Court has previously written: "To establish a prima-facie case of discrimination, a plaintiff must demonstrate that: (i) she is a member of a protected class; (ii) she suffered an adverse-employment action, and (iii) similarly situated employees were treated differently." Gerald v. Locksley, 785 F. Supp. 2d at 1099.  The Court cited to the Tenth Circuit's August, 2005, decision of Orr v. City of Albuquerque 417 F.3d 1149 (10th Cir. 2005), in which the Tenth Circuit stated: "To make out a prima facie case of discrimination, the female Plaintiffs must demonstrate (1) membership in a protected class, (2) adverse employment action, and (3) disparate treatment among similarly situated employees."  Orr v. City Of Albuquerque, 417 F.3d 1140, 1149 (10th Cir. 2005).  Only a few months after Orr v. City Of Albuquerque, in December, 2005, the Tenth Circuit held that a district court's inclusion in the plaintiff's prima facie case of showing "comparable employees who were not in a protected class did not receive comparable adverse employment action" was the "recitation of an outmoded prima facie case test" and that showing disparate treatment of similarly situated individuals is only one way to prove the third McDonnell Douglas Corp. v. Green element.  Sorbo v. United Parcel Serv., 432 F.3d at 1173.  The Tenth Circuit recognized that the proper third element is -- and had been since at least 1999 -- the broader prima facie requirement that the defendant took the adverse employment action under "circumstances giving rise to an inference of discrimination."  Sorbo v. United Parcel Serv., 432 F.3d at 1173 (citing Perry v. Woodward, 199 F.3d 1126, 1135-40 (1999); Salguero v. City of Clovis, 366 F.3d at 1175; Plotke v. White, 405 F.3d at 1101; Hysten v. Burlington N. & Santa Fe Ry. Co., 296 F.3d at 1181; Jones v. Denver Post Corp., 203 F.3d at 753).  It noted that, "[w]hile this broader requirement may be (and often is) satisfied by proof that the employer treated similarly situated employees more favorably, such proof is just one sufficient means to do this and should not itself be mistaken as an indispensable element of the prima facie case."  United Parcel Serv., 432 F.3d at 1173.  At the same time, the Tenth Circuit noted that its precedent has been inconsistent on whether a prima facie discrimination case requires showing similarly situated individuals were treated more favorably: "As noted in Jaramillo v. Colo. Judicial Dep't, 427 F.3d 1303, 1307 n.1 (10th Cir. 2005), this court's own jurisprudence has not been entirely consistent in this regard."  Sorbo v. United Postal Serv., 432 F.3d at 1173 n.4 (citing, as an e.g. cite, MacKenzie v. City & Cnty. of Denver, 414 F.3d at 1277).
         Similarly, in the context of the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634 ("ADEA"), which also applies the McDonnell Douglas Corp. v. Green prima facie case framework, the Supreme Court declared: "Because it lacks probative value, the fact that a[] . . . plaintiff was replaced by someone outside the protected class is not a proper element of the McDonnell Douglas prima facie case."  O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 312 (1996).  The Supreme Court held that "the proper solution to the problem lies not

### 2. **Title VII Retaliation.**

To establish a prima facie case of retaliation, a plaintiff must show: "(1) that he [or she] engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." Proctor v. United Parcel Serv., 502 F.3d 1200, 1208 (10th Cir. 2007)(quoting Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d at 1202). "To establish that a causal connection exists," a plaintiff "may proffer 'evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.'" Proctor v. United Parcel Serv., 502 F.3d at 1208 (quoting Haynes v. Level 3 Commc'ns, LLC, 456 F.3d 1215, 1228 (10th Cir. 2006)). Generally speaking, if this temporal proximity between the protected activity and the adverse action are not "very close in time," the plaintiff "must offer additional evidence to establish causation." Proctor v. United Parcel Serv., 502 F.3d at 1209 (internal quotation marks omitted)(quoting Haynes v. Level 3 Commc'ns, LLC, 456 F.3d at 1228). See Walton v. New Mexico State Land Office, 113 F. Supp. 3d at 1190; Gerald v. Locksley, 785 F. Supp. 2d at 1099-1100.

### 3. **Materially Adverse Employment Action.**

The Tenth Circuit liberally defines what constitutes an adverse employment action. See Orr v. City of Albuquerque, 417 F.3d 1144, 1150 (10th Cir. 2005)("Because of the remedial

---

in making an utterly irrelevant factor an element of the prima facie case, but rather in recognizing that the prima facie case requires 'evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion.'" 517 U.S. at 312-13 (emphasis in original)(quoting Teamsters v. United States, 431 U.S. 324, 358 (1977)). The Court, therefore, concludes that its articulation of the McDonnell Douglas Corp. v. Green prima facie case elements for discrimination in Gerald v. Locksley, based on the Tenth Circuit's decision in Orr v. City of Albuquerque, which was among the Tenth Circuit's jurisprudence "not . . . entirely consistent in this regard," Sorbo v. United Postal Serv., 432 F.3d at 1173 n.4, is not the best statement of the law.

nature of Title VII lawsuits, we broadly define adverse employment action.").  The Tenth Circuit has stated:

> Such actions are not simply limited to monetary losses in the form of wages or benefits.  Instead, we take a case-by-case approach, examining the unique factors relevant to the situation at hand.  Nevertheless, we will not consider a mere inconvenience or an alteration of job responsibilities to be an adverse employment action.

Sanchez v. Denver Pub. Sch., 164 F.3d 527, 532 (10th Cir. 1998)(internal quotation marks omitted)(citations omitted).  See Proctor v. United Parcel Serv., 502 F.3d at 1208.  An adverse action "is not limited to discriminatory actions that affect the terms and conditions of employment."  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 64 (2006).  "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ., 595 F.3d 1126, 1133 (10th Cir. 2010)(internal quotation marks omitted) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. at 68).  "The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm."  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. at 68 ("We speak of material adversity because we believe it is important to separate significant from trivial harms."). "We construe the phrase 'adverse employment action' liberally and do not limit it to 'monetary losses in the form of wages or benefits.'"  Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ., 595 F.3d at 1133 (quoting Annett v. Univ. of Kan., 371 F.3d 1233, 1239 (10th Cir. 2004)).  Acts that carry "a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects" may be considered adverse actions, although "a mere inconvenience or an alteration of job responsibilities will not suffice."  Annett v. Univ. of Kan., 371 F.3d at 1239

(internal quotation marks omitted)(citation omitted).

In Anderson v. Clovis Municipal Schools, 265 F. App'x 699 (10th Cir. 2008) (unpublished), the Tenth Circuit, in an unpublished opinion, addressed the requirement of an adverse employment action in the context of a disparate-treatment claim and a hostile work environment claim. There, an employee, who had been placed on a growth plan, alleged other harsh treatment and a written reprimand in support of his claim that he suffered a hostile work environment. Relying on Schuler v. City of Boulder, 189 F.3d 1304 (10th Cir. 1999), the plaintiff, Anderson, argued that the growth plan and formal reprimand rose to the level of an adverse employment action under Tenth Circuit law. See Schuler v. City of Boulder, 189 F.3d 1304 (10th Cir. 1999). In discussing Anderson v. Clovis Municipal School's reliance on Schuler v. City of Boulder, the Tenth Circuit stated in MacKenzie v. City & Cty. of Domier, 414 F.3d 1266 (10th Cir. 2005): "While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions . . . would form the basis of a discrimination suit." 414 F.3d at 1279. See Heno v. Sprint/United Mgmt. Co., 208 F.3d 847, 857 (10th Cir. 2007)(explaining that Title VII proscribes only discriminatory conduct that "alters the employee's compensation, terms, conditions, or privileges of employment, or adversely affects [the employee's] status as an employee" (internal quotation marks omitted)). "Only acts that constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits will rise to the level of an adverse employment action." Robinson v. Cavalry Portfolio Serv., LLC, 365 F. App'x 104, 114 (10th Cir. 2010)(unpublished)(quoting Haynes v. Level 3 Commc'ns, 456 F.3d at 1218-19)(internal quotation marks omitted). See

Walton v. New Mexico State Land Office, 113 F. Supp. 3d at 1190-92; Gerald v. Locksley, 785 F. Supp. 2d at 1100-01.

## LAW REGARDING THE NMHRA

The NMHRA, which the New Mexico Human Rights Division and the New Mexico Human Rights Commission administers, makes it an unlawful discriminatory practice for

> an employer, unless based on a bona fide occupational qualification or other statutory prohibition, to refuse to hire, to discharge, to promote or demote or to discriminate in matters of compensation, terms, conditions or privileges of employment against any person otherwise qualified because of race, age, religion, color, national origin, ancestry, sex, physical or mental handicap or serious medical condition, or, if the employer has fifty or more employees, spousal affiliation; provided, however, that 29 U.S.C. Section 631(c)(1) and (2) shall apply to discrimination based on age; or, if the employer has fifteen or more employees, to discriminate against an employee based upon the employee's sexual orientation or gender identity[.]

N.M. Stat. Ann. § 28-1-7A. The NMHRA allows individuals to bring a lawsuit in the appropriate district court after exhausting their administrative remedies. See Luboyeski v. Hill, 117-NMSC-380, 872 P.2d 353, 355 (1994). The NMHRA sets out the same standard for establishing wrongful discrimination as Title VII. See Orr v. City of Albuquerque, 417 F.3d 1144, 1149 n.5 (10th Cir. 2005)("Plaintiffs' burden under the NMHRA is identical to their burden under Title VII."); Lobato v. N.M. Env't Dep't, 733 F.3d 1283, 1296-97 (10th Cir. 2013) (holding that, "because we conclude that Lobato has no Title VII claim, we also conclude he has no NMHRA claim"). The NMHRA requires an individual to first exhaust his or her administrative remedies before bringing a lawsuit. See Luboyeski v. Hill, 117-NMSC-380, 872 P.2d at 355; Bates v. N.M. Corr. Dep't, No. CIV 08-1013, 2010 WL 4339367, at *7 (D.N.M. Sept. 30, 2010)(Browning, J.)("NMHRA claims must be administratively exhausted before being brought in federal court."). The NMHRA provides:

> A person aggrieved by an order of the commission may obtain a trial de novo in

the district court of the county where the discriminatory practice occurred or where the respondent does business by filing a notice of appeal within ninety days from the date of service of the [New Mexico Human Rights] commission's order.

N.M. Stat. Ann. § 28-1-13A.

The Supreme Court of New Mexico applies the framework that the Supreme Court of the United States established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), "[w]hen considering a violation of the NMHRA." <u>Juneau v. Intel Corp.</u>, 2006-NMSC-002, ¶ 9, 127 P.3d 548, 551. The Supreme Court of New Mexico has stated that, "when considering claims under the NMHRA, we may look at federal civil rights adjudication for guidance in interpreting the NMHRA. Our reliance on the methodology developed in the federal courts, however, should not be interpreted as an indication that we have adopted federal law as our own." <u>Ocana v. Am. Furniture Co.</u>, 2004-NMSC-018, ¶ 23, 91 P.3d 58, 68 (internal quotation marks omitted)(citations omitted). "[C]laims of age, race, national origin, gender discrimination, and retaliation are all subject to the burden shifting framework that the Supreme Court established in <u>McDonnell Douglas Corp. v. Green</u>." <u>Gamez v. Country Cottage Care and Rehab.</u>, 377 F. Supp. 2d 1103, 1119 (D.N.M. 2005)(citing <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. at 802-804). Under the <u>McDonnell Douglas Corp. v. Green</u> framework, a plaintiff must set forth a prima facie case of discrimination. <u>See</u> <u>Kelley v. City of Albuquerque</u>, 375 F. Supp. 2d 1183, 1210 (D.N.M. 2004)(Browning, J.). If the plaintiff establishes a prima facie case for any of his discrimination claims, "the burden shifts to the defendant to come forward with a legitimate nondiscriminatory reason for its employment related decision." <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. at 802. "Upon the employer's articulation of a legitimate, nondiscriminatory reason . . . the presumption of discrimination established by the prima facie case simply drops out of the picture." <u>Kelley v. City of Albuquerque</u>, 375 F. Supp. 2d at 1210 (internal quotations omitted).

The plaintiff then must present evidence that the defendant's proffered reason for the employment decision was pretextual. See Kelley v. City of Albuquerque, 375 F. Supp. 2d at 1210 (citing Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1230 (10th Cir. 2000)). The Supreme Court of New Mexico has stated that the framework it applies to discrimination claims under the NMHRA is as follows: "[A]n employee bears the initial burden of demonstrating a prima facie case of discrimination, which then shifts the burden to the employer to provide a legitimate, non-discriminatory reason for the adverse employment action. The employee then has the opportunity to rebut the employer's proffered reason as pretextual or otherwise inadequate." Juneau v. Intel Corp., 2006-NMSC-002, ¶ 9, 127 P.3d at 551 (citing McDonnell Douglas Corp. v. Green, 411 U.S. at 802-805). This approach is the same as the McDonnell Douglas Corp. v. Green framework.

While New Mexico uses federal law to interpret the NMHRA, there are two ways in which the NMHRA is broader than federal law. First, as this Court has previously acknowledged, the Supreme Court of New Mexico allows for personal liability under the NMHRA. See Duprey v. Twelfth Judicial Dist. Court, No. 08-0756 JB, 2009 WL 2482170, at *7 (D.N.M. July 28, 2009)(Browning, J.). The NMHRA defines "employer" as "any person employing four or more persons and any person acting for an employer." N.M. Stat. Ann. § 28-1-2B. While acknowledging that there is generally no personal liability under Title VII, the Supreme Court of New Mexico has "reject[ed] the proposition that there can exist no individual liability under the NMHRA." Sonntag v. Shaw, 2001-NMSC-015, ¶ 13, 22 P.3d 1188, 1193. In Sonntag v. Shaw, a defendant relied on Title VII case law to argue that employees cannot sue a corporation's owner in the owner's individual capacity under the NMHRA. See 2001-NMSC-015, ¶ 13, 22 P.3d at 1193. Although it held that the defendant could not be held personally

liable, given that the plaintiff had failed to exhaust administrative remedies, the Supreme Court

of New Mexico declined to close the door on individual liability under the NMHRA. See 2001-

NMSC-015, ¶ 13, 22 P.3d at 1193. The Supreme Court of New Mexico noted:

> [T]his Court has acknowledged the possibility of individual liability for
> discrimination claims. *Cf.* *Luboyeski v. Hill*, *117 N.M. 380, 382, 872 P.2d 353,*
> *355 (1994)*(affirming the dismissal of individual defendants because the plaintiff
> failed to exhaust administrative remedies against them); Mitchell-Carr v.
> McLendon, 1999-NMSC-025, ¶ 10, 127 N.M. 282, 980 P.2d 65 (citing
> Luboyeski). As Plaintiff suggests, the potential for individual liability for
> discrimination claims is rooted in the language of the NMHRA itself, which
> forbids "any person" from supporting a discriminatory practice. Section 28-1-
> 7(i); see N.M.S.A. 1978, § 28-1-2(A) (1993)(including within its definition of
> "person" for purposes of the NMHRA, "one or more individuals").

2001-NMSC-015, ¶ 12, 22 P.3d at 1193. Second, the NMHRA's definition of "serious medical

condition," N.M. Stat. Ann. § 28-1-7, is broader in scope than the ADA's definition of disability.

See Clayton v. Pioneer Bank, No. 07-0680, 2008 WL 5787472, at *17-18 (D.N.M. Dec. 31,

2008)(Browning, J.)(recognizing that, although "the terms 'medical condition' under the

NMHRA, and 'disability,' under the ADA, may be interchangeable in some cases[,]" they may

not be the same in others).

**LAW REGARDING THE FEDERAL ENCLAVE DOCTRINE**

The Constitution of the United States' Enclave Clause gives Congress the power to:

> exercise exclusive Legislation . . . over all Places purchased by the Consent of the
> Legislature of the State in which the Same shall be, for the Erection of Forts,
> Magazines, Arsenals, dock-Yards, and other needful Buildings.

U.S. Const. art. I, § 8, cl. 17. Under the federal enclave doctrine, "state law that is adopted after

the creation of the enclave generally does not apply on the enclave." Allison v. Boeing Laser

Tech. Servs., 689 F.3d at 1235. The central principle of the federal enclave doctrine is that

Congress has exclusive authority over these enclaves. See Allison v. Boeing Laser Tech. Servs.,

689 F.3d at 1235. The Tenth Circuit has explained:

But in the absence of applicable federal legislation displacing state law, those state laws that existed at the time that the enclave was ceded to the federal government remain in force. "Since a State may not legislate with respect to a federal enclave unless it reserved the right to do so when it gave its consent to the purchase by the United States, only state law existing at the time of the acquisition remains enforceable, not subsequent laws." *Paul* [*v. U.S.*], 371 U.S. [245,] 268 [(1953)]. Thus, the federal government acquires property subject to state law.

> The Constitution does not command that every vestige of the laws of the former sovereignty must vanish. On the contrary its language has long been interpreted so as to permit the continuance until abrogated of those rules existing at the time of the surrender of sovereignty which govern the rights of the occupants of the territory transferred. This assures that no area however small will be left without a developed legal system for private rights.

*James Stewart & Co. v. Sandrakula*, 309 U.S. 94, 99-100 (1940). And even though state law will not remain static outside the enclave, any changes made to the state law applicable within the enclave must be a matter of federal law. Because "future statutes of the state are not a part of the body of laws in the ceded area," "Congressional action is necessary to keep [state law] current." *James Stewart*, 309 U.S. at 100.

Allison v. Boeing Laser Tech. Servs., 689 F.3d at 1237. The law of federal enclaves, however, allows for three exceptions. See Allison v. Boeing Laser Tech. Servs., 689 F.3d at 1237.

The Supreme Court has recognized at least three exceptions to the rule that only state law in effect at the time of cession applies within the federal enclave: 1) where Congress has, by statute, provided a different rule; 2) where the state explicitly retained the right to legislate over specific matters at the time of cession; and 3) where minor regulatory changes modify laws existing at the time of cession.

The first exception recognizes the obvious fact that Congress can legislate on behalf of the enclave and may provide for the application of state laws enacted after the creation of the enclave. *See* [*U.S. v.*] *Sharpnack*, 355 U.S. [286,] 294-95 [(1958)]. Thus, for example, the first Federal Crimes Act, enacted in 1790, defined a number of federal crimes that applied to federal enclaves, and in 1825 Congress adopted the first Assimilated Crimes Act, which allowed state criminal codes to apply to crimes committed on federal enclaves. *Id.* at 288, 290. State criminal codes now apply to crimes committed on military bases, Indian reservations, federal facilities, and public lands unless other federal statutes bar their application. Congress has also allowed the application of state law to a variety of civil claims in federal enclaves, such as wrongful death, 16 U.S.C. §

457; workers' compensation, 40 U.S.C. § 3172; unemployment compensation, 26 U.S.C. § 3305(d); and fish and game regulation, 10 U.S.C. § 2671.

But no federal statute yet allows the broad application of state employment, tort, and contract law to federal enclaves. And "it is well established that in order for Congress to subject a federal enclave to state jurisdiction, there must be a specific congressional deferral to state authority over federal property." *West River Elec. Ass'n, Inc. v. Black Hills Power and Light Co.*, 918 F.2d 713, 719 (8th Cir. 1990).

The second exception deals with those powers the states expressly reserved at the time of cession. In *James v. Dravo Contracting Co.*, 302 U.S. 134 (1937), the Supreme Court upheld the power of states to transfer only partial jurisdiction to the federal government, retaining some authority over the ceded lands. Common reservations of power include the authority to collect state taxes and the right to serve civil and criminal process within an enclave. *See, e.g., James v. Dravo Contracting Co.*, 302 U.S. at 149, and *Paul*, 371 U.S. at 266 (discussing West Virginia and California federal enclave cession consent statutes). Reservations may also be much broader, preserving a wide range of state powers. *See United States v. Fields, 516 F.3d 923, 929 (10th Cir. 2008)*(explaining that an Oklahoma cession statute "indicates that the United States is being ceded full civil and criminal jurisdiction, with a concurrent jurisdiction reserved to the State").

The third exception applies to minor regulatory changes to state programs that existed at the time of cession. In *Paul,* the Supreme Court considered state regulatory schemes that were in place when the state ceded sovereignty but required ongoing maintenance from a regulatory body. The Court found, for example, that changes in milk pricing regulations applicable on a federal enclave might be permissible "provided the basic state law authorizing such control has been in effect since the time[ ] of [cession]." *Paul*, 371 U.S. at 269.

Allison v. Boeing Laser Tech. Servs., 689 F.3d at 1237-38.

## ANALYSIS

The Court concludes that the federal enclave doctrine applies to state employment discrimination claims when the plaintiffs work and are harmed on the federal enclave, even if the employer makes allegedly discriminatory decisions elsewhere. Consequently, the federal enclave doctrine bars the Plaintiffs' NMHRA and NMFPWA claims, because the Plaintiffs were harmed on the federal enclave, and the NMHRA and NMFPWA do not predate the federal enclave's creation. If the federal enclave doctrine applied to state-law employment

discrimination claims only when an employer makes the employment decisions on the federal enclave, the Court would not grant summary judgment in this case, because Sandia Labs has not established that the allegedly discriminatory decisions happened on Kirtland Air Force Base.

## I. THE FEDERAL ENCLAVE DOCTRINE APPLIES TO THE PLAINTIFFS' STATE-LAW CLAIMS.

The Plaintiffs work or worked on Kirtland Air Force Base, and they bring state-law employment discrimination claims against Sandia Labs. Although courts are split whether the federal enclave doctrine applies to state employment discrimination claims when an employer makes an allegedly discriminatory decision off the federal enclave, the Court concludes that the best rule is that the federal enclave doctrine applies when an employee works on a federal enclave. Here, it is clear that most, if not all, of the Plaintiffs work on the federal enclave, and, if there was a tortious employment practice, the injury and damage are on the federal enclave.

### A. COURTS ARE SPLIT WHETHER THE FEDERAL ENCLAVE DOCTRINE APPLIES WHEN ALLEGEDLY DISCRIMINATORY DECISIONS ARE MADE OFF OF THE ENCLAVE.

When employees who work on a federal enclave bring state-based employment claims, some federal courts look to where the defendant employer made an allegedly discriminatory decision when deciding whether the federal enclave doctrine applies to the claims. In Camargo, the plaintiff worked as a hairdresser on Fort Bliss, a United States Army post headquartered in El Paso, Texas, and she sued her employer, a contractor, alleging that she was terminated for discriminatory reasons. See 2010 WL 3516186, at *1. The Honorable Kathleen Cardone, United States District Judge for the Western District of Texas, stated that,

> [f]or federal enclave jurisdiction to apply, in employment discrimination cases, the adverse employment decision must have been made on federal territory, because the locus of decision-making is where such a tort arises. The fact that the employee's day-to-day job site is on a federal enclave, alone, is not sufficient for these purposes; rather, the location where management made the illegal decision controls.

2010 WL 3516186, at *2.  See Balderrama v. Pride Indus., Inc., 963 F. Supp. 2d 646, 659 (W.D. Tex. 2013)(Cardone, J)(determining that the federal enclave doctrine does  not bar the plaintiff's state law claims when the complaint alleges that the defendants made "discriminatory and retaliatory decisions in El Paso, but off of Fort Bliss"); Lawler v. Miratek Corp., No. EP-09-CV-252-KC, 2010 WL 743925, at *4 (W.D. Tex. Mar. 2, 2010)(Cardone, J.)(concluding that federal enclave jurisdiction does not apply to the plaintiff's state-law claims, because the "employment-discrimination misdeeds allegedly committed by Miratek -- such as the termination of Lawler's employment for improper reasons -- . . . were committed where its management was located, which is a building outside of Fort Bliss"); Gavrilovic v. Worldwide Language Res., Inc., 441 F. Supp. 2d 163, 177 (D. Me. 2006)(Hornby, J)(stating that the federal enclave doctrine does not apply to United States military bases abroad, but, even if it did, it would not apply to the plaintiff's employment claims, because "company senior management in Maine" made the allegedly retaliatory decision to recall her from the military base and to discontinue her security clearance).

Other federal courts -- mostly in California -- apply the federal enclave doctrine whenever the employee works on a federal enclave, even if a challenged employment decision occurred off of the enclave.  In Powell v. Tessada & Assocs., Inc., No. C 04-05254, 2005 WL 578103 (N.D. Cal. Mar. 10, 2005)(Fogel, J[19])(unpublished), the plaintiffs worked for a contractor as janitors at Moffett Federal Airfield, a federal enclave in Northern California.  See 2005 WL 578103, at *2.  When their employer got a new contract to provide janitorial services to Moffett Federal Airfield, the employer did not retain the plaintiffs, and the plaintiffs brought state-law

---

[19]The Honorable Jeremy D. Fogel, United States Senior District Judge for the Northern District of California, currently serves as the Federal Judicial Center's Director.  See Senior Staff, https://www.fjc.gov/about/senior-staff (last visited May 4, 2018).

claims alleging that the employer discriminated against them on the basis of their age.  See 2005 WL 578103, at *2.  The plaintiffs argued that, although they worked on a federal enclave, the federal enclave doctrine did not apply, because the "Defendants' refusal to retain Plaintiffs was accomplished in Defendants' corporate office in Virginia," not on the federal enclave.  2005 WL 578103, at *2.  Judge Fogel concluded that, "regardless of where the decision not to retain Plaintiffs was made, the decision reflects Defendants' employment practice on the enclave.  As a result, Plaintiffs cannot maintain their state law claims."  2005 WL 578103, at *2.

In Shurow v. Gino Morena Enterprises, LLC, No. 3:16-CV-02844, 2017 WL 1550162 (S.D. Cal. May 1, 2017)(Lorenz, J.)(slip copy), the plaintiff worked for a contractor on Camp Pendleton, a federal enclave in Southern California, and brought state-law employment claims alleging harassment and retaliation.  See 2017 WL 1550162, at *1.  The plaintiff argued that the federal enclave doctrine does not bar her state claims, because the human resources department was located outside Camp Pendleton, and management was outside Camp Pendleton when it decided to terminate her.  See 2017 WL 1550162, at *2.  The Honorable M. James Lorenz, United States District Judge for the Southern District of California, rejected those arguments, stating: "In the context of claims by employees against contractor employers operating on a federal enclave, the Doctrine applies if the plaintiff's place of employment was located on the federal enclave.  Because Plaintiff's place of employment was located on Camp Pendleton, the Federal Enclave Doctrine applies."  2017 WL 1550162, at *2 (citations omitted).  See Haining v. Boeing Co., No. 2:12-CV-10704-ODW, 2013 WL 4874975, at *3 (C.D. Cal. Sept. 11, 2013) (Wright II, J)(unpublished)("The enclave's law governs the employment claims of an employee of a federal contractor operating on a federal enclave.  Because Haining was employed by Boeing exclusively at Vandenberg, his claims arose within a federal enclave -- regardless of

where decisions concerning his employment or termination were made." (citations omitted));
Lockhart v. MVM, Inc., 97 Cal. Rptr. 3d 206, 212 (2009), as modified (July 24, 2009)
("[A]lthough [the termination] letter may have originated at respondent's corporate headquarters
in Virginia . . . appellant was the employee of a federal contractor operating on a federal enclave.
Thus, her employment claims are governed by the enclave's law."); Taylor v. Lockheed Martin
Corp., 92 Cal. Rptr. 2d 873, 872 (Cal Ct. 2d 2000)("As the employee of a contractor operating
on the enclave, Taylor's claims are governed by the enclave's law, rather than by state law.").

The Tenth Circuit has not considered the question, but several United States District
Court for the District of New Mexico decisions have determined that the federal enclave doctrine
applies to claims by an employee who works on the federal enclave even when the alleged
discriminatory decision occurred off the federal enclave. For instance, in Allison v. Boeing
Laser Tech. Servs., the Honorable Robert Hayes Scott, United States Magistrate Judge,
determined that the federal enclave doctrine bars a federal enclave employee's state-law claims
even if some employment decisions were made off of the federal enclave. See Allison v. Boeing
Laser Tech. Servs., No. CV 09-275, 2010 WL 11590920, at *5 (D.N.M. Aug. 2, 2010)
(Scott, M.J.)(citing Rosseter v. Industrial Light & Magic, 2009 WL 210452, at *2 (N.D. Cal. Jan.
27, 2009)(Alsup, J.); Powell v. Tessada & Assocs., 2005 WL 578103, at *2 (N.D. Cal. Mar. 10,
2005); Lockhart v. MVM, Inc., 97 Cal. Rptr. 3d 206, 212 (Ct. App. 2d Dist. Cal. 2009); Taylor v.
Lockheed Martin Corp., 92 Cal. Rptr. 2d at 872).

In Richards v. Lockheed Martin Corp., the Honorable William P. Johnson, then-United
States District Judge and now Chief Judge, similarly concluded that, "although the actual
decision to terminate Plaintiff may have been made" off of the federal enclave -- in that case, the
White Sands Missile Base -- the federal enclave doctrine applied to the plaintiff's claims;

"'regardless of where the decision not to retain [the plaintiff] was made, the decision reflects Defendants' employment practice on the enclave.'" Richards v. Lockheed Martin Corp., 2012 U.S. Dist. LEXIS 191331, *4 (quoting Powell v. Tessada & Assocs., 2005 WL 578103, at *2) (citing Rosseter v. Industrial Light & Magic, 2009 WL 210452, at *2; Lockhart v. MVM, Inc., 97 Cal. Rptr. 3d at 212; Taylor v. Lockheed Martin Corp., 92 Cal. Rptr. 2d at 872). "In other words," Judge Johnson explained, "any claims that Plaintiff asserts with regard to his termination arose by virtue of his employment on the federal enclave." Richards v. Lockheed Martin Corp., 2012 U.S. Dist. LEXIS 191331, *4.

Recently, the Honorable Steven C. Yarbrough, United States Magistrate Judge, faced facts similar to those in this case. In Smelser v. Sandia Corporation, No. CIV 17-388, 2018 WL 1627214 (D.N.M. March 30, 2018)(Yarbrough, M.J.)(slip copy), the plaintiff worked for Sandia Labs on the Kirtland Air Force Base. See 2018 WL 1627214, at *8.

> Although Plaintiff does not dispute that some of her state law claims are barred under the federal enclave doctrine to the extent they are premised on conduct that occurred on Kirtland Air Force Base, she asserts in her response brief and accompanying affidavit that the federal enclave doctrine should not bar any claims arising from conduct that occurred off base. Specifically, Plaintiff states in her affidavit that Sandia's human resources department was located off base during the relevant time period, that she met with the human resources department, including an equal opportunity representative, to report her need for reasonable accommodations and the instances of discrimination, harassment, and retaliation that she was subjected to, and that the human resources department took no action.

2018 WL 1627214, at *8 (citations omitted). Magistrate Judge Yarbrough notes that the plaintiff did not make these HR-related allegations in the complaint, but "even taking into account Plaintiff's assertions regarding the location and involvement of Sandia's human resources department, the Court nevertheless concludes that Plaintiff's claims remain subject to the federal enclave doctrine." 2018 WL 1627214, at *8. Magistrate Judge Yarbrough continued:

> [T]he critical inquiry is whether the conduct or employment decision at issue here "**reflects Defendants' employment practice on the enclave**" – in other words, whether the claims that Plaintiff asserts with regard to her employment "**arose by virtue of [her] employment on the federal enclave.**" *See Richards v. Lockheed Martin Corporation et al.*, No. 2:11-cv-01033-WJ-CG, March 1, 2012 Mem. Op. and Order at 3. Defendants correctly characterize this as a determination of "the locus in which the claim arose", i.e., "where the 'substance and consummation of the' claim occurred, and where 'all pertinent events occurred.'" Doc. 25 at 2 (*quoting Olig v. Xanterra Parks & Resorts, Inc.*, 2013 WL 3936904, at *3 (D. Mont. July 30, 2013) (unpublished) (internal citations omitted)). Here, Plaintiff does not dispute that she worked in a Sandia building on Kirtland Air Force Base and that all of the events giving rise to this lawsuit -- with the exception of the above assertions regarding Sandia's human resources department -- took place on Kirtland Air Force Base. **Specifically, the reasonable accommodations Plaintiff alleges were not provided, the alleged discrimination and retaliatory incidents, and the purported violations of Sandia's employee handbook all concerned her work activities on the base**. . . .
>
> Under these facts, the Court concludes that **Plaintiff's claims arose by virtue of her work on a federal enclave and that any decisions Sandia's human resources department may have undertaken reflected Defendants' employment practices on the enclave.**

Smelser v. Sandia Corp., 2018 WL 1627214, at *8 (emphasis added)(citing Richards v. Lockheed Martin Corp., 2012 U.S. Dist. LEXIS 191331, *4; Shurow v. Gino Morena Enterprises, LLC, 2017 WL 1550162, at *2; Haining v. Boeing Co., 2013 WL 4874975, at *3; Lockhart v. MVM, Inc., 175 Cal. App. 4th at 1459).

## B.    THE FEDERAL ENCLAVE DOCTRINE APPLIES TO FEDERAL ENCLAVE EMPLOYEES' STATE-LAW EMPLOYMENT DISCRIMINATION CLAIMS.

The federal enclave doctrine applies to state law employment discrimination claims that employees who work on a federal enclave bring, because the harm happens on the federal enclave. The Court, therefore, agrees with its fellow District of New Mexico judges in adopting the Ninth Circuit's approach to apply the federal enclave doctrine when the employee works on a federal enclave no matter where the employer made a discriminatory decision.

The Plaintiffs contend that the Court should apply the federal enclave doctrine only when

an employer makes a discriminatory decision while on the federal enclave.  <u>See</u> Post-Hearing Response at 2.  The Plaintiffs contend that looking to where the decision was made is the correct approach, because, according to the Plaintiffs, (i) the Court should apply the federal enclave doctrine to state employment discrimination claims when the state claim originates on the federal enclave; and (ii) New Mexico courts would consider a discrimination claim to originate where a discriminatory decision is made.  <u>See</u> Post-Hearing Response at 2.

The Court declines to adopt the Plaintiffs' suggested approach for two reasons.  First, the Constitution of the United States of America grants Congress the power "[t]o exercise exclusive legislation" in federal enclaves, so it would not make sense for state choice-of-law rules to determine the scope of that power.  U.S. Const. art. I, § 8.  Applying the federal enclave doctrine only when state law would conclude that a claim arose on the federal enclave would subordinate a power that the Constitution grants to Congress.  <u>See</u> U.S. Const. art. VI ("This Constitution, and the laws of the United States which shall be made in pursuance thereof . . . shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding.").  When Congress exercises exclusive jurisdiction over federal enclaves, it "'acts as a state government with total legislative, executive, and judicial power.'"  <u>Allison v. Boeing Laser Tech. Servs.</u>, 689 F.3d at 1236-37 (quoting <u>United States v. Jenkins</u>, 734 F.2d 1322, 1325-26 (9th Cir.1983)).  The federal enclave doctrine "operates as a choice of law doctrine that dictates which law applies to causes of action arising on federal enclaves."  <u>Allison v. Boeing Laser Tech. Servs.</u>, 689 F.3d at 1235.  Under the federal enclave doctrine, only state laws in effect when the federal enclave was established may be enforced; there are a few exceptions to this general rule, but they underscore only the principle that state laws only apply on federal enclaves when Congress expressly says they do.

See Allison v. Boeing Laser Tech. Servs., 689 F.3d at 1237 (noting that exceptions to the federal enclave doctrine's rule that only state laws in effect before the federal enclave's existence apply include "1) where Congress has, by statute, provided a different rule; 2) where the state explicitly retained the right to legislate over specific matters at the time of cession; and 3) where minor regulatory changes modify laws existing at the time of cession").

Second, even if New Mexico law determined the federal enclave doctrine's application in this case, there is no sound reason to believe that New Mexico would place an employment discrimination action where the discriminatory decision was made. The Plaintiffs contend that, although New Mexico courts have not determined where an employment discrimination claim originates, New Mexico courts look to Title VII for guidance when interpreting the NMHRA. See Post-Hearing Response at 2 (citing Garcia v. Hatch Valley Pub. Sch., 2016-NMCA-034, ¶ 11, 369 P.3d at 4). In Garcia v. Hatch Valley Pub. Sch., the Court of Appeals of New Mexico stated that, "where there is no New Mexico precedent which resolves issues regarding the NMHRA, we look to federal law interpreting Title VII for guidance." 2016-NMCA-034, ¶ 11, 369 P.3d at 4, rev'd on other grounds, 2018-NMSC-020, ¶ 11. According to the Plaintiffs, the Court should conclude that an NMHRA action arises where a discriminatory decision is made, because Title VII grants jurisdictions in venues in which a discriminatory decision is made. See Post-Hearing Response at 2 (citing Reid v. D.P. Curtis Trucking, Inc., 2012 WL 5409786, at *1; Tipnis v. Emery Tel., 2007 WL 1306495, at *1). Essentially, the Plaintiffs urge the Court to follow the Western District of Texas, which looks to Title VII's venue rules to determine that an employment discrimination claim arose where a decision was made:

> The Court first observes that there appears to be very little Texas precedent on the subject of determining the exact geographical location at which an employment discrimination claim may be said to arise; accordingly, the Court will turn to related areas of federal jurisprudence to analyze this issue. *See Rodriguez v.*

*Flitertek,* 518 F.Supp.2d 845, 849 (W.D.Tex.2007)(holding that federal employment-discrimination law may be used to shed light on [Texas Commission on Human Rights Act, V.T.C.A. Labor Code § 21 ("TCHRA")] when on-point state-law precedents are scarce). One context in which courts discuss the question of where an employment discrimination tort actually occurs is in connection with the venue provisions of the Title VII federal employment discrimination laws. *See* 42 U.S.C. § 2000e–5(f)(3) (providing that venue is proper "in any judicial district in the State in which the unlawful employment practice is alleged to have been committed," among other places). Ordinarily, Courts assume that the place where the allegedly unlawful employment practice was committed is simply the place where the aggrieved employee had been working or was seeking work. *See, e.g., March v. ABM Sec. Serv. Inc.,* No. H–09–CV–2422, 2010 WL 104480, at *1 (S.D.Tex. Jan.7, 2010); *see also Ferguson v. Exelon Nuclear,* No. 09–CV–1237, 2010 WL 107566, at *1 (C.D.Ill. Jan.7, 2010).

However, when the location of the aggrieved worker's supervisor is different than the location where the worker or prospective worker is situated, courts generally hold that the place where the "unlawful employment practice is alleged to have been committed" is the place where the employer "made the decision" which is the subject of the complaint, not the place where the "effects are felt ." *Whipstock v. Raytheon Co.,* No. 2:07–CV–11137, 2007 WL 2318745, at *3 (E.D.Mich. Aug. 10, 2007). Instead of looking to where the worker is located, when "determining where an alleged unlawful employment practice was committed, the Court must look to the place where the decisions and actions concerning the employment practices occurred." *Ifill v. Potter,* No. 05–CV–2320, 2006 WL 3349549, at *2 (D.D.C. Nov. 17, 2006) (internal citations and quotation marks omitted).

Lawler v. Miratek Corp., No. EP-09-CV-252-KC, 2010 WL 743925, at *3.

If the Court had to determine whether an NMHRA claim originated from the place of the work or the place of the decision, the Court would not look to Title VII venue for guidance, because there is plenty of state caselaw and Restatement principles to guide the Court. For example, New Mexico follows the traditional lex loci delicti commissi doctrine for tort claims, i.e., that "the substantive rights of the parties are governed by the law of the place where the wrong occurred." Terrazas v. Garland & Loman, Inc., 2006-NMCA-111, ¶ 12, 142 P.3d at 377. Thus, New Mexico courts continue to adhere to the Restatement (First) of Conflicts of Laws (1934), such that the state where the wrong occurred is "the state where the last event necessary to make an actor liable for an alleged tort takes place." Restatement (First) Conflicts of Law §

377 & cmt. a (1934).  See Flemma v. Halliburton Energy Servs., 2013-NMSC-022, 303 P.3d

814, 819 ("New Mexico follows the Restatement (First) of Conflict of Laws when analyzing

choice of law issues."); United Wholesale Liquor Co. v. Brown-Forman Distillers Corp., 1989-

NMSC-030, ¶ 9, 775 P.2d 233, 469 ("New Mexico adheres to a traditional conflicts of law

analysis contained in Restatement (First) of Conflicts of Law.").  Although no New Mexico court

has determined whether an employment discrimination claim arises where the allegedly

discriminatory employment decision is made, the Court sees no sound reason to treat the

NMHRA and the NMFPWA differently than any other tort under New Mexico law.  New

Mexico precedent and the Restatement (First) of Conflicts of Law indicate that, if the Plaintiffs

suffered harm in New Mexico, then New Mexico would apply its own laws.  Otherwise, New

Mexico would not apply its own law.  There is, therefore, no need to look to Title VII for

guidance in interpreting NMHRA on this issue.[20]

---

[20]Moreover, Title VII's venue provisions -- which determine the courts that can decide a
Title VII claim -- is not an appropriate benchmark to determine what laws to apply.  Title VII
states that plaintiffs may bring Title VII claims

> in any judicial district in which the unlawful employment practice is alleged to
> have been committed, in the judicial district in which the employment records
> relevant to such practice are maintained and administered, or in the judicial
> district in which the aggrieved person would have worked but for the alleged
> unlawful employment practice, but if the respondent is not found within any such
> district, such an action may be brought within the judicial district in which the
> respondent has his principal office.

42 U.S.C. § 2000e-5(f)(3).  For discriminatory compensation decisions, an unlawful employment
practice occurs

> when a discriminatory compensation decision or other practice is adopted, when
> an individual becomes subject to a discriminatory compensation decision or other
> practice, or when an individual is affected by application of a discriminatory
> compensation decision or other practice, including each time wages, benefits, or
> other compensation is paid, resulting in whole or in part from such a decision or
> other practice.

Here, the Plaintiffs were largely, if not entirely, working on Kirtland Air Force Base. It is not a big leap to say that the harm occurred on Kirtland Air Force Base and that the Court should focus on the harm's locus. New Mexico follows the Restatement (First) for the Conflicts of Laws, which directs courts to apply the law of the land where the harm occurred. See Terrazas v. Garland & Loman, Inc., 2006-NMCA-111, ¶ 12, 142 P.3d at 377. Although the Court does not conclude that the Restatement (First) for the Conflicts of Laws governs the federal enclave doctrine analysis, its principles provide useful guidance for determining whether the federal enclave doctrine applies to the Plaintiffs' employment discrimination claims. The Restatement (First) rules are clear and easy to apply. Focusing on the place of the harm is the most pragmatic metric so that the federal enclave doctrine applies to claims for employment discrimination that employees who work on federal enclaves bring. The silliness and burden of deciding where decisions were made, when all the harm occurs on the federal enclave, is not the best use of courts' or the parties' time. The place of decision is an arbitrary benchmark, and there is not much justice to be gained by ferreting out where a decisionmaker happened to be standing when making a certain decision.[21] The decision only matters insofar as it affects the worker's employment experience.[22]

---

42 U.S.C.A. § 2000e-5(e)(3)(A). Thus, Title VII venue may be premised on many different actions, including the place where a discriminatory decision is adopted, but also where "an individual is affected" by the decision, § 2000e-5(e)(3)(A), where the relevant employment records are located, or where a worker would have worked but for a discriminatory decision, see § 2000e-5(f)(3). Far from establishing that an employment discrimination claim arises from the place where the discriminatory decision was made, Title VII's § 2000e-5 provides a guide for determining which venue or venues may hear a particular Title VII claim. See Reid v. D.P. Curtis Trucking, Inc., 2012 WL 5409786, at *1 (stating that the Title VII's venue statute "favors factors convenient to the employer [and] trumps the more general venue statute found at 28 U.S.C. § 1404(a), which favors a plaintiff's choice of forum"). In other words, Title VII's venue provisions tell the Court little about what laws to apply to a given action.

[21]In this case, there is not any discernable justice to be gained in deciding whether a

## II. THE FEDERAL ENCLAVE DOCTRINE BARS THE PLAINTIFFS' STATE-LAW CLAIMS.

Under the federal enclave doctrine, the general rule is that "state law that is adopted after the creation of the enclave generally does not apply on the enclave." Allison v. Boeing Laser Tech. Servs., 689 F.3d at 1235. Here, the New Mexico Legislature adopted the NMHRA and the NMFPWA after the Kirtland Air Force Base became a federal enclave. Kirtland Air Force Base was established as a federal enclave in 1954. See Allison v. Boeing Laser Tech. Servs., 689 F.3d at 1235. The New Mexico Legislature enacted the NMHRA in 1969. See Benavidez, 212 F. Supp. 3d at 1097; Human Rights Comm'n of New Mexico v. Bd. of Regents of Univ. of New Mexico Coll. of Nursing, 1981-NMSC-026, ¶ 9, 624 P.2d 518, 519. The New Mexico Legislature enacted the NMFPWA in 2013. See 2013 N.M. Laws ch. 12 ("Enacting the Fair Pay for Women Act"). Given that the Kirtland Air Force Base became a federal enclave before New

---

decision is "made" in the off-enclave HR office where an allegedly discriminatory policy is written or at the on-enclave HR's vice-president's office where the policy is approved.

[22]On the other hand, if the tortious employment decisions were made on the federal enclave and injured a plaintiff who does not work and is not on the federal enclave, there is no sound reason to not give the employer the benefit and protection of the federal enclave doctrine. In other words, although the Court concludes that the better rule is a broader federal enclave doctrine rather than a more narrow one that may be difficult to apply, the Court's approach and the District Court of the Western District of Texas' rules do not have to be mutually exclusive.

Thus, the only place where the federal enclave doctrine should not protect an employer like Sandia Labs, which is operating largely on a federal enclave, is where the employer makes the decision off the federal enclave and the plaintiff was also off the federal enclave. For example, if Sandia Lab's off-enclave official discriminates against a job applicant residing in Tennessee, the federal enclave doctrine would not apply. In that scenario, it cannot be soundly said that the place of the harm is the workplace if the plaintiff has presumably never worked on the federal enclave and -- if interviewed remotely -- may never have stepped foot on it. Absent this rare situation, however, the federal enclave doctrine should apply to an employer with the bulk of its offices and employees on a federal enclave.

Mexico enacted the NMHRA and the NMFPWA, the federal enclave doctrine therefore bars those claims.[23]

### III. IF THE PLACE OF DECISION RULE APPLIED, THE COURT COULD NOT SOUNDLY GRANT SUMMARY JUDGMENT, BECAUSE SANDIA LABS HAS NOT ESTABLISHED THAT IT MADE THE CHALLENGED DECISIONS ON KIRTLAND AIR FORCE BASE.

Before considering where certain decisions were made, it is necessary to identify what specific decisions are at issue. Reviewing the Complaint, there appears to be two categories of decisions: (i) broad decisions in designing, approving, and implementing certain evaluation and compensation policies; and (ii) narrow decisions in evaluating, compensating, and promoting specific employees.

As to the broad policy decisions, the Plaintiffs allege that Sandia Lab's evaluation system disadvantages women. See Complaint ¶¶ 24-32, at 6-7. It follows, according to the Plaintiffs, that Sandia Labs violated the NMHRA by intentionally discriminating against women:

> Sandia has engaged in an intentional, company-wide, and systematic policy, pattern, and/or practice of discrimination against its female employees. Sandia has intentionally discriminated against Plaintiffs and the Class in violation of the New Mexico Human Rights Act by, among other things:
>
> a. Utilizing a biased performance rating system;
>
> b. Utilizing a biased compensation system;
>
> c. Utilizing a biased promotion system; and
>
> d. Failing to take reasonable and adequate steps to prevent and correct the use of unreliable, unvalidated, and/or illegitimate criteria to determine the terms and conditions of employment.

---

[23]As mentioned supra at 44, there are three exceptions to the general rule that the federal enclave doctrine bars state laws enacted after the federal enclave is established: "1) where Congress has, by statute, provided a different rule; 2) where the state explicitly retained the right to legislate over specific matters at the time of cession; and 3) where minor regulatory changes modify laws existing at the time of cession." Allison v. Boeing Laser Tech. Servs., 689 F.3d at 1237. None of those exceptions apply in this case, and indeed the Plaintiffs have not argued that they apply.

These company-wide policies are intended to and do have the effect of:

> a. Denying Plaintiffs and Class Members business opportunities because of their gender;
>
> b. Compensating them less because of their gender;
>
> c. Failing to promote them because of their gender;
>
> d. Evaluating their performance more negatively because of their gender; and
>
> e. Providing them with inferior terms and conditions of employment as a result of discriminatory performance measures that systematically disadvantaged them because of their gender.

Complaint ¶¶ 93-94, at 20-21. The Plaintiffs also argue that Sandia Labs' policies have had an "unlawful disparate impact on women" in violation of the NMHRA. Complaint ¶ 104, at 22. As for the NMFPWA, the Plaintiffs allege that "Sandia has discriminated against employees on the basis of sex by paying wages to female employees at a rate less than the rate paid to male employees for work of equal skill, effort, and responsibility." Complaint ¶ 108, at 22.

According to the Plaintiffs, Sandia Labs conducts an annual performance evaluation process in which employees are "organized into peer groups to be rated against one another in so-called 'Centers,' which are collections of several managers' employees. Supervisors attend these meetings and present the merits of their own employees as compared to the other supervisors' employees." Complaint ¶ 28, at 6-7. The "supervisors to rank employees from worst to best using a performance rating from 1 through 5, with 1 being worst, and 5 being best" and "[o]nly a certain percentage of employees in a defined peer group may be assigned certain ranks -- for example, only a certain percentage of employees may receive a 5." Complaint ¶ 25, at 6. The Plaintiffs identify a few flaws to this system. One, because the rankings are curved, the process "forces a distribution of performance ratings outcomes . . regardless of whether there are meaningful performance differences between individual employees with in a particular peer group." Complaint ¶ 26, at 6. Second,

because these evaluation process are done in group "Centers," which are "collections of several managers' employees," an employee "could end up with a poor rating . . . regardless of her actual performance record and the rank her supervisor originally recommended."  Complaint ¶ 28, at 7.  Third, the managers evaluate employees in part "based on four 'personality' or 'behavior' factors: Strategic Thinking, Adapting to Meet Demands, Teaming with Others, and Modelling Personal Accountability," which, according to the Plaintiffs, are "invalid and unreliable" factors.  Complaint ¶ 27, at 6.

According to the Plaintiffs, this system disadvantages women, because it "create[s] inaccurate and biased outcomes, especially when they operate within a culture of bias towards women, as is true in Sandia."[24]  Complaint ¶ 31, at 7.  For instance, the Plaintiffs contend that "female employees are particularly adversely impacted by 'Center' meetings, where the vast majority of attending managers are men [and the] proportion of men in management roles only increases at higher levels of the organization."  Complaint ¶ 30, at 7.

As for individualized decisions, the named Plaintiffs allege many specific discriminatory decisions.  Kennicott, for instance, alleges that she sought another Sandia Lab position but learned that a less qualified male employee was already hired for the job before the position was advertised.  See Complaint ¶ 54, at 11-12.  Kennicott also alleges that, after she made a gender discrimination complaint to superiors, male managers retaliated against her by not hiring her to

---

[24]The Plaintiffs assert that the "personality" or "behavior" factors -- Strategic Thinking, Adapting to Meet Demands, Teaming with Others, and Modeling Personal Accountability -- are "invalid and unreliable and disadvantage women."  Complaint ¶ 27, at 6.  Although the Plaintiffs do not explain precisely why evaluation employees on those factors in particular disadvantage women, the Court can imagine a theory that these factors, at the very least, provide biased managers -- whom the Plaintiffs allege are mostly men -- the means or avenues to apply those biases to female employees' disadvantage.  For example, Kennicott specifically alleges that her manager "engaged in . . . gender-based critiques of her communication and teamwork skills, noting that she had a reputation for being 'difficult'"  and advised her to be "'softer' in her speech," Complaint ¶ 58, at 12-13 -- critiques that, conceivably, may not levied in the same way against male employees.

another position, "expressing concerns about unspecific negative 'behaviors,'" and not reducing her workload while she underwent cancer treatment, rating her as a 3 after years of receiving 4 ratings.  Complaint ¶ 55-59, at 12.  See also id. ¶¶ 113-116, at 23.  Kennicott also alleges that mangers made "gender-based critiques of her communication and teamwork skills."  Complaint ¶ 58, at 12-13.

Garcia alleges that her reviews "have not fully recognized her contributions" and that she is paid less than men with "significantly less seniority and experience."  Complaint ¶ 66-67, at 15.  She contends that "[c]omments within her reviews have revealed a culture of sexism at Sandia."  Complaint ¶ 68, at 15.  She asserts that "[g]ender-based stereotypes about at Sandia" such that she is not offered projects involving travel, and employees presume that she does not know how to operate power tools.  Complaint ¶ 69, at 15-17.

Phelps alleges that "less qualified and less experienced male colleagues rose through the ranks must faster than she did.  They were offered greater leadership opportunities, and in approximately 2009, one of the peers Ms. Phelps mentored was promoted over her.  In the years that followed, male colleagues and supervisors excluded Ms. Phelps from meetings, and supervisors specifically asked her to perform, in their words, 'low visibility' work."  Complaint ¶ 73, at 16-17.  Phelps also contends that she has been paid less than similarly situated colleagues.  See Complaint ¶ 74, at 17.

**A.    THE ADVERSE EMPLOYMENT DECISION IS WHERE SANDIA LABS MAKES DETERMINATIONS ON COMPENSATION AND PROMOTIONS.**

Camargo states that, for the federal enclave jurisdiction to apply in an employment discrimination case, "the adverse employment decision must have been made on federal territory, because the locus of decision-making is where such a tort arises."  Camargo, 2010 WL 3516186, at *2 (citing Lawler v. Miratek, Corp., 2010 WL 743925, at *3-4).  When it comes to decisions

to fire or not hire, the decisionmaking's locus is a fairly straightforward inquiry. When the allegedly discriminatory decision relates to a policy, however, the locus is harder to pin down.

The Court does not believe that the locus of decision in this case for the Plaintiffs' state-law claims would be where Sandia Labs' employees created the performance evaluation policy.[25] Writing a performance evaluation policy harms no one if it is not approved and implemented. Likewise, the Court does not believe that the locus of decision in this case is necessarily where a policy is approved. Sandia Labs asserts that the place of decision is where the Vice President of HR & Communications officially approved the performance evaluation policy. See Supp. Response at 6; Tr. at 8:25-9:9 (Gordon). The Vice President can stamp "APPROVED" over a printed-out copy of a proposed performance evaluation process all he or she likes; the officially approved process is still several steps away from affecting anyone. Although the Vice President may be the ultimate authority for how Sandia Labs will evaluate its employees, that Vice President may, for example, change his or her mind before moving forward with the plan. In that case, there is no harm to anyone.

The next question is whether the adverse employment decision is the one that a manager makes when rating an employee pursuant to Sandia Labs' performance evaluation policy, or whether the adverse employment decision is when compensation and promotions decisions are made pursuant to those ratings. The Court concludes that a discriminatory employee performance rating system harms an employee only when the employer uses the rating's results to determine compensation and promotion. The NMHRA states that is unlawful to "refuse to hire, to discharge, to promote or demote or to discriminate in matters of compensation, terms,

---

[25]The record suggests that Sandia Labs' Compensation Group was involved in creating the employee performance evaluation process. See supra n.14.

conditions or privileges of employment against any person otherwise qualified because of . . . [a person's] sex." N.M. Stat. Ann. § 28-1-7(a). Those rules implicate discriminatory personnel decisions and not necessarily discriminatory evaluations. Just as officially approving a policy does not, at that moment, affect employees, rating employees based on that policy does not affect those employees until the employer uses the results to make decisions on raises, promotions, demotions, or terminations. The question would then become where Sandia Labs made decisions affecting the Plaintiffs' pay and career paths.

**B.   THE RECORD DOES NOT SHOW WHERE SANDIA LABS MADE DETERMINATIONS ON EMPLOYEE COMPENSATION AND PROMOTIONS.**

Surprisingly, the record does not reveal where decisions on employees' pay and promotions are made. The Plaintiffs have framed the place of decision dispute over where decisions are made regarding policies. Thus the record shows that the Compensation Group -- which has operated on Kirtland Air Force Base for all relevant time periods, see Supp. Response at 2; HR Chart at 1-20 -- administers Sandia Labs' performance evaluation process and analyzes the results for gender-based outcome disparities, see Bars Depo. at 53:11-3; id. at 53:4-9. The record shows that the Vice President of H&R Communications -- who has worked on the Kirtland Air Force Base for all relevant time periods, with the possible exception of May, 2017, see Supp. Response at 5; HR Chart at 1-21 -- has final approval of Sandia Labs' policies on compensation, promotions, antidiscrimination, and performance evaluations, see Supp. Response at 6; Baros Dep. at 104:23-105:1 (Baros); id. 105:2-10 (Levin-Gesundheit, Baros); id. at 105:25-106:2-3. The record shows that Talent Acquisition -- which has operated off of Kirtland Air Force Base for all relevant time periods, see Supp. Submission at 3-4; HR Chart at 10 -- works with the compensation department and hiring managers to set salaries for new hires, see Baros Depo. at 216:8-12 (Baros). The record shows that Talent Management -- which has

operated on and off Kirtland Air Force Base at various times, see HR Chart at 1-12 -- trains

Sandia Labs' employees on antidiscrimination policies, see Supp. Submission at 7; Baros Depo.

at 207:5-21, 208:7-11 (Levin-Gesundheit, Baros).  The record does not show, however, where

Sandia Labs looks at individual employees' performance evaluation rankings and managers'

comments and makes compensation or promotion decisions based on those results.

Consequently, even if the Court applied Camargo's place of decision rule in this case, the Court

would not be able to determine whether the Plaintiffs' state claims challenge allegedly

discriminatory decisions made on or off the federal enclave.[26]  Because Sandia Labs has the

burden to show, on a motion for summary judgment, that it is entitled to judgment as a matter of

law, the Court would deny the motion if it applied the Camargo rule.

The Plaintiffs' specific complaints do not clearly indicate where the alleged actions took

place.  Many of their allegations relate to managers' decisions to assign review scores and/or

make evaluation comments, see Complaint ¶ 52, at 11 (alleging that Kennicott has not received

top review score of 5 despite contributing equally or surpassing male peers); id. ¶ 58, at 12

(alleging that, "after she raised concerns of gender discrimination," Kennicott received an

---

[26]The Plaintiffs argue that, because they challenge Sandia Labs' policies, the decision place at issue is where those policies were created and/or managed.  See, e.g., Response at 2 ("[T]he challenged common policies and practices at the heart of this class action appear to have been created and/or monitored off federal land."); Post-Hearing Response at 4 (arguing that the Plaintiffs do not challenge managers' decisions but rather the "systematic discrimination against women as a class by way of four company-wide policies"); id. at 4-5 ("Plaintiffs have even shown how the named Plaintiffs' individual allegations stem from specific, challenged companywide policies.").  Company policies may violate employment discrimination laws, and employers may be liable for creating those policies, but, when a court looks to Camargo to determine whether the federal enclave doctrine applies, the critical question is where the adverse employment decision happened.  2010 WL 3516186, at *2 (considering where an employer made the decision to terminate an employee).  There is no sound reason to consider the place where an employer drafts or approves a policy as the critical adverse employment decision, given that additional decisions are necessary -- e.g., decisions to terminate or to not promote an employee -- before anyone is harmed.

evaluation score of 3); id. ¶ 68, at 15 (alleging that Garcia never received a 5 score on her employee evaluations); id. ¶ 68, at 15 (contending that "[c]omments within [Garcia's] reviews have revealed a culture of sexism at Sandia"), yet the record does not establish where managers typically make those decisions, nor do the Complaint's allegations indicate where managers made those specific decisions.

Many allegations relate to where Sandia Labs makes decisions on hiring, promoting, and salary, see Complaint ¶ 54, at 11-12 (alleging that Kennicott sought another Sandia Lab position, but learned that a less qualified male employee was already hired for the job before the position was advertised); id. ¶ 56, at 12 (alleging that a "male manager informed [Kennicott] that he did not want to select her" for a "technical leadership opportunity" because of her pending equal employment opportunity complaint); id. ¶ 67, at 15 (alleging that Garcia is paid less than men with "significantly less seniority and experience"); id. ¶ 69, at 15 (alleging that Garcia is not offered project opportunities that involve traveling); id. ¶ 73, at 16-17 (alleging that "less qualified and less experienced male colleagues rose through the ranks must faster than [Phelps] did," and that "supervisors specifically asked her to perform, in their words, 'low visibility' work"); id. ¶ 73, at 17 (contending that Phelps was never promoted to "Distinguished Level"); id. ¶ 74, at 17 (contending that Phelps has been paid less than similarly situated colleagues), yet the record does not establish where Sandia Labs typically make those decisions, see supra at 51, nor do the Complaint's allegations indicate where they made the specific decisions relating to the Plaintiffs.

The Plaintiffs' remaining allegations relate to various acts or statements, see Complaint ¶ 59, at 12 (alleging that Kennicott's manager forced her to work excessive hours while she underwent cancer treatment); id. ¶ 58, at 12-13 (alleging that mangers made "gender-based

critiques of [Kennicott's] communication and teamwork skills"); id. ¶ 68, at 15 (contending that Garcia has been told that she can "never compete" with "younger men's education" or with "older men's experience"); id. ¶ 69, at 15-17 (alleging that other employees presume that Garcia does not know how to operate power tools with which she has years of experience), yet the Complaint does not specify where these acts or statements were made.[27]

In sum, the Court cannot determine where Sandia Labs made the allegedly adverse employment decisions against the Plaintiffs, because the pleadings and the record do not clearly indicate where Sandia Labs made decisions on compensation and promotions. Accordingly, Sandia Labs has not met its burden of showing that it is entitled to judgment on the state law claims, if the Camargo rule applies. Thus, while the Court will grant Sandia Labs' Motion, the Court concludes that, if the Camargo rule applied, it would not grant summary judgment on the Plaintiffs' state-law claims. The Court suspects, however, that if and when it has a more robust record, most, if not all, of the state law claims would fall within the federal enclave even with the Camargo rule.

**IT IS ORDERED** that (i) the Defendant's Motion to Dismiss State Law Claims, filed March 17, 2017 (Doc. 14), is granted; and (ii) the state law claims that Plaintiffs Lisa A. Kennicott, Lisa A. Garcia, and Sue C. Phelps assert in the Class Action Complaint, filed February 7, 2017 (Doc. 1), are dismissed with prejudice.

---

[27]A good guess for a lot of these events is, of course, that they happened on Kirtland Air Force Base, where the named Plaintiffs work or worked, but the Court cannot say that -- if Camargo rules applied -- Sandia Labs has made that showing.

UNITED STATES DISTRICT JUDGE

Counsel:

Anne Brackett Shaver
Michael Ian Levin-Gesundheit
Shira J. Tevah
Kelly Maureen Dermody
Lin Yee Chan
Tiseme Gabriella Zegeye
Lieff Cabraser Heimann & Bernstein, LLP
San Francisco, California

--and--

Adam T. Klein
Cheryl-Lyn Bentley
Elizabeth Stork
Outten & Golden LLP
New York, New York

    *Attorneys for the Plaintiffs*

Grace E. Speights
Krissy A. Katzenstein
Michael S. Burkhardt
Morgan, Lewis & Bockius LLP
Washington, D.C.

--and--

Scott D. Gordon
Jeffrey L. Lowry
Paola Viviana Jaime
Stephanie Latimer
Theresa W. Parrish
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

    *Attorneys for the Defendant*