# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

LISA A. KENNICOTT, LISA A. GARCIA,
SUE C. PHELPS, and JUDI DOOLITTLE, on
behalf of themselves and a class of those
similarly situated,

      Plaintiffs,

vs.                                     No. CIV 17-0188 JB\GJF

SANDIA CORPORATION d/b/a SANDIA
NATIONAL LABORATORIES,

      Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) the Plaintiffs' Letter from Anne B. Shaver, Lieff, Cabraser, Heimann & Bernstein, LLP, to the Court (dated November 12, 2018), filed November 12, 2018 (Doc. 187)("Letter"); and (ii) the Letter from Krissy A. Katzenstein, Morgan Lewis, to the Court (dated November 15, 2018), filed November 15, 2018 (Doc. 188)("Letter Response"). The primary issues are: (i) whether the Court should, at this time, decide Defendant's Motion to Dismiss Plaintiffs' Class Claims, filed August 9, 2018 (Doc. 155)("MTD"); (ii) whether the Court should grant the proposed case schedule in the Plaintiffs' Letter, which modifies pretrial deadlines to which the parties stipulated in the Joint Proposed Case Schedule at 4, filed October 11, 2018 (Doc. 183), by requiring Defendant Sandia Corporation ("Sandia Labs") to complete electronically stored information ("ESI") production by January 4, 2019, and the Plaintiffs to submit their motion for class certification and expert reports by April 5, 2019, to accommodate a July 1, 2019, class certification hearing deadline; and (iii) whether the Court should grant the proposed case schedule in Sandia Labs' Letter Response, which modifies pretrial deadlines for the same reason and requires Sandia Labs to complete ESI production by February 1, 2019, and the

Plaintiffs to submit their motion for class certification and expert reports by March 25, 2019. The Court will not, at this time, decide the MTD, because the Court will address the MTD after the class certification hearing. The Court will amend the Joint Proposed Case Schedule as described below and require Sandia Labs to complete ESI production on January 15, 2019, and the Plaintiffs to submit their motion for class certification and expert reports by March 25, 2019.

## **FACTUAL BACKGROUND**

Plaintiffs Lisa A. Kennicott, Lisa A. Garcia, Sue C. Phelps, and Judi Doolittle allege that Sandia Labs, "a federally-funded research and development contractor operating under contract for the Department of Energy and managed by Sandia Corporation," First Amended Class Action Complaint ¶ 1, at 1, filed July 5, 2018 (Doc. 146)("First Amended Complaint"), has "policies, patterns, and practices," which result in female employees earning lower compensation and fewer promotions than "their male counterparts," First Amended Complaint, ¶ 3, at 2. According to the Plaintiffs, Sandia Labs applies uniform policies in its offices throughout the United States of America. See First Amended Complaint ¶¶ 22-23, at 5-6. The Plaintiffs allege that Sandia Labs' employee performance evaluation process, see First Amended Complaint ¶¶ 26-30, at 6-7, initial salary calculations, see First Amended Complaint ¶¶ 31-35, at 7-8, and promotion system, see First Amended Complaint ¶¶ 36-40, at 8-9, disadvantage women, see First Amended Complaint ¶¶ 26-40, at 6-9.

# PROCEDURAL BACKGROUND

Kennicott, Garcia, and Phelps sue Sandia Labs on behalf of themselves and a class of those similarly situated.  <u>See</u> Class Action Complaint, filed February 7, 2017 (Doc. 1)("Complaint").[1] Doolittle joined Kennicott, Garcia, and Phelps as a named plaintiff when the Plaintiffs amended their Complaint.  <u>See</u> First Amended Complaint at 1.  In the First Amended Complaint, the Plaintiffs assert: (i) that Sandia Labs engages in intentional discrimination, violating Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-15 ("Title VII"); and (ii) that Sandia Labs engages in disparate impact discrimination in violation of Title VII.  <u>See</u> Amended Complaint ¶¶ 85-99, at 21-23.  Kennicott asserts individual Title VII claims against Sandia Labs for retaliation and constructive discharge.  <u>See</u> Amended Complaint ¶¶ 100-08, at 23-24.  Sandia Labs filed its MTD on August 9, 2018, arguing that the Plaintiffs are on a fishing expedition, because the First Amended Complaint is inconsistent with the Complaint; that the Plaintiffs cannot satisfy rule 23(a) of the Federal Rules of Civil Procedure's commonality requirement, or rule 23(b)(2)'s or (b)(3)'s requirements for class action certification; and that the Plaintiffs have not identified specific actions resulting in a disparate impact.  <u>See</u> MTD at 1-3.  Simultaneously, Sandia Labs requests that, to conserve resources, the Court stay discovery until the Court decides the MTD.  <u>See</u> Motion to Stay Discovery Pending Ruling on Defendant's MTD Class Claims at 4, filed August 9, 2018 (Doc. 156).  The Plaintiffs respond, averring that the First Amended Complaint satisfies the pleading requirements and that Sandia Labs' MTD mainly addresses class certification, which the parties will address when the Plaintiffs move to certify a class.  <u>See</u> Plaintiffs' Response in

---

[1]The Court dismissed the Plaintiffs' state-law claims -- the Complaint's Counts III, IV, V, and VII of the Complaint -- under the federal enclave doctrine.  <u>See</u> Order at 1, filed March 31, 2018 (Doc. 106).  For the Court's reasoning for the dismissal, see generally Memorandum Opinion, 314 F. Supp. 3d 1142 (D.N.M. 2018)(Browning, J.), filed May 14, 2018 (Doc. 113).

Opposition to Defendant's MTD Plaintiffs' Class Claims at 1, filed August 23, 2018 (Doc. 157). In response to Sandia Labs' request to stay discovery, the Plaintiffs accuse Sandia Labs of attempting to delay discovery and argue that, because Sandia Labs will lose the MTD, discovery will continue regardless the MTD. See Plaintiffs' Response in Opposition to Defendant's Motion to Stay Discovery at 1, filed August 23, 2018 (Doc. 158).

On October 11, 2018, the Plaintiffs filed a Joint Proposed Case Schedule. See Joint Proposed Case Schedule at 4. As part of the Joint Proposed Case Schedule, the parties stipulated to a discovery stay to end on December 14, 2018. See Joint Proposed Case Schedule at 2. The Joint Proposed Case Schedule provides for the following deadlines:

| Event | Proposed Deadline |
| --- | --- |
| Stipulated discovery stay ends | December 14, 2018 |
| Sandia completes production of ESI, including final privilege log | March 1, 2019 |
| Pre-class certification discovery deadline | April 12, 2019 |
| Plaintiffs submit motion for class certification and expert reports | May 9, 2019 |
| Sandia submits opposition to class certification and expert reports | July 25, 2019 |
| Plaintiffs submit reply motion and expert reports | September 13, 2019 |

Joint Proposed Case Schedule at 2.

The Court held a hearing on the MTD on October 17, 2018. See Draft Transcript of Hearing at 1 (taken October 17, 2018)("Tr.").[2] At the hearing, the Court said it thought the MTD was an attempt to preempt and shortcut the Plaintiffs' upcoming motion for class certification without allowing the Plaintiffs to conduct discovery, and the Court said it would "sit" on the MTD

---

[2]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

for a while, planning to decide the MTD at or after the class certification hearing.[3]  Tr. at 4:5-4:12

(Court).  Rutstein v. Avis Rent-A-Car Sys., Inc., 211 F.3d 1228, 1234 (11th Cir. 2000)("Going

beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts,

and applicable substantive law in order to make a meaningful determination of the certification

issues.").  "In determining the propriety of a class action, the question is not whether the plaintiff

or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the

requirements of Rule 23 are met."  Anderson v. City of Albuquerque, 690 F.2d 796, 799 (10th Cir.

1982)(citing Fed. R. Civ. P. 23).  See Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350-52

(2011)("Wal-Mart"); Vallario v. Vandehey, 554 F.3d 1259, 1267 (10th Cir. 2009).  In response to

the Court's declination to decide the MTD immediately or promptly, the Court and the parties

agreed that the parties and the Court would schedule a class certification hearing for July 1, 2019,

and that the parties would modify the Joint Proposed Case Schedule to account for the July 1,

2019, class certification hearing.  See Tr. at 37:25-38:12 (Court, Shaver, Katzenstein).

1.    **The Letter.**

The Plaintiffs filed the Letter to notify the Court that the parties could not agree to a

modified case schedule.  See Letter at 1.  The Plaintiffs state that they will struggle to meet the

_____

[3]As Sandia Labs filed its MTD on August 9, 2018, the MTD appears on the six-month list for September, 2019.  The six-month list is "a semiannual report showing, by U.S. district judge and magistrate judge, all motions pending more than six months . . . . The reporting requirements . . . are designed to help reduce both costs and delays in civil litigation in the district courts."  Civil   Justice   Reform   Act   Report,   United   States   Courts, http://www.uscourts.gov/statistics-reports/analysis-reports/civil-justice-reform-act-report   (last visited November 19, 2018).  The Court set the hearing on July 1, 2019, because the parties did not indicate that they plan to submit documents after the class certification hearing.  See Tr. at 36:13-37:24.  The Court wants to have time to decide the motion for class certification and the MTD by the end of September, 2019.

July 1, 2019, class certification hearing deadline and explain that Sandia Labs has refused to withdraw its MTD or speed its ESI production to allow the Plaintiffs to meet the July 1, 2019, class certification hearing deadline. See Letter at 2. According to the Plaintiffs, the parties each proposed a modified case schedule, and the Plaintiffs summarize the proposed schedules:

| Event | Sandia's Proposed Deadline | Plaintiffs' Proposed Deadline |
|---|---|---|
| Stipulated discovery stay ends | November 30, 2018 | November 26, 2018 |
| Sandia completes production of ESI, including final privilege log | February 1, 2019 | January 4, 2019 |
| Pre-class certification discovery deadline | March 24, 2019 | April 4, 2019 |
| Plaintiffs submit motion for class certification and expert reports | March 25, 2019 | April 5, 2019 |
| Sandia submits opposition to class certification and expert reports | May 16, 2019 | May 16, 2019 |
| Plaintiffs submit reply motion and expert reports | June 18, 2019 | June 18, 2019 |
| Class certification hearing | July 1, 2019 | July 1, 2019 |

Letter at 5.

The Plaintiffs ask for "a minimum of three months after ESI is produced" to file the class certification motion and expert reports, but, according to the Plaintiffs, Sandia Labs wants to limit the Plaintiffs to seven weeks for the task. See Letter at 3. The Plaintiffs justify their request, explaining that Sandia Labs has refused to provide relevant compensation documents, promotion policy documents, and email information; that the Plaintiffs intend to compel Sandia Labs to produce these documents; and that the Plaintiffs anticipate needing to compel additional information, because Sandia Labs has been slow to provide discovery documents. See Letter at 3. The Plaintiffs also expect that the parties will "need to litigate a number of privilege-related

disputes," because Sandia Labs produced an incomplete privilege log and has refused to produce "an augmented privilege log." Letter at 4. The Plaintiffs further explain that the parties agreed to defer litigating the privilege log issues until after Sandia Labs completes ESI production and that the Plaintiffs anticipate other litigation following the ESI production's completion. See Letter at 4. According to the Plaintiffs, they will "have to review potentially millions of pages of documents, identify witnesses for fact depositions, and schedule and take those depositions" before filing their class certification motion and expert reports, and that the parties anticipate logistical difficulties scheduling witness meetings, because they must accommodate the witnesses' and the parties' schedules. Letter at 4. The Plaintiffs complain that Sandia Labs' schedule allows the Plaintiffs only seven weeks to complete the tasks listed above, and it grants Sandia Labs two months for ESI production, and six weeks for drafting responses to the class certification motion and expert reports. See Letter at 4. Accordingly, the Plaintiffs request either that the Court dismiss Sandia Labs' MTD or that the Court grant the Plaintiffs' proposed case schedule. See Letter at 5.

> **2.**     **The Letter Response.**

Sandia Labs responded to the Plaintiffs' Letter on November 15, 2018. See Letter Response at 1. In the Letter Response, Sandia Labs explains that, following the October 17, 2018, hearing, Sandia Labs proposed a case schedule that maintained the discovery stay, reduced Sandia Labs' time to complete ESI production, and reduced proportionately the parties' time to complete the class certification responses and replies. See Letter Response at 1. According to Sandia Labs, the Plaintiffs, in response, suggested that Sandia Labs complete ESI production by December 14, 2018, the date that the parties' stipulated discovery stay ends. Sandia Labs depicts this proposal as an attempt to "back out of the stipulated discovery stay." Letter Response at 1. Sandia Labs

explains that it then proposed two months for its ESI production and two months for pre-class certification discovery.  See Letter Response at 2.

Sandia Labs complains that the Plaintiffs' proposed case schedule requires Sandia Labs to complete ESI production, involving "millions of pages of documents," in six weeks "during the holiday season."  Letter Response at 2.  Sandia Labs also worries that the Plaintiffs' proposed case schedule shortens Sandia Labs' time for responding to the Plaintiffs' class certification motion and expert reports from seventy-five to forty-one days, but gives the Plaintiffs thirty-two days for replying to the response; this change shortens Sandia Labs' response time by forty-five percent and the Plaintiffs' reply time by thirty-six percent.  See Letter Response at 2.  Sandia Labs avers that the Plaintiffs' request for additional time for discovery and preparation before their class certification motion reflects that the Plaintiffs "have no idea what this case is about or who the relevant witnesses are."  Letter Response at 2.

Sandia Labs also responds to the Plaintiffs' complaints about its discovery production.  See Letter Response at 3.  Addressing the Letter's allegations, Sandia Labs indicates that: (i) the parties have disputed the 2018 policy document production since May, 2018, and the Plaintiffs could move to compel the information;  (ii) the Plaintiffs identified their concerns about deficiencies regarding other policy, compensation, and correspondence production shortly before the stipulated discovery stay, and Sandia Labs is prepared to address these issues; (iii) the Plaintiffs addressed their concerns about the privilege log shortly before the parties agreed to the stipulated discovery stay, although Sandia Labs produced the privilege log more than nine months before the Plaintiffs mentioned their concerns;  (iv)  the Plaintiffs could have challenged Sandia Labs' attorney-client privilege assertions earlier.  See Letter Response at 3.  Accordingly, Sandia Labs

asks the Court to grant its MTD or adopt Sandia Labs' proposed case schedule.  See Letter Response at 4.

3.    **The Letter Reply.**

The Plaintiffs replied on November 15, 2018, to Sandia Labs' Letter Response.  See Letter from Anne B. Shaver, Lieff, Cabraser, Heimann & Bernstein, LLP, to the Court at 1-2 (dated November 15, 2018), filed November 15, 2018 (Doc. 189)("Letter Reply").  First, the Plaintiffs dispute Sandia Labs' allegations that the Plaintiffs have delayed in bringing motions to compel. See Letter Reply at 1.  The Plaintiffs explain that the parties agreed, and informed the Court, that the parties would resolve the motions to compel "once the ESI custodians are resolved or ESI production is complete."  Letter Reply at 1.  Second, the Plaintiffs aver that the parties have recognized since the case's beginning that the Plaintiffs require ESI production, and that commonsense dictates that ESI production will help the Plaintiffs identify witnesses to depose. See Letter Reply at 2.  Third, the Plaintiffs explain that they identified discovery deficiencies well before agreeing to the stipulated discovery stay in October, 2018.  See Letter Reply at 2.  Finally, the Plaintiffs note that Sandia Labs has offered no reason why it cannot complete ESI production by January 4, 2019, the Plaintiffs' proposed ESI production deadline.  See Letter Reply at 2.  The Plaintiffs summarize:

> [A]ssuming Sandia has a good faith reason for not completing ESI production by January 4, the appropriate remedy is not simply to move that date in a way that prejudices Plaintiffs by unfairly squeezing their review time but to adjust the remainder of the schedule so that neither side is prejudiced.

Letter Reply at 2.

## LAW REGARDING RULE 12(b)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994). The Complaint's sufficiency is a question of law, and, when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the nonmoving party, and draw all reasonable inferences in the plaintiff's favor. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a MTD."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." (citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006))).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 550 U.S. at 555.

To survive an MTD, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted). The United States Court of Appeals for the Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(citations omitted)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570). See Gallegos v. Bernalillo Cty. Bd. of Cty. Comm'rs, 278 F. Supp. 3d 1245, 1259 (D.N.M. 2017)(Browning, J.).

"When a party presents matters outside of the pleadings for consideration, as a general rule 'the court must either exclude the material or treat the motion as one for summary judgment.'" Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d 1081, 1103 (10th Cir. 2017)(quoting Alexander v. Oklahoma, 382 F.3d 1206, 1214 (10th Cir. 2004)). There are three limited exceptions to this general principle: (i) documents that the complaint incorporates by reference, see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322; (ii) "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do

not dispute the documents' authenticity," Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002); and (iii) "matters of which a court may take judicial notice," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322.  See Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d at 1103 (holding that the district court did not err by reviewing a seminar recording and a TV episode on a rule 12(b)(6) motion, which were "attached to or referenced in the amended complaint," central to the plaintiff's claim, and "undisputed as to their accuracy and authenticity"). "[T]he court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record."  Van Woudenberg v. Gibson, 211 F.3d 560, 568 (10th Cir. 2000), abrogated on other grounds by McGregor v. Gibson, 248 F.3d 946, 955 (10th Cir. 2001).

In Gee v. Pacheco, 627 F.3d 1178 (10th Cir. 2010), the defendants "supported their motion with numerous documents, and the district court cited portions of those motions in granting the [MTD]."  627 F.3d at 1186.  The Tenth Circuit held that "[s]uch reliance was improper" and that, even if "the district court did not err initially in reviewing the materials, the court improperly relied on them to refute Mr. Gee's factual assertions and effectively convert the motion to one for summary judgment."  627 F.3d at 1186-87.  In other cases, the Tenth Circuit has emphasized that, "[b]ecause the district court considered facts outside of the complaint . . . it is clear that the district court dismissed the claim under Rule 56(c) and not Rule 12(b)(6)."  Nard v. City of Okla. City, 153 F. App'x 529, 534 n.4 (10th Cir. 2005)(unpublished).[4]  In Douglas v. Norton, 167 F. App'x

---

[4]Nard v. City of Okla. City is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . [a]nd we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value

698 (10th Cir. 2006)(unpublished), the Tenth Circuit addressed an untimely filed charge with the Equal Employment Opportunity Commission -- which the Tenth Circuit analogized to a statute of limitations -- and concluded that, because the requirement was not jurisdictional, the district court should have analyzed the question under rule 12(b)(6), and "because the district court considered evidentiary materials outside of Douglas' complaint, it should have treated Norton's motion as a motion for summary judgment." 167 F. App'x at 704-05.

The Court has previously ruled that, when a plaintiff references and summarizes defendants' statements in a complaint, the Court cannot rely on documents containing those statements that the defendants attach in their briefing. See Mocek v. City of Albuquerque, No. CIV 11-1009 JB/KBM, 2013 WL 312881, at *50-51 (D.N.M. Jan. 14, 2013)(Browning, J.). The Court reasoned that the statements were neither incorporated by reference nor central to the plaintiff's allegations in the complaint, because the plaintiff cited the statements only to attack the defendant's reliability and truthfulness. See 2013 WL 312881, at *50-51. The Court has also previously ruled that, when determining whether to toll a statute of limitations in an action alleging fraud and seeking subrogation from a defendant, the Court may not use interviews and letters attached to an MTD, which show that a plaintiff was aware of the defendant's alleged fraud before the statutory period expired. See Great Am. Co. v. Crabtree, No. CIV 11-1129 JB/KBM, 2012 WL 3656500, at *3, *22-23 (D.N.M. Aug. 23, 2012)(Browning, J.)("Crabtree"). The Court in

with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that Nard v. City of Oklahoma City and Douglas v. Norton, 167 F. App'x 698 (10th Cir. 2006), Rhoads v. Miller, [352 F. App'x 289 (10th Cir. 2009), and Hamilton v. Water Whole International Corp., 302 F. App'x 789, 798 (10th Cir. 2008), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

Crabtree determined that the documents did not fall within any of the Tenth Circuit's exceptions to the general rule that a complaint must rest on the sufficiency of its contents alone, as the complaint did not incorporate the documents by reference or refer to the documents. See 2012 WL 3656500, at *22-23; Mocek v. City of Albuquerque, 2013 WL 312881, at *50 (refusing to consider statements that were not "central to [the plaintiff's] claims").

On the other hand, in a securities class action, the Court has ruled that a defendant's operating certification, to which plaintiffs refer in their complaint, and which was central to whether the plaintiffs adequately alleged a loss, falls within an exception to the general rule, so the Court may consider the operating certification when ruling on the defendant's MTD without converting the motion into one for summary judgment. See Genesee Cty. Emps.' Ret. Sys. v. Thornburg Mortg. Secs. Tr. 2006-3, 825 F. Supp. 2d 1082, 1150-51 (D.N.M. 2011)(Browning, J.). See also Sec. & Exch. Comm'n v. Goldstone, 952 F. Supp. 2d 1060, 1217-18 (D.N.M. 2013)(Browning, J.)(considering, on a MTD, electronic mail transmissions referenced in the complaint as "documents referred to in the complaint," which are "central to the plaintiff's claim" and whose authenticity the plaintiff did not challenge); Mata v. Anderson, 760 F. Supp. 2d 1068, 1101 (D.N.M. 2009)(Browning, J.)(relying on documents outside of the complaint because they were "documents that a court can appropriately view as either part of the public record, or as documents upon which the Complaint relies, and the authenticity of which is not in dispute").

## LAW REGARDING MODIFICATION OF SCHEDULING ORDERS

Rule 16 of the Federal Rules of Civil Procedure provides that courts will, with some exceptions, issue scheduling orders in each case:

**(b) Scheduling.**

**(1) *Scheduling Order.*** Except in categories of actions exempted by local rule, the district judge -- or a magistrate judge when authorized by local rule -- must issue a scheduling order:

**(A)** after receiving the parties' report under Rule 26(f);[5] or

**(B)** after consulting with the parties' attorneys and any unrepresented parties at a scheduling conference.

**(2) *Time to Issue.*** The judge must issue the scheduling order as soon as practicable, but unless the judge finds good cause for delay, the judge must issue it within the earlier of 90 days after any defendant has been served with the complaint or 60 days after any defendant has appeared.

**(3) *Contents of the Order.***

**(A)** *Required Contents.* The scheduling order must limit the time to join other parties, amend the pleadings, complete discovery, and file motions.

**(B)** *Permitted Contents.* The scheduling order may:

**(i)** modify the timing of disclosures under Rules 26(a)[6] and 26(e)(1);[7]

**(ii)** modify the extent of discovery;

**(iii)** provide for disclosure, discovery, or preservation of electronically stored information;

**(iv)** include any agreements the parties reach for asserting claims of privilege or of protection as trial-preparation

---

[5]Rule 26(f) requires parties to provide the court with a discovery plan. <u>See</u> Fed. R. Civ. P. 26(f).

[6]Rule 26(a) enumerates disclosures required under the Federal Rules of Civil Procedure. <u>See</u> Fed. R. Civ. P. 26(a).

[7]Rule 26(e)(1) requires parties to supplement or correct information provided in their required disclosures. <u>See</u> Fed. R. Civ. P. 26(e)(1).

> material after information is produced, including agreements reached under Federal Rule of Evidence 502;[8]
>
> **(v)** direct that before moving for an order relating to discovery, the movant must request a conference with the court;
>
> **(vi)** set dates for pretrial conferences and for trial; and
>
> **(vii)** include other appropriate matters.

Fed. R. Civ. P. 16(b).

"The District Court has wide discretion in its regulation of pretrial matters." Si-Flo, Inc. v. SFHC, Inc., 917 F.2d 1507, 1514 (10th Cir. 1990). Scheduling orders, however, "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). Accord Street v. Curry Bd. of Cty. Comm'rs, No. CIV 06-0776 JB/KBM, 2008 WL 2397671, at *6 (D.N.M. Jan. 30, 2008)(Browning, J.). The advisory committee notes to rule 16 observe:

> [T]he court may modify the schedule on a showing of good cause if it cannot reasonably be met despite the diligence of the party seeking the extension. Since the scheduling order is entered early in the litigation, this standard seems more appropriate than a "manifest injustice" or "substantial hardship" test. Otherwise, a fear that extensions will not be granted may encourage counsel to request the longest possible periods for completing pleading, joinder, and discovery.

Fed. R. Civ. P. 16(b)(4) advisory committee's note to 1983 amendment.

The Tenth Circuit has held that the concepts of good cause, excusable neglect, and diligence are related. "The Tenth Circuit . . . has recognized the interrelation between 'excusable neglect' and 'good cause.'" Pulsecard, Inc. v. Discover Card Servs. Inc., 168 F.R.D. 295, 301 (D. Kan. 1996)(Rushfelt, J.)(citing Broitman v. Kirkland (In re Kirkland), 86 F.3d 172, 175 (10th

---

[8]Rule 502 of the Federal Rules of Evidence allows parties to reach agreements about the effects of accidentally disclosing attorney-client-privileged or work-product information. See Fed. R. Evid. 502.

Cir. 1996)("In re Kirkland")).  "Properly construed, 'good cause' means that scheduling deadlines cannot be met despite a party's diligent efforts."  Street v. Curry Bd. of Cty. Comm'rs, 2008 WL 2397671, at *6 (quoting Fed. R. Civ. P. 16(b)).  See Advanced Optics Elecs., Inc. v. Robins, 769 F. Supp. 2d 1285, 1313 (D.N.M. 2010)(Browning, J.)(noting that the "rule 16(b) good-cause inquiry focuses on the diligence of the party seeking [to] amend the scheduling order.").  In re Kirkland, the Tenth Circuit dealt with the definition of "good cause" in the context of a predecessor to modern rule 4(m) of the Federal Rules of Civil Procedure,[9] and noted:

> [W]ithout attempting a rigid or all-encompassing definition of "good cause," it would appear to require at least as much as would be required to show excusable neglect, as to which simple inadvertence or mistake of counsel or ignorance of the rules usually does not suffice, and some showing of "good faith on the part of the party seeking the enlargement and some reasonable basis for noncompliance within the time specified" is normally required.

86 F.3d at 175 (emphasis in original)(internal quotation marks omitted)(quoting Putnam v. Morris, 833 F.2d 903, 905 (10th Cir. 1987)).  The Tenth Circuit explained that Putnam v. Morris "thus recognized that the two standards, although interrelated, are not identical and that 'good cause' requires a greater showing than 'excusable neglect.'"  In re Kirkland, 86 F.3d at 175.

---

[9]Rule 4(m) provides:

> If a defendant is not served within 120 days after the complaint is filed, the court -- on motion or on its own after notice to the plaintiff -- must dismiss the action without prejudice against that defendant or order that service be made within a specified time.  But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.  This subdivision (m) does not apply to service in a foreign country under Rule 4(f) or 4(j)(1).

Fed. R. Civ. P. 4(m).  The Tenth Circuit in In re Kirkland interpreted rule 4(j), which was substantially identical.  See 86 F.3d at 174 ("Rule 4(j) requires the court to dismiss a proceeding if service has not been made upon the defendant within 120 days after filing and the party responsible for service cannot show good cause why it was not made.").

Where a party is diligent in its discovery efforts and nevertheless cannot comply with the scheduling order, the Court has found good cause to modify the scheduling order if the requesting party timely brings forward its request. In <u>Advanced Optics Electronics, Inc. v. Robins</u>, the Court concluded that, where the defendant did not conduct discovery or make any good-faith discovery requests, and where the defendant did not make efforts "diligent or otherwise" to conduct discovery, the defendant did not, therefore, show good cause to modify the scheduling order. 769 F. Supp. 2d at 1313 n.8. In <u>Street v. Curry Board of County Commissioners</u>, No. CIV 06-0776 JB/KBM, 2008 WL 2397671 (D.N.M. Jan. 30, 2008)(Browning, J.), however, the Court concluded that the plaintiff had "shown good cause for a delay in seeking leave to amend," because she "was diligent in pursuing discovery . . . [and] brought to the Court's attention her identification of an additional claim in a timely manner," where she discovered the claim through "documents provided in discovery." 2008 WL 2397671, at *11. In <u>Montoya v. Sheldon</u>, No. CIV 10-0360 JB/WDS, 2012 WL 5353493 (D.N.M. Oct. 7, 2012)(Browning, J.), the Court did not find good cause to modify the scheduling order and reopen discovery, and refused to grant the plaintiffs' request to do so, where the plaintiffs' excuse for not disclosing their expert before the close of discovery was that they thought that the case would settle and they would thus not require expert testimony. <u>See</u> 2012 WL 5353493, at *14. The Court noted:

> The [plaintiffs] filed this case on April 15, 2010. Because [Plaintiff] D. Montoya had seen the physician before that date, the fact that the [plaintiffs] are only now bringing the physician forward as a newly identified expert witness, over two years later, and over one and a half years after the deadline to disclose expert witnesses, does not evidence circumstances in which the Court can find excusable neglect nor good cause.

2012 WL 5353493, at *14.

In Scull v. Management & Training Corp., No. CIV 11-0207 JB/RHS, 2012 WL 1596962 (D.N.M. May 2, 2012)(Browning, J.), the Court denied a plaintiff's request for an extension of time to name an expert witness against a defendant. 2012 WL 1596962, at *9. The plaintiff asserted that he had waited to name an expert witness until a second defendant joined the case, but a scheduling order was in effect before the second defendant entered the case. 2012 WL 1596962, at *4, *8-9. The Court concluded that the plaintiff should have known that he would need to name an expert witness against the defendant already in the case. See 2012 WL 1596962, at *8. The Court determined that the plaintiff was seeking "relief from his own disregard" for the deadline. 2012 WL 1596962, at *8. "Despite his knowledge that [defendant] PNA had yet to enter the case, [plaintiff] Scull chose to allow the deadline to pass without naming expert witnesses against [defendant] MTC." 2012 WL 1596962, at *8. Regarding the defendant who entered the case at a later date, however, the Court allowed the plaintiff an extension of time to name an expert witness, because it "was not unreasonable for Scull to expect a new deadline to name expert witnesses upon PNA's entrance into the case because he had not yet had the opportunity to engage in discovery against PNA as he had against MTC." 2012 WL 1596962, at *9. The Court also noted that not naming an expert witness "is a high price to pay for missing a deadline that was arguably unrealistic when it was set," as Scull could not have determined the need for an expert witness until after PNA entered the case. 2012 WL 1596962, at *9.

In Stark-Romero v. National Railroad Passenger Co. (AMTRAK), 275 F.R.D. 544 (D.N.M. 2011)(Browning, J.), the Court concluded that a lawyer had shown excusable neglect when he missed a scheduling deadline because, soon after his son's wedding, his father-in-law developed a tumor in his chest, and the lawyer arranged his father-in-law's medical care, and only after the lawyer returned to his work did he realize that a deadline passed. See 275 F.R.D. 549-50. The

Court noted that the lawyer could have avoided missing the deadline had he not left his work until the last minute, just before his son's wedding, but concluded that the lawyer had demonstrated good faith and missed the deadline because of "life crises," and not because of his inadvertence. 275 F.R.D. 549-50. In West v. New Mexico Taxation and Revenue Department, No. CIV 09-0631 JB/CEG, 2010 WL 3834341 (D.N.M. July 29, 2010)(Browning, J.), the Court allowed a plaintiff extended time to file a response to a defendant's motion for summary judgment, in part because of the difficulty that the plaintiff's counsel experienced attempting to obtain depositions with certain defense witnesses, and thus it was not her fault, and in part because cross-motions on summary judgment are particularly helpful for the Court:

> [C]ross-motions tend to narrow the factual issues that would proceed to trial and promote reasonable settlements. In some cases, it allows the Court to determine that there are no genuine issues for trial and thereby avoid the expenses associated with trial. The Court prefers to reach the merits of motions for summary judgment when possible.

2010 WL 3834341, at *4-5. On the other hand, in Liles v. Washington Tru Solutions, LLC, No. CIV 06-854 JB/CEG, 2007 WL 2298440 (D.N.M. June 13, 2007)(Browning, J.), the Court denied a plaintiff's request for additional time to respond to a defendant's motion for summary judgment, when the only rationale that the plaintiff provided was that its counsel's "family and medical emergencies" precluded the plaintiff from timely responding. 2007 WL 2298440, at *2. See Gallegos v. Wood, No. CIV 13-1055 JB/KBM, 2017 WL 3701866, at *38 (D.N.M. Aug. 25, 2017)(Browning, J.)(determining that the plaintiffs established "good cause" when the plaintiffs relied on the United States' initial assurances that it would not object to an extension for designating expert witnesses); Trujillo v. Rio Arriba Cty., No. CIV 15-0901 JB/WPL, 2016 WL 4035340, at *10 (D.N.M. June 15, 2016)(Browning, J.)(concluding that "good cause" existed for extending discovery when a plaintiff missed a discovery deadline, because the plaintiff relied on

the defendants' assertions while working with the defendants' schedule to organize depositions); Upky v. Lindsey, No. CIV 13-0553 JB/GBW, 2015 WL 3543058, at *6-7 (D.N.M. May 14, 2015)(Browning, J.)(granting a scheduling modification to obtain a firm trial date, and stating that the Court would not modify a pretrial schedule because a witness' deposition could only be done by videotape); Peshlakai v. Ruiz, No. CIV 13-0752 JB/ACT, 2013 WL 6503604, at *14-15 (D.N.M. Nov. 20, 2013)(Browning, J.)(allowing a scheduling modification where the plaintiffs shaped "their initial expert strategy around apparent misinformation" and later discovered that they required an expert, and rejecting the argument that postponing trial and requiring the defendants' to revise their summary judgment briefing would incurably prejudice the defendants); United States v. Hopkins, No. CIV 11-0416 JB/CG, 2012 WL 6846400, at *6 (D.N.M. Dec. 22, 2012)(Browning, J.)(concluding that, where a plaintiff proceeded "pro se, from federal prison," and sought information from the United States, which possessed the information sought, the plaintiff showed good cause).

## LAW REGARDING GOOD CAUSE AND EXCUSABLE NEGLECT

The Tenth Circuit has "recognized the interrelation between 'excusable neglect' and 'good cause.'" Pulsecard, Inc. v. Discover Card Servs. Inc., 168 F.R.D. at 301 (citing In re Kirkland, 86 F.3d at 175). In general, the phrases "good cause" and "excusable neglect" are assumed to have the same meaning in various statutory contexts. Courts generally presume that a drafter of a statute intends identical language in statutes with similar purposes to have the same meaning. See Merrill Lynch, Pierce, Fenner & Smith v. Dabit, 547 U.S. 71, 85-86 (2006)(Stevens, J.). Moreover, "[t]he rules of statutory construction apply to the Federal Rules." In re Kubler, No. MC 11-0048 JB, 2012 WL 394680, at *11 (D.N.M. Jan. 25, 2012)(Browning, J.). Accord Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 168 (1993)(applying the expressio

unius est exclusio alterius canon[10] to interpret rule 9(b) of the Federal Rules of Civil Procedure);

Hillis v. Heineman, 626 F.3d 1014, 1017-18 (9th Cir. 2010)("This same principle of statutory

construction applies to interpreting the Federal Rules of Civil Procedure.").   The Court, for

example, has relied upon the meaning of "good cause" under rule 16 of the Federal Rules of Civil

Procedure -- which concerns amendments of scheduling orders -- when interpreting "good cause"

under rule 32 of the Federal Rules of Criminal Procedure -- which concerns criminal sentencing

and judgment.  United States v. Jones, No. CR 14-0769 JB, 2016 U.S. Dist. LEXIS 9938, at *8-11

(D.N.M. Jan. 15, 2016)(Browning, J.).

    In the civil rule 16 context, the Court has stated that the good-cause inquiry focuses on the

diligence of the party seeking to amend a scheduling deadline.  See Walker v. THI of N.M. at

Hobbs Ctr., 262 F.R.D. 599, 602-03 (D.N.M. 2009)(Browning, J.); Guidance Endodontics, LLC

v. Dentsply Int'l, Inc., No. CIV 08-1101 JB/RLP, 2009 WL 3672505, at *2-3 (D.N.M. Sept. 29,

2009)(Browning, J.); Trujillo v. Bd. of Educ. of the Albuquerque Pub. Schs., Nos. CIV 02-1146

JB/LFG, CIV 03-1185 JB/LFG, 2007 WL 2296955, at *3 (D.N.M. June 5, 2007)(Browning, J.).

The Court has concluded that, "[p]roperly construed, 'good cause' means that scheduling deadlines

cannot be met despite a party's diligent efforts."  Advanced Optics Elecs., Inc. v. Robins, 769

F. Supp. 2d at 1313.  Accord Gerald v. Locksley, No. CIV 10-0721 JB/LFG, 2011 WL 3510845,

at *13-14 (D.N.M. Aug. 1, 2011)(Browning, J.).  Thus, "the moving party [must] show that it has

been diligent in attempting to meet the deadlines, which means it must provide an adequate

explanation for any delay."  Minter v. Prime Equip. Co., 451 F.3d 1196, 1205 n.4 (10th Cir. 2006).

---

[10]Expressio unius est exclusio alterius is "the canon that expressing one item of a commonly associated group or series excludes another left unmentioned."  United States v. Vonn, 535 U.S. 55, 65 (2002).

Where a party is diligent in its discovery efforts and nevertheless cannot comply with the scheduling order, the Court has found good cause to modify the scheduling order if the requesting party timely brings forward its request. For example, in <u>Advanced Optics Electronics, Inc. v. Robins</u>, the Court found that, where the defendant did not conduct discovery or make any good-faith discovery requests, and where the defendant did not make efforts "diligent or otherwise" to conduct discovery, the defendant did not show good cause to modify the scheduling order. 769 F. Supp. 2d at 1313 n.8. By contrast, in <u>Street v. Curry Board of County Commissioners</u>, the Court found that the plaintiff had "shown good cause for a delay in seeking leave to amend," because she "was diligent in pursuing discovery . . . [and] brought to the Court's attention her identification of an additional claim in a timely manner," where she discovered the claim through "documents provided in discovery." 2008 WL 2397671, at *11. The Court arrived at a similar determination in <u>Abraham v. WPX Production Productions, LLC</u>, No. CIV 06-0776 JB/KBM, 2016 WL 548251 (D.N.M. Jan. 25, 2016)(Browning, J.). There, the Court found good cause to amend a pleading when the plaintiffs had a very short amount of time to amend the pleadings, "even though discovery had only just begun." 2016 WL 548251, at *20. "The Plaintiffs may not have obtained or reviewed all of the documents that might reveal their conspiracy claim's existence before the deadline to amend passed." 2016 WL 548251, at *20. Furthermore, the delay was minimal and would not prejudice the defendants. <u>See</u> 2016 WL 548251, at *20.

Overall, good cause requires diligence and a conscientious attempt to comply with the Court's scheduling order. When parties have not done so, the Court has not found good cause. In <u>Montoya v. Sheldon</u>, the Court did not find good cause to modify the scheduling order and reopen discovery where the plaintiffs' excuse for not disclosing their expert before the close of discovery

was that they thought the case would settle and they would thus not require expert testimony.  See 2012 WL 5353493, at *14.  The Court noted:

> The [plaintiffs] filed this case on April 15, 2010.  Because [Plaintiff] D. Montoya had seen the physician before that date, the fact that the [plaintiffs] are only now bringing the physician forward as a newly identified expert witness, over two years later, and over one and a half years after the deadline to disclose expert witnesses, does not evidence circumstances in which the Court can find excusable neglect nor good cause.

2012 WL 5353493, at *14.

The Tenth Circuit has previously considered the meaning of "excusable neglect" in the context of relief from a final judgment, order, or proceeding under rule 60(b) of the Federal Rules of Civil Procedure.  United States v. Timers Pres., 999 F.2d 452, 454 (10th Cir. 1993).  "[T]hree requirements . . . must be met when setting aside a default judgment under Rule 60(b): (1) the moving party's culpable conduct did not cause the default; (2) the moving party has a meritorious defense; and (3) the non-moving party will not be prejudiced by setting aside the judgment." United States v. Timers Pres., 999 F.2d at 454 (citing Meadows v. Dominican Republic, 817 F.2d 517, 521 (9th Cir. 1987); INVST Fin. Grp., Inc. v. Chem-Nuclear Sys., Inc., 815 F.2d 391, 398 (6th Cir. 1987); 6 James W. Moore, et al., Moore's Federal Practice ¶ 55.10[1] (2d ed. 1992)).  In determining whether a party's neglect is excusable, the question

> "is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission."  Relevant factors include "the danger of prejudice to the [opposing party], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith."

Jennings v. Rivers, 394 F.3d 850, 856-57 (10th Cir. 2005)(quoting Pioneer Inv. Servs. Co. v. Brunswich Assocs. Ltd. P'ship, 507 U.S. 380, 395 (1993)("Pioneer")).  In this context, as in others, the Tenth Circuit has stated that the reason for delay is an important, if not the most important,

factor in this analysis.  See Hamilton v. Water Whole Int'l Corp., 302 F. App'x 789, 798 (10th Cir. 2008)(unpublished)(citing United States v. Torres, 372 F.3d 1159, 1163 (10th Cir. 2004)(analyzing the excusable neglect standard in the context of rule 4(b)(4) of the Federal Rules of Appellate Procedure, where the party filed an untimely notice of appeal)).

The relevant factors that the Tenth Circuit used in Jennings v. Rivers with regard to 60(b)(1) have been used to determine whether excusable neglect exists in a number of other contexts.  See Pioneer, 507 U.S. at 395 (discussing application of the excusable neglect standard to Federal Rules Bankruptcy Procedure 9006(b)(1)); In re Kirkland, 86 F.3d at 175 (concluding that in Pioneer "the Supreme Court [ of the United States] relied upon use of the term 'excusable neglect' in a broad sense in Rules 6(b), 13(f), 60(b)(1), and 60(b)(6)," but that the Pioneer factors did not apply to the "good cause" standard under rule 4(j)); City of Chanute v. Williams Nat. Gas Co., 31 F.3d 1041, 1046 (10th Cir. 1994)("Thus, we apply the Pioneer test for 'excusable neglect' under Fed. R. App. P. 4(a)(5)."); United States v. Torres, 372 F.3d at 1162 ("We now likewise conclude that the Supreme Court's construction of 'excusable neglect' in Pioneer also applies to the term 'excusable neglect' as it is used in Federal Rule of Appellate Procedure 4(b)(4)."). Deliberate tactics do not create excusable neglect; "'[e]xcusable litigation mistakes are not those which were the result of a deliberate and counseled decision by the complaining party . . . . ;' rather, they are the 'kinds of mistakes that a party could not have protected against.'" Thompson v. THI of N.M. at Casa Arena, No. CIV 05-1331 JB/LCS, 2008 WL 5999653, at *18 (D.N.M. Dec. 24, 2008)(Browning, J.)(quoting Yapp v. Excel Corp., 186 F.3d 1222, 1231 (10th Cir. 1999)).

The Court has applied the Pioneer factors to find that a party demonstrated excusable neglect when its attorney failed to respond to a motion for summary judgment, because its attorney mistakenly thought that the Court's vacating a scheduling order meant there was no deadline for

filing responsive pleadings.  See Estate of Anderson v. Denny's, Inc., No. CIV 12-0605 JB/GBW, 2013 WL 690809, at *13-14 (D.N.M. Feb. 7, 2013)(Browning, J.).  The Court noted that the attorney's failure to file a responsive pleading was not unintentional, as the attorneys' misunderstanding of local court rules caused him to think that he did not need to respond.  See 2013 WL 690809, at *14.  The Court also noted that the attorney was honest with his reason for not filing, as he did not make up an excuse of catastrophic circumstances precluding him from responding.  See 2013 WL 690809, at *14.  The Court recognized that granting the party leave to file a late response was "generous," and that the attorney's failure to respond was "barely excusable."  2013 WL 690809, at *14.  The Court also explained that it is bound by Tenth Circuit precedent requiring the Court to determine motions for summary judgment on their merits, rather than granting such motions for procedural defaults.  See 2013 WL 690809, at *14 (citing Reed v. Bennett, 312 F.3d 1190, 1196 (10th Cir. 2002)).  The Court also found that the prejudice to the party requesting summary judgment was little, as the only costs the party would incur are those it would also have incurred had the attorney timely responded.  See Estate of Anderson v. Denny's, Inc., 2013 WL 690809, at *14-15.

By contrast, the Court has denied a plaintiff's request for an extension of time to name an expert witness against a defendant, when the plaintiff asserted that he had waited to name an expert witness until a second defendant joined the case, because, before the second defendant entered the case, a scheduling order was in effect, and the plaintiff should have known that he would need to name an expert witness against the defendant already in the case.  See Scull v. Mgmt. & Training Corp., 2012 WL 1596962, at *8.  The Court stated that the plaintiff was seeking "relief from his own disregard" for the deadline.  2012 WL 1596962, at *8.  "Despite his knowledge that [Defendant] PNA had yet to enter the case, [Plaintiff] Scull chose to allow the deadline to pass

without naming expert witnesses against [Defendant] MTC." 2012 WL 1596962, at *8. Regarding the defendant who entered the case at a later date, however, the Court allowed the plaintiff an extension of time to name an expert witness, as it "was not unreasonable for Scull to expect a new deadline to name expert witnesses upon PNA's entrance into the case because he had not yet had the opportunity to engage in discovery against PNA as he had against MTC." 2012 WL 1596962, at *9. The Court also noted that not naming an expert witness "is a high price to pay for missing a deadline that was arguably unrealistic when it was set," as Scull could not have determined the need for an expert witness until after PNA entered the case. 2012 WL 1596962, at *9.

In <u>Stark-Romero v. National Railroad Passenger Co. (AMTRAK)</u>, the Court found that a lawyer had shown excusable neglect when his reason for missing a scheduling deadline was that soon after his son's wedding, his father-in-law developed a tumor in his chest, the lawyer arranged his father-in-law's medical care, and only after the lawyer returned to his work did he realize that a deadline passed. <u>See</u> 275 F.R.D. at 549-50. The Court noted that the lawyer could have avoided missing the deadline had he not left his work until the last minute, just before his son's wedding, but found that the lawyer had demonstrated good faith and missed the deadline because of "life crises," and not his own inadvertence. 275 F.R.D. at 549-50. On the other hand, in <u>Liles v. Washington Tru Solutions, LLC</u>, the Court denied a plaintiff's request for additional time to respond to a defendant's motion for summary judgment, when the plaintiff's only rationale was that its counsel's "family and medical emergencies" -- without further explanation -- precluded the plaintiff from timely responding. 2007 WL 2298440, at *2.

## LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'" Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)). See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)("Celotex").

> Before the court can rule on a party's motion for summary judgment, the moving party must satisfy its burden of production in one of two ways: by putting evidence into the record that affirmatively disproves an element of the nonmoving party's case, or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323-25. On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment." Cardoso v. Calbone, 490 F.3d 1194, 1197 (10th Cir. 2007).

Plustwik v. Voss of Nor. ASA, No. CIV 11-0757, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.). "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial." Celotex, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[11] Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial. See Celotex, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)("Liberty Lobby"). In American Mechanical Solutions, LLC v. Northland Process Piping,

---

[11]Although the Honorable William J. Brennan, Jr., Associate Justice of the Supreme Court of the United States, dissented in Celotex, this sentence is widely understood to be an accurate statement of the law. See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

Inc., 184 F. Supp. 3d 1030 (D.N.M. 2016)(Browning, J.), the Court granted summary judgment for the defendant when the plaintiff did not offer expert evidence supporting causation or proximate causation in its breach-of-contract or breach-of-the-implied-warranty-of-merchantability claims. 184 F. Supp. 3d at 1075. The Court reasoned that the plaintiff could prove neither the breach-of-contract claim's causation requirement nor the breach-of-the-implied-warranty-of-merchantability claims' proximate-causation requirement with mere common knowledge, and the plaintiff provided no expert testimony bolstering its arguments. See 184 F. Supp. 3d at 1075, 1079. Without the requisite evidence, the plaintiff, the Court determined, failed to prove "an essential element of the nonmoving party's case," rendering "all other facts immaterial." 184 F. Supp. 3d at 1075 (quoting Plustwik v. Voss of Nor. ASA, 2013 WL 1945082, at *1).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)(quoting Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d at 1241)). Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). It is not enough for the party opposing a properly

supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." Liberty Lobby, 477 U.S. at 256. See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried."  (internal quotation marks omitted)(quoting Coleman v. Darden, 595 F.2d, 533, 536 (10th Cir. 1979)).

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. v. Omer, No. CIV 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Fed. R. Civ. P. 56(e); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Liberty Lobby, 477 U.S. at 248).  Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party.  See Liberty Lobby, 477 U.S. at 251 (citing Vitkus v. Beatrice Co., 11 F.3d at 1539; Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)).  "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to

return a verdict for that party. If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." Liberty Lobby, 477 U.S. at 249 (citations omitted)(citing First Nat. Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 290 (1968); Dombrowski v. Eastland, 387 U.S. 82, 87 (1967)). Where a rational trier of fact, considering the record as a whole, cannot find for the nonmoving party, there is no genuine issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain principles. First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial. See Liberty Lobby, 477 U.S. at 249. Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." Liberty Lobby, 477 U.S. at 254. Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor, and construe all evidence in the light most favorable to the nonmoving party. See Liberty Lobby, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."); Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999). Fourth, the court cannot decide any issues of credibility. See Liberty Lobby, 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts. This doctrine developed most robustly in the qualified immunity arena. In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court concluded that summary judgment is appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts. 550 U.S. at 378-81. The Supreme Court explained:

At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus[.] Co. v. Zenith Radio Corp., 475 U.S. [at] 586-587 . . . (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. [at] 247-248 . . . . When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life. Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

550 U.S. at 380-81 (emphasis in original).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304 (10th Cir. 2009), and explained:

[B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts." York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting Scott[ v. Harris], 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

584 F.3d at 1312 (brackets omitted). "The Tenth Circuit, in Rhoads v. Miller, 352 F. App'x 289 [, 291] (10th Cir. 2009) . . . [(unpublished),] explained that the blatant contradictions of the record must be supported by more than other witnesses' testimony[.]" Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.), aff'd, 499 F. App'x 771 (10th Cir. 2012).

# LAW REGARDING CLASS CERTIFICATION UNDER RULE 23

Rule 23 sets forth the requirements for certifying a class action under the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 23. All classes must satisfy: (i) all the requirements of rule 23(a); and (ii) one of the three sets of requirements under rule 23(b), where the three sets of requirements correspond to the three categories of classes that a court may certify. See Fed. R. Civ. P. 23(a)-(b). The plaintiff[12] bears the burden of showing that the requirements are met, see Rex v. Owens ex rel. Okla., 585 F.2d 432, 435 (10th Cir. 1978); Pueblo of Zuni v. United States, 243 F.R.D. 436, 444 (D.N.M. 2007)(Johnson, J.), but, in doubtful cases, class certification is favored, see Esplin v. Hirschi, 402 F.2d 94, 101 (10th Cir. 1968)("[T]he interests of justice require that in a doubtful case, . . . any error, if there is to be one, should be committed in favor of allowing the class action."); Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 563 (2d Cir. 1968)("[W]e hold that . . . rule [23] should be given a liberal rather than a restrictive interpretation, and that [denying certification] is justified only by a clear showing to that [end]. . . ."). In ruling on a class certification motion, the Court need not accept either party's representations, but must independently find the relevant facts by a preponderance of the evidence.[13] See Rutstein v. Avis

---

[12]Technically, it is the party seeking certification, i.e., the movant, who bears the burden of proof, and defendants may also move for class certification. See William B. Rubenstein, Newberg on Class Actions § 7:20 (5th ed.). As a practical matter, however, motions for class certification are made almost exclusively by plaintiffs.

[13]As the Court has previously noted, Tenth Circuit precedent suggests that the Court must show some level of deference to the Complaint's factual allegations when ruling on a rule 23 motion: "The Court must accept a plaintiff's substantive allegations as true," but it "need not blindly rely on conclusory allegations which parrot Rule 23," and "may consider the legal and factual issues presented by plaintiff's complaints." In re Thornburg Mortg., Inc. Sec. Litig., 912 F. Supp. 2d 1178, 1120 (D.N.M. 2012)(Browning, J.)(citing Shook v. El Paso Cty., 386 F.3d 963, 968 (10th Cir. 2004); J.B. v. Valdez, 186 F.3d 1280, 1290 n.7 (10th Cir. 1999); Eisen v. Carlisle & Jacquelin, 417 U.S. at 178). Since the Court's statement in In re Thornburg Mortgage, Inc. Securities Litigation, however, the Tenth Circuit issued an opinion stating that district courts

Rent-A-Car Sys., Inc., 211 F.3d at 1234 ("Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues."). "In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." Anderson v. City of Albuquerque, 690 F.2d at 799. See Vallario v. Vandehey, 554 F.3d at 1267 ("We, of course, adhere to the principle that class certification does not depend on the merits of a suit."). Still, the Court must conduct a rigorous analysis of the rule 23 requirements, even if the facts that the Court finds in its analysis bear on the merits of the suit:

> Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule -- that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc. We recognized in [General Telephone Co. of the Southwest v.] Falcon that "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," and that certification is proper only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied. Actual, not presumed, conformance with Rule 23(a) remains indispensable." Frequently the "rigorous analysis" will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped. The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action. Nor is there anything unusual about that

---

should apply a "strict burden of proof" to class certification issues. Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc., 725 F.3d 1213, 1218 (10th Cir. 2013). This request is consistent with the general trend in the federal judiciary toward using an ordinary preponderance standard to find facts at the class certification stage. See, e.g., Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc., 546 F.3d 196, 202 (2d Cir. 2008); In re Hydrogen Peroxide Litig., 552 F.3d 305, 318-20 (3d Cir. 2008); William B. Rubenstein, Newberg on Class Actions § 7.21 (5th ed. 2017)("Newberg")(tracing the shift in the case law from deferring to plaintiffs' representations to adopting an ordinary preponderance standard, and disclaiming the Court's statement from In re Thornburg Mortgage, Inc. Securities Litigation -- a statement that earlier versions of the treatise espoused). Thus, although the Tenth Circuit has not yet explicitly adopted the preponderance standard for fact-finding in class certification analyses, it most likely will, and the Court will employ that standard here.

consequence: The necessity of touching aspects of the merits in order to resolve preliminary matters, e.g., jurisdiction and venue, is a familiar feature of litigation.

Wal-Mart, 564 U.S. at 350-52.  In a subsequent, seemingly contradictory admonition, however, the Supreme Court cautioned district courts not to decide the case's merits at the class certification stage:

> Although we have cautioned that a court's class-certification analysis must be "rigorous" and may "entail some overlap with the merits of the plaintiff's underlying claim," Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.  Merits questions may be considered to the extent -- but only to the extent -- that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.

Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 465-66 (2013).  To reconcile these two directives, the Court will find facts for the purposes of class certification by the preponderance of the evidence but will allow the parties to challenge these findings during the subsequent merits stage of this case.  This approach is analogous to preliminary injunction practice, and many circuits have endorsed it.  See Abbott v. Lockheed Martin Corp., 725 F.3d 803, 810 (7th Cir. 2013); In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 313 (3d Cir. 2008); Gariety v. Grant Thornton, LLP, 368 F.3d 356, 366 (4th Cir. 2004).  Because of the res judicata effect a class judgment has on absent parties, a court may not simply accept the named parties' stipulation that class certification is appropriate, but must conduct its own independent rule 23 analysis.  See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620-22 (1997).  In taking evidence on the question of class certification, the Federal Rules of Evidence apply, albeit in a relaxed fashion.  See Anderson Living Trust v. WPX Energy Production LLC, 306 F.R.D. 312, 378 n.39 (D.N.M. 2015)(Browning, J.).

1.      **Rule 23(a)**.

All classes must satisfy the prerequisites of rule 23(a):

(a)      **Prerequisites**.  One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

> (1)      the class is so numerous that joinder of all members is impracticable;
>
> (2)      there are questions of law or fact common to the class;
>
> (3)      the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4)      the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  "A party seeking to certify a class is required to show . . . that all the requirements of [rule 23(a)] are clearly met."  Reed v. Bowen, 849 F.2d 1307, 1309 (10th Cir. 1988).  "Although the party seeking to certify a class bears the burden of proving that all the requirements of Rule 23 are met, the district court must engage in its own 'rigorous analysis' of whether 'the prerequisites of Rule 23(a) have been satisfied.'"  Shook v. El Paso Cty., 386 F.3d 963, 968 (10th Cir. 2004)(quoting Gen. Tel. Co. of the S.W. v. Falcon, 457 U.S. 147, 161 (1982), and citing Reed v. Bowen, 849 F.2d at 1309).  These four requirements are often referenced as numerosity, commonality, typicality, and adequacy, respectively.  See Fed. R. Civ. P. 23(a).

Rule 23(a)(2) requires that "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Even "factual differences in the claims of the individual putative class members should not result in a denial of class certification where common questions of law exist."  In re Intelcom Grp. Sec. Litig., 169 F.R.D. 142, 148 (D. Colo. 1996)(Daniel, J.).  See Adamson v. Bowen, 855 F.2d 668, 676 (10th Cir. 1988)("That the claims of individual putative class members may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the

application of a common policy."); <u>Lopez v. City of Santa Fe</u>, 206 F.R.D. 285, 289 (D.N.M. 2002)(Vázquez, J.)("Commonality requires only a single issue common to the class, and the fact that 'the claims of individual putative class members may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the application of a common policy.'" (citations omitted)(citing <u>In re Am. Med. Sys., Inc.</u>, 75 F.3d 1069, 1080 (6th Cir. 1996); <u>Adamson v. Bowen</u>, 855 F.2d at 676)). A single common question will suffice to satisfy rule 23(a)(2), but the question must be one "that is central to the validity of each one of the claims." <u>Wal-Mart</u>, 564 U.S. at 349.

"Where the facts as alleged show that Defendants' course of conduct concealed material information from an entire putative class, the commonality requirement is met." <u>In re Oxford Health Plans, Inc. Sec. Litig.</u>, 191 F.R.D. 369, 374 (S.D.N.Y. 2000)(Brieant, J.).

The commonality requirement was widely perceived to lack teeth before the Supreme Court's decision in <u>Wal-Mart</u>, which grafted the following requirements onto rule 23(a)(2): (i) that the common question is central to the validity of each claim that the proposed class brings; and (ii) that the common question is capable of a common answer. <u>See Wal-Mart</u>, 564 U.S. at 348-52. In that case, a proposed class of about 1.5 million current and former Wal-Mart employees sought damages under Title VII for Wal-Mart's alleged gender-based discrimination. <u>See</u> 564 U.S. at 342. Wal-Mart, however, had no centralized company-wide hiring or promotion policy, instead opting to leave personnel matters to the individual store managers' discretion. <u>See</u> 564 U.S. at 343-45. The plaintiffs argued that, although no discriminatory formal policy applied to all proposed class members, "a strong and uniform 'corporate culture' permits bias against women to infect, perhaps subconsciously, the discretionary decisionmaking of each one of Wal-Mart's thousands of managers -- thereby making every [proposed class member] the victim of one

common discriminatory practice."  564 U.S. at 345.  The Supreme Court disagreed that such a

theory constitutes a common question under rule 23(a)(2).

> The crux of this case is commonality -- the rule requiring a plaintiff to show that "there are questions of law or fact common to the class."  Rule 23(a)(2).  That language is easy to misread, since "[a]ny competently crafted class complaint literally raises common 'questions.'"  Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 131-132 (2009).  For example: Do all of us plaintiffs indeed work for Wal-Mart?  Do our managers have discretion over pay?  Is that an unlawful employment practice?  What remedies should we get?  Reciting these questions is not sufficient to obtain class certification.  Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury," [Gen. Tel. Co. of the S.W. v. Falcon, 457 U.S. at 157].  This does not mean merely that they have all suffered a violation of the same provision of law.  Title VII, for example, can be violated in many ways -- by intentional discrimination, or by hiring and promotion criteria that result in disparate impact, and by the use of these practices on the part of many different superiors in a single company.  Quite obviously, the mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once.  Their claims must depend upon a common contention -- for example, the assertion of discriminatory bias on the part of the same supervisor.  That common contention, moreover, must be of such a nature that it is capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

> What matters to class certification . . . is not the raising of common "questions" -- even in droves -- but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.  Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

Wal-Mart, 564 U.S. at 349-50 (emphasis in original)(quoting Nagareda, supra, at 132).  In EQT

Production Co. v. Adair, 764 F.3d 347 (4th Cir. 2011), the United States Court of Appeals for the

Fourth Circuit stated:

> We first review the aspects of the district court's analysis that apply to all five royalty underpayment classes.

> At bottom, the district court believed that both the commonality and predominance requirements of Rule 23 were satisfied by the same basic fact: the

defendants employed numerous uniform practices related to the calculation and payment of CBM [coalbed methane gas] royalties. These common practices are not irrelevant to Rule 23(b)'s predominance requirement. But we hold that the district court abused its discretion by failing to consider the significance of this common conduct to the broader litigation.

> The district court identified numerous common royalty payment practices. For example, it noted that EQT sells all of the CBM it produces in Virginia to an affiliate, EQT Energy, and that "all royalty owners within the same field have been paid royalties based on the same sales price for the CBM." With respect to CNX, it noted that CNX "has uniform policies and procedures which governed its calculation of CBM revenues," and that "it has deducted severance and license taxes when calculating royalties since January 1, 2004."

> That the defendants engaged in numerous common practices may be sufficient for commonality purposes. As noted above, the plaintiffs need only demonstrate one common question of sufficient importance to satisfy Rule 23(a)(2).

764 F.3d at 366 (citations omitted).

In Wal-Mart, the Honorable Antonin Scalia, Associate Justice of the Supreme Court of the United States, stated: "Wal-Mart is entitled to individualized determinations of each employee's eligibility for backpay." 564 U.S. at 366. From this observation, he then concluded:

> Because the Rules Enabling Act forbids interpreting Rule 23 to "abridge, enlarge or modify any substantive right," 28 U.S.C. § 2072(b), a class cannot be certified on the premise that Wal-Mart will not be entitled to litigate its statutory defenses to individual claims. And because the necessity of that litigation will prevent backpay from being "incidental" to the classwide injunction, respondents' class could not be certified even assuming, arguendo, that "incidental" monetary relief can be awarded to a 23(b)(2) class.

Wal-Mart, 131 U.S. at 367. Thus, the common question or questions cannot be "incidental," nor can the plaintiff submit a long list of "incidental" questions or issues, and say that they predominate over the real issues to be used.

2. **Rule 23(b)**.

Once the court concludes that the threshold requirements have been met, "it must then examine whether the class falls within at least one of three categories of suits set forth in Rule 23(b)." Adamson v. Bowen, 855 F.2d at 675. See DG ex rel. Stricken v. Devaughn, 594 F.3d 1188, 1199 (10th Cir. 2010)("In addition to satisfying Rule 23(a)'s requirements, the class must also meet the requirements of one of the types of classes described in subsection (b) of Rule 23."). Rule 23(b) provides that a class action is appropriate if the threshold requirements are satisfied, and the case falls into one or more of three categories:

**(b)** **Types of Class Actions.** A class action may be maintained if Rule 23(a) is satisfied and if:

**(1)** prosecuting separate actions by or against individual putative class members would create a risk of:

**(A)** inconsistent or varying adjudications with respect to individual putative class members that would establish incompatible standards of conduct for the party opposing the class; or

**(B)** adjudications with respect to individual putative class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

**(2)** the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

**(3)** the court finds that the questions of law or fact common to putative class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently

adjudicating the controversy. The matters pertinent to these findings include:

**(A)**     the putative class members' interests in individually controlling the prosecution or defense of separate actions;

**(B)**     the extent and nature of any litigation concerning the controversy already begun by or against putative class members;

**(C)**     the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

**(D)**     the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b). "Only one of rule 23(b)'s subdivisions must be satisfied to meet the class-action requirements." Gonzales v. City of Albuquerque, No. CIV 09-0520 JB/RLP, 2010 WL 4053947, at *11 (D.N.M. Aug. 21, 2010)(Browning, J.)(citing Carpenter v. Boeing, Co., 456 F.3d 1183, 1187 (10th Cir. 2006)(stating that the district court must determine whether a suit "falls within one of the categories of actions maintainable as class actions")).

The three categories of class actions -- really four, as rule 23(b)(1) contains two subcategories, known as (b)(1)(A) and (b)(1)(B) class actions -- are not of equal utility. Class actions under (b)(1) can be certified only in very particular circumstances. Class actions under (b)(2) are broadly available, but are only capable of seeking injunctive or declaratory relief, and not damages. Far and away the most controversial class action category, (b)(3), can be brought for class-wide damages, injunctive relief, declaratory relief, or any combination thereof. Class actions under (b)(3) always require notice to all proposed class members of certification of the class, and those individuals must be given the opportunity to opt out if they so desire. See Fed. R. Civ. P. 23(c)(2)(B); Phillips Petrol. Co. v. Shutts, 472 U.S. 797, 812 (1985)("[W]e hold that due

process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an 'opt out' or 'request for exclusion' form to the court."). The other class action categories, however, are ordinarily mandatory, and neither notice nor opportunity to opt out needs to be given. <u>See</u> Fed. R. Civ. P. 23(c)(2)(B); <u>Phillips Petrol. Co. v. Shutts</u>, 472 U.S. at 811 n.3 (limiting the constitutional requirement of an opt-out notice "to those class actions which seek to bind known plaintiffs concerning claims wholly or predominately for money judgments"). The Court will focus on the most important form of class action, the (b)(3) damages class action.[14]

---

[14]The Court will briefly address the other class-action types. Rule 23(b)(1) contains two subcategories of class action, (b)(1)(A) actions and (b)(1)(B) actions; a class need satisfy the requirements of only one to be certified. <u>See</u> Fed. R. Civ. P. 23(b)(1). Class actions under (b)(1)(A) are designed to avoid the situation in which a defendant subject to suit by multiple plaintiffs is ordered to undertake incompatible courses of conduct as a result of the non-centralized nature of the adjudication. <u>See</u> Fed. R. Civ. P. 23(b)(1)(A). "Incompatible" means more than simply inconsistent. A situation in which, for example, a defendant was ordered to pay ten thousand dollars to a plaintiff in one case, was ordered to pay ten million dollars to another plaintiff in an identical or similar case, and was found to not be at fault at all in yet another case, may be inconsistent, but it does not create "incompatible standards of conduct for the party opposing the class." Fed. R. Civ. P. 23(b)(1)(A). Such alleged inconsistency is a normal and expected part of the system of individualized adjudication used by the judiciary to apply a uniform set of laws to varied factual settings. What (b)(1)(A) is designed to avoid is injunctive or declaratory "whipsawing," in which, <u>e.g.</u>, one court orders a school district to close an underperforming inner-city school and bus its students to suburban schools, and another court orders the district to keep the school open and bus suburban students in to the school. Class actions under (b)(1)(B) serve a similar role, but apply when varying adjudications would result in practically -- rather than legally -- incompatible judgments. <u>See</u> Fed. R. Civ. P. 23(b)(1)(B). Rule 23(b)(1)(B) applies when the defendant has possession or control of a *res* -- a pot of money or thing that constitutes the relief that the proposed class seeks -- and the relief sought by all the individual members of the proposed class would more than exhaust the *res*. For example, if a Ponzi scheme operator took ten billion dollars of investors' money, and, upon law enforcement's discovery of the scheme, had only six billion dollars remaining, then the individual investors' claims to recover their rightful share would add up to four billion dollars more than existed in the *res*. Thus, the court might certify a (b)(1)(B) class action to ensure that the custodian of the *res* does not pay out the entire *res* to the first investors to file suit, but, instead, distributes the *res* fairly among all investors.

The two subcategories of (b)(1) class action have other things in common as well. Both exist, in a sense, for the benefit of the defendant -- at least relative to (b)(2) and (b)(3) class actions -- and are rarely brought, in part because plaintiffs have little incentive to bring them. In the (b)(1)(B) example, each investor hopes to recover the full value of his or her investment, not a 60% value, and thus is incentivized to file as an individual. In the (b)(1)(A) example, the plaintiff seeking to close down the school (i) does not care about the inconsistent obligations of the school district, and (ii) would rather not be joined in a class action with plaintiffs who want to keep the school open. Last, (b)(1) class actions, along with (b)(2) class actions, are mandatory: if certified, no person covered under the class definition may opt out of it or pursue his or her own individual claim. As such, no notice needs to be given to the class members that they are part of ongoing litigation, although the certifying court may elect to direct notice in appropriate circumstances. See Fed. R. Civ. P. 23(c)(2)(A). Class actions under (b)(2) provide for injunctive or declaratory relief when a defendant has "acted or refused to act on grounds that apply generally to the class." Fed. R. Civ. P. 23(b)(2).

> The key to the (b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted -- the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." Nagareda, supra, at 132. In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant. Similarly, it does not authorize class certification when each class member would be entitled to an individualized award of monetary damages.

Wal-Mart, 564 U.S. at 360-61 (emphasis in original). The (b)(2) class action was invented for the purpose of facilitating civil rights suits, and much of its use is in that field today. See Newberg § 4:26. The (b)(2) class action allows civil rights litigants to advocate on behalf of all similarly situated individuals, such as a disenfranchised black voter representing a class of all black voters within an unconstitutionally drawn district or a jail inmate representing all inmates in an overcrowding case. Anyone familiar with the nation's seminal civil rights cases, however, knows that many of them are not brought as class actions, which raises a question:

> [W]hy would anyone ever bring one? . . . Th[is] inquiry is generated because if an individual litigant pursues an individual case for injunctive relief and prevails, she can generally get all of the remedy that she needs without going through the hurdles of certifying a class. For example, to return to Brown v. Board of Education, once Linda Brown prevailed on her race discrimination claim, her remedy -- a desegregated school -- was hers to pursue. Although that remedy would affect many other persons not a part of her litigation, hence making class certification appropriate, there is no requirement that to secure that remedy, she had to file a class action.

To satisfy rule 23(b)(3), the court must find "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  Rule 23(b)(3) provides that "[t]he matters pertinent to these findings include": (i) the class members' interest in individually controlling the prosecution or defense of separate actions; (ii) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (iii) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (iv) the

---

Nonetheless, social change advocates tend to pursue class certification under Rule 23(b)(2) for several reasons.  First, and perhaps most importantly, Linda Brown will likely graduate from school long before her case ends; if hers is simply an individual action, it will become moot and risk dismissal.  Class certification, however, constitutes an exception to the mootness doctrine in certain circumstances.  Second, the scope of the plaintiff's relief is likely augmented by certifying a class.  It is arguable that all that Linda Brown would have been able to secure as a remedy for her individual claim was a desegregated school for herself, not for students throughout the entire school district; there is some relationship between the scope of the class and the scale of the remedy.  Third, it is often the case that the attorneys pursuing civil rights actions are doing so as public interest lawyers paid by an organization like the NAACP Legal Defense Fund or the American Civil Liberties Union (ACLU); they may therefore have a financial incentive to pursue a class's case rather than a series of individual cases as they have limited resources, and the economies of scale may argue for a class action suit.  Most generally, many civil rights cases are brought as class suits because the attorneys and clients pursuing them conceptualize their efforts in group, not individual, terms.  Thus, while an individual civil rights plaintiff might be able to secure the relief that she seeks without a (b)(2) class, a series of factors may encourage the pursuit of one.

Newberg § 4:26 (footnotes omitted).  Like (b)(1) class actions, (b)(2) class actions are mandatory -- individuals covered under the class definition may not opt out -- and do not require notice to be given to the class.  See Fed. R. Civ. P. 23(c)(2)(A).

difficulties likely to be encountered in the management of a class action. Fed. R. Civ. P. 23(b)(3)(A)-(D).

Rule 23(b)(3)'s first requirement is that questions common to the class predominate over those that are individualized. See Fed. R. Civ. P. 23(b)(3). A question is common when "the same evidence will suffice for each member to make a prima facie showing," Blades v. Monsanto Co., 400 F.3d 562, 566 (8th Cir. 2005)(citing In re Visa Check/MasterMoney Antitrust Litig., 208 F.3d 124, 136-40 (2d Cir. 2001)), or when the issue is "susceptible to generalized, class-wide proof," In re Nassau Cty. Strip Search Cases, 461 F.3d 219, 227 (2d Cir. 2006). A question is individual when "the members of a proposed class will need to present evidence that varies from member to member," Blades v. Monsanto Co., 400 F.3d at 566. Although a case need not present only common questions to merit certification, and the presence of some individual questions does not destroy predominance, the rule 23(b)(3) predominance requirement is much stricter than the rule 23(a)(1) commonality requirement: the latter requires only that a common question or questions exist; the former requires that the common question or questions predominate over the individual ones. See Amchem Prods., Inc. v. Windsor, 521 U.S. at 623-24; In re Thornburg Mortg., Inc. Sec. Litig., 912 F. Supp. 2d 1178, 1225 (D.N.M. 2012)(Browning, J.)("The predominance criterion of rule 23(b)(3) is 'far more demanding' than rule 23(a)(2)'s commonality requirement."). As the Tenth Circuit, addressing a Title VII claim, put it:

> The myriad discriminatory acts that Plaintiffs allege (e.g., failure to promote, failure to train, unequal pay, disrespectful treatment, etc.) each require independent legal analysis, and similarly challenge the predominance requirement of Rule 23(b)(3) if not also the commonality requirement of Rule 23(a).
>
> . . . .
>
> Although we do not rest our decision upon Rule 23(a), cases that interpret . . . the commonality requirement of Rule 23(a) illustrate the instant Plaintiffs'

inability to satisfy Rule 23(b)(3)'s "far more demanding" requirement that common issues predominate.

Monreal v. Potter, 367 F.3d 1224, 1237 (10th Cir. 2004)(footnote omitted).

The predominance question applies to both macro damages -- the total class damages -- and to the micro damages -- the individual damages. In Comcast Corp. v. Behrend, 569 U.S. 27 (2013), the Supreme Court held that it could not accept the regression model which the plaintiffs' expert had developed as evidence that damages were susceptible of measurement across an entire class -- as rule 23(b)(3) requires. The plaintiffs argued four theories of antitrust violations; one theory was that Comcast Corp.'s activities had an antitrust impact, because Comcast Corp.'s activities reduced the level of competition from "overbuilders," companies that build competing cable networks in areas where an incumbent cable company already operates. 569 U.S. at 31. The district court found, among other things, that the damages resulting "from overbuilder-deterrence impact could be calculated on a classwide basis." 569 U.S. at 31-32.

> To establish such damages, [the plaintiffs relied] solely on the testimony of Dr. James McClave. Dr. McClave designed a regression model comparing actual cable prices in the Philadelphia [Designated Market Area] with hypothetical prices that would have prevailed but for [Comcast Corp.'s] allegedly anticompetitive activities. The model calculated damages of $875,576,662.00 for the entire class. As Dr. McClave acknowledged, however, the model did not isolate damages resulting from any one theory of antitrust impact. The district court nonetheless certified the class.

569 U.S. at 31-32 (citations omitted).

The United States Court of Appeals for the Third Circuit affirmed the district court decision. The Third Circuit concluded that the plaintiffs "provided a method to measure and quantify damages on a classwide basis," finding it unnecessary to decide "whether the methodology was a just and reasonable inference or speculation." 569 U.S. at 32 (quoting 655 F.3d 182, 206 (3d Cir. 2011)). The Supreme Court granted certiorari on the question of "[w]hether

a district court may certify a class action without resolving whether the plaintiff class had introduced admissible evidence, including expert testimony, to show that the case is susceptible to awarding damages on a class-wide basis." 569 U.S. at 39. Justice Scalia criticized the Third Circuit's reluctance to entertain arguments against the plaintiffs' damages model "simply because those arguments would also be pertinent to the merits determination." 569 U.S. at 34. Justice Scalia said that

> it is clear that, under the proper standard for evaluating certification, respondents' model falls far short of establishing that damages are capable of measurement on a classwide basis. Without presenting another methodology, respondents cannot show Rule 23(b)(3) predominance: Questions of individual damage calculations will inevitably overwhelm questions common to the class.

569 U.S. at 34. Justice Scalia stated that, under the Third Circuit's logic, "at the class-certification stage, *any* method of measurement is acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be. Such a proposition would reduce rule 23(b)(3)'s predominance requirement to a nullity." 569 U.S. at 35 (emphasis in original).

It is clear that Comcast Corp. v. Behrend applies to classwide damages. It is less clear that Comcast Corp. v. Behrend's language applies to the determination of individual damages. There are three ways that the Court could deal with Comcast Corp. v. Behrend and the determination of individual damage awards. First, the Court could decide that Comcast Corp. v. Behrend applies only to classwide damages and is not controlling at all in the determination of individual damages. Second, the Court could decide that everything that Justice Scalia said about classwide damages also applies to the determination of individual damages. Third, the Court could decide that Justice Scalia said some things relating to the determination of individual damages, but not the same things that apply to classwide damages. As to the first option, while much could be said of limiting Justice Scalia's opinion to classwide damages -- even from the language of the opinion and from

the wording of the question presented -- the Court is reluctant to say that it has nothing to say that might be relevant to the determination of individual damages awards. Some of Justice Scalia's concerns about admissible evidence to determine damages -- whether classwide or individual damage awards -- still seem relevant to whether damages are classwide or individual. While Justice Scalia was not addressing the determination of individual damage awards, some of what he said -- and how he said it -- causes the Court to be cautious in determining a methodology for calculating individual damage awards. On the other hand, the Court is not convinced that it should or even can apply <u>Comcast Corp. v. Behrend</u>'s language to the individual determination of damages as it does to classwide damages. The dissent stated that "[r]ecognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal." 569 U.S. at 42 (Ginsburg, J., dissenting). Justice Scalia did not refute this proposition, and the Court has no reason to think the dissent's statement -- which is accurate -- does not remain good law. Accordingly, just because each plaintiff and class member may get a different amount and there has to be a separate calculation of each plaintiff's damages does not defeat class certification.

What the Court thinks that <u>Comcast Corp. v. Behrend</u> says that is relevant to the individual determination of damages is threefold. First, at the class certification stage, the Court cannot ignore how individual damages, if any are appropriate, are to be decided. In other words, the Court cannot ignore the possible complexities of the individual damages determinations in making the predominance calculation. A class can have individual damage calculations, but the Court has to look at the issues of individual damages calculations at the class certification stage. Second, the methodology for all class members needs to be common or, if there are different methodologies for some plaintiffs and class members, the Court must take these differences into account at the

class certification stage in the predominance analysis. In other words, if the Court is going to use different methodologies for different class members, it must decide: (i) whether these differences create questions affecting only individual members; and (ii) whether these individual questions predominate over the questions of law or fact common to the class. Third, even if the methodology is common to the class, the Court must decide whether it will operate in a consistent way for each individual class member. The law and methodology may be the same, but when applied to the class, they may create issues for one class member or group of class members that they do not create for other class members or groups. The predominance analysis must identify precisely the common issues and uncommon issues that application of the class methodology or methodologies raise, and then determine whether, in the total issue mix, the common issues predominate over the individual ones.

A defendant's desire to assert individual counterclaims[15] does not typically defeat predominance. See Phillips Petrol. Co. v. Shutts, 472 U.S. at 810; Allapattah Servs., Inc. v. Exxon Corp., 333 F.3d 1248, 1260 (11th Cir. 2003). A defendant's desire to assert individual affirmative defenses also often does not defeat predominance, see Smilow v. Sw. Bell Mobile Sys., Inc., 323 F.3d 32, 39 (1st Cir. 2003)("Courts traditionally have been reluctant to deny class action status under Rule 23(b)(3) simply because affirmative defenses may be available against individual members."), but this statement is less true after Wal-Mart.[16] Other recurring individual issues

[15]Generally speaking, counterclaims, even common ones, are not permitted against absent class members at all.

[16]Limitations defenses are an especially common breed of affirmative defense. Limitations defenses generally present common questions, rather than individual ones, because a limitations defense's merits rest on two facts: (i) the date on which the claim accrued; and (ii) the date on which the action was filed. Fact (ii) is a common issue in virtually every class action, because the entire class gets credit for the filing date of the class action complaint. Fact (i) may not be truly

present more serious challenges to predominance, such as: (i) the prima facie element of reliance or due diligence in common-law fraud and other cases;[17] (ii) differences in the applicable law in a

---

common, but it might be, if, for example, the discovery rule delays accrual of a claim until the cause of action is discovered, and all class members' causes of action are discovered at the same time, or if a single act by the defendant breached contracts with all class members at once. Even if the question is individual -- for example, if a class is defined as only encompassing preexisting filed claims, or if the discovery rule might delay the accrual of the claim for some class members but not others -- it still typically does not defeat predominance.

> Although a necessity for individualized statute-of-limitations determinations invariably weighs against class certification under Rule 23(b)(3), we reject any per se rule that treats the presence of such issues as an automatic disqualifier. In other words, the mere fact that such concerns may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones. As long as a sufficient constellation of common issues binds class members together, variations in the sources and application of statutes of limitations will not automatically foreclose class certification under Rule 23(b)(3). Predominance under Rule 23(b)(3) cannot be reduced to a mechanical, single-issue test.

Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 296 (1st Cir. 2000)(citing 5 James W. Moore et al., Moore's Federal Practice ¶ 23.46[3] (3d ed. 1999)). See Newberg § 4:57 (confirming that the above passage "reflects the law in most circuits" (footnote omitted)).

[17]The advisory committee's notes to rule 23 state that

> a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class. On the other hand, although having some common core, a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed.

Fed. R. Civ. P. 23 advisory committee's notes (citing Miller v. Nat'l City Bank of N.Y., 166 F.2d 723 (2d Cir. 1948); Oppenheimer v. F. J. Young & Co., Inc., 144 F.2d 387 (2d Cir. 1944)).

> Despite the generalized concern about the individual nature of the misrepresentations and/or reliance inquiry in fraud cases, there are at least three recurring situations in which courts have found common issues predominant in fraud cases: (1) those in which reliance is common across the class; (2) those in

multi-state, state-law-based class actions,[18] see Castano v. Am. Tobacco Co., 84 F.3d 734, 741

(5th Cir. 1996); and (iii) the need to determine individual personal injury damages, which presents

---

which courts have excused a showing of individual reliance; and (3) those in which the underlying law does not require a showing of individual reliance.

Newberg § 4:58. Reliance may be a common issue when the same misrepresentation is made to the entire class; some circuits have held that written misrepresentations may be common issues while oral misrepresentations are presumed to be individualized. See, e.g., Moore v. PaineWebber, Inc., 306 F.3d 1247, 1253 (2d Cir. 2002)("[T]he Third, Fourth, Fifth, Sixth, and Seventh Circuits . . . have held that oral misrepresentations are presumptively individualized."); In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 319 (3d Cir. 1998)(certifying class where alleged misrepresentations were written and uniform); Spencer v. Hartford Fin. Servs. Grp., Inc., 256 F.R.D. 284, 297 (D. Conn. 2009)(Hall, J.)(certifying class where class definition was narrowed to include only those who had received written communications from defendant). The requirement that plaintiffs show reliance is most often presumed or excused in so-called fraud-on-the-market securities cases, in which class members -- investors in the defendant company -- are presumed to be rational, fully informed actors who use all of the information available to the general public, but are also presumed to not possess insider information.

> We have found a rebuttable presumption of reliance in two different circumstances. First, if there is an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance. Second, under the fraud-on-the-market doctrine, reliance is presumed when the statements at issue become public. The public information is reflected in the market price of the security. Then it can be assumed that an investor who buys or sells stock at the market price relies upon the statement.

Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 159 (2008)(citing Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153 (1972); Basic Inc. v. Levinson, 485 U.S. 224, 245 (1988)).

[18]In In re Bridgestone/Firestone, Inc., 288 F.3d 1012 (7th Cir. 2002), The Honorable Frank H. Easterbrook, United States Circuit Judge for the Seventh Circuit, in an opinion that predates Wal-Mart and Comcast, stated:

> No class action is proper unless all litigants are governed by the same legal rules. Otherwise the class cannot satisfy the commonality and superiority requirements of Fed. R. Civ. P. 23(a), (b)(3). Yet state laws about theories such as those presented by our plaintiffs differ, and such differences have led us to hold

that other warranty, fraud, or products-liability suits may not proceed as nationwide classes

288 F.3d at 1015.  Judge Easterbrook then discussed how variations in tires defeat class treatment:

> Because these claims must be adjudicated under the law of so many jurisdictions, a single nationwide class is not manageable.  Lest we soon see a Rule 23(f) petition to review the certification of 50 state classes, we add that this litigation is not manageable as a class action even on a statewide basis.  About 20% of the Ford Explorers tires were shipped without Firestone tires.  The Firestone tires supplied with the majority of the vehicles were recalled at different times; they may well have differed in their propensity to fail, and this would require sub-subclassing among those owners of Ford Explorers with Firestone tires.  Some of the vehicles were resold and others have not been; the resales may have reflected different discounts that could require vehicle-specific litigation.  Plaintiffs contend that many of the failures occurred because Ford and Firestone advised the owners to underinflate their tires, leading them to overheat.  Other factors also affect heating; the failure rate (and hence the discount) may have been higher in Arizona than in Alaska.  Of those vehicles that have not yet been resold, some will be resold in the future (by which time the tire replacements may have alleviated or eliminated any discount) and some never will be resold.  Owners who wring the last possible mile out of their vehicles receive everything they paid for and have claims that differ from owners who sold their Explorers to the second-hand market during the height of the publicity in 2000.  Some owners drove their SUVs off the road over rugged terrain, while others never used the "sport" or "utility" features; these differences also affect resale prices.

> Firestone's tires likewise exhibit variability; that's why fewer than half of those included in the tire class were recalled.  The tire class includes many buyers who used Firestone tires on vehicles other than Ford Explorers, and who therefore were not advised to underinflate their tires.

> . . . .

> When courts think of efficiency, they should think of market models rather than central-planning models.

> Our decision in Rhone-Poulenc Rorer made this point, and it is worth reiterating: only "a decentralized process of multiple trials, involving different juries, and different standards of liability, in different jurisdictions" (51 F.3d at 1299) will yield the information needed for accurate evaluation of mass tort claims.

> . . . .

such a challenge to predominance that class certification of mass tort claims is now exceedingly rare, see Amchem Prods., Inc. v. Windsor, 521 U.S. at 625. There is little uniform guidance on how to assess when common issues predominate over individual ones, and the Court's statements to this point have, obviously, done more to disavow various tempting but fallacious rules than they have to set forth a usable standard.

There is currently a split of authority between the United States Courts of Appeals over the proper way to analyze predominance. The Honorable Richard A. Posner, United States Circuit Judge for the Seventh Circuit, concludes that the predominance inquiry boils down to "a question of efficiency." Butler v. Sears, Roebuck & Co., 702 F.3d 359, 362 (7th Cir. 2012), vacated, 569 U.S. 1015 (2013). Judge Posner poses the predominance question as: "Is it more efficient, in terms both of economy of judicial resources and of the expense of litigation to the parties, to decide some issues on a class basis or all issues in separate trials?" Butler v. Sears, Roebuck & Co., 702 F.3d at 362. In Butler v. Sears, Roebuck & Co., the Seventh Circuit reversed a district court's denial of

---

No matter what one makes of the decentralized approach as an original matter, it is hard to adopt the central-planner model without violence not only to Rule 23 but also to principles of federalism. Differences across states may be costly for courts and litigants alike, but they are a fundamental aspect of our federal republic and must not be overridden in a quest to clear the queue in court. See BMW v. Gore, 517 U.S. [559, 568-73 (1996)]; Szabo[v. Bridgeport Machines, Inc., 249 F.3d 672 (7th Cir. 2001)](reversing a nationwide warranty class certification); Spence v. Glock, Ges.m.b.H., 227 F.3d 308 (5th Cir. 2000)(reversing a nationwide tort class certification); Larry Kramer, Choice of Law in Complex Litigation, 71 N.Y.U. L. Rev. 547, 579 (1996); Linda S. Mullenix, Mass Tort Litigation and the Dilemma of Federalization, 44 DePaul L. Rev. 755, 781 (1995); Robert A. Sedler, The Complex Litigation Project's Proposal for Federally-Mandated Choice of Law in Mass Torts Cases: Another Assault on State Sovereignty, 54 La. L .Rev. 1085 (1994). Tempting as it is to alter doctrine in order to facilitate class treatment, judges must resist so that all parties' legal rights may be respected.

288 F.3d at 1018-20.

certification of a class of washing-machine owners who alleged that Sears' washing machines were prone to cultivate mold and affirmed the district court's certification of the same class to pursue a claim that the machines' control units were defective. <u>See</u> 702 F.3d at 360-61. The Seventh Circuit certified the class -- which spanned six states -- to pursue its mold claim under state breach-of-warranty law:

> A class action is the more efficient procedure for determining liability and damages in a case such as this, involving a defect that may have imposed costs on tens of thousands of consumers yet not a cost to any one of them large enough to justify the expense of an individual suit. If necessary a determination of liability could be followed by individual hearings to determine the damages sustained by each class member (probably capped at the cost of replacing a defective washing machine -- there doesn't seem to be a claim that the odors caused an illness that might support a claim for products liability as distinct from one for breach of warranty). But probably the parties would agree on a schedule of damages based on the cost of fixing or replacing class members' mold-contaminated washing machines. The class action procedure would be efficient not only in cost, but also in efficacy, if we are right that the stakes in an individual case would be too small to justify the expense of suing, in which event denial of class certification would preclude any relief.

> . . . .

> [T]he district court will want to consider whether to create different subclasses of the control unit class for the different states. That should depend on whether there are big enough differences among the relevant laws of those states to make it impossible to draft a single, coherent set of jury instructions should the case ever go to trial before a jury.

<u>Butler v. Sears, Roebuck & Co.</u>, 702 F.3d at 362. Along with numerous other class actions pending appeal before the Supreme Court, the Supreme Court vacated <u>Butler v. Sears, Roebuck & Co.</u>, and remanded it to the Seventh Circuit "for reconsideration in light of <u>Comcast Corp. v. Behrend</u>." <u>Butler v. Sears, Roebuck & Co.</u>, 727 F.3d 796, 797 (7th Cir. 2013). On reconsideration, the Seventh Circuit reaffirmed its prior decision, again in an opinion written by Judge Posner:

> Sears thinks that predominance is determined simply by counting noses: that is, determining whether there are more common issues or more individual

issues, regardless of relative importance. That's incorrect. An issue "central to the validity of each one of the claims" in a class action, if it can be resolved "in one stroke," can justify class treatment. [Wal-Mart, 564 U.S. at 338]. That was said in the context of Rule 23(a)(2), the rule that provides that class actions are permissible only when there are issues common to the members of the class (as of course there are in this case). But predominance requires a qualitative assessment too; it is not bean counting. In Amgen Inc. v. Connecticut Retirement Plans & Trust Funds, [568 U.S. at 468], the Court said that the requirement of predominance is not satisfied if "individual questions . . . overwhelm questions common to the class," and in Amchem Products, Inc. v. Windsor, 521 U.S. . . . [at] 623 . . . , it said that the "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." And in In re Inter-Op Hip Prosthesis Liability Litigation, 204 F.R.D. 330, 345 (N.D. Ohio 2001), we read that "common issues need only predominate, not outnumber individual issues." . . .

As we noted in Carnegie v. Household Int'l., Inc., 376 F.3d 656, 661 (7th Cir. 2004), "the more claimants there are, the more likely a class action is to yield substantial economies in litigation. It would hardly be an improvement to have in lieu of this single class 17 million suits each seeking damages of $15 to $30. . . . The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30" (emphasis in original). The present case is less extreme: tens of thousands of class members, each seeking damages of a few hundred dollars. But few members of such a class, considering the costs and distraction of litigation, would think so meager a prospect made suing worthwhile.

There is a single, central, common issue of liability: whether the Sears washing machine was defective. Two separate defects are alleged, but remember that this class action is really two class actions. In one the defect alleged involves mold, in the other the control unit. Each defect is central to liability. Complications arise from the design changes and from separate state warranty laws, but can be handled by the creation of subclasses. See, e.g., Johnson v. Meriter Health Services Employee Retirement Plan, 702 F.3d [364,] 365[ 7th Cir. 2012) (10 subclasses).

Butler v. Sears, Roebuck & Co., 727 F.3d at 801-02 (emphasis in original).[19]

---

[19]In addition to articulating the Seventh Circuit's construction of the predominance inquiry, Judge Posner addressed Comcast Corp. v. Behrend's impact on the Seventh Circuit's case:

So how does the Supreme Court's Comcast decision bear on the rulings . . . in our first decision?

Comcast holds that a damages suit cannot be certified to proceed as a class action unless the damages sought are the result of the class-wide *injury* that the suit

alleges.  <u>Comcast</u> was an antitrust suit, and the Court said that "if [the plaintiffs] prevail on their claims, they would be entitled only to damages resulting from reduced overbuilder competition, since that is the only theory of antitrust impact accepted for class-action treatment by the District Court.  It follows that a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory.  If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)."  "[A] methodology that identifies damages *that are not the result of the wrong*" is an impermissible basis for calculating class-wide damages.  [569 U.S. at 37](emphasis added).  "For all we know, cable subscribers in Gloucester County may have been overcharged because of petitioners' alleged elimination of satellite competition (*a theory of liability that is not capable of classwide proof*)."  And on the next page of its opinion the Court quotes approvingly from Federal Judicial Center, Reference Manual on Scientific Evidence 432 (3d ed. 2011), that "the first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact *of that event*."  (emphasis the [Supreme] Court's).  None of the parties had even challenged the district court's ruling that class certification required "that the damages resulting from . . . [the antitrust violation] were measurable 'on a class-wide basis' through use of a 'common methodology.'"

Unlike the situation in <u>Comcast</u>, there is no possibility in this case that damages could be attributed to acts of the defendants that are not challenged on a class-wide basis; all members of the mold class attribute their damages to mold and all members of the control-unit class to a defect in the control unit.

Sears argues that Comcast rejects the notion that efficiency is a proper basis for class certification, and thus rejects our statement that "predominance" of issues common to the entire class, a requirement of a damages class action under Rule 23(b)(3), "is a question of efficiency."  But in support of its argument Sears cites only the statement in the dissenting opinion in Comcast that "economies of time and expense" favor class certification, -- a statement that the majority opinion does not contradict. Sears is wrong to think that anything a dissenting opinion approves of the majority must disapprove of.

Sears compares the design changes that may have affected the severity of the mold problem to the different antitrust liability theories in <u>Comcast</u>.  But it was not the existence of multiple theories in that case that precluded class certification; it was the plaintiffs' failure to base all the damages they sought on the antitrust impact -- the injury -- of which the plaintiffs were complaining. In contrast, any buyer of a Kenmore washing machine who experienced a mold problem was harmed by a breach of warranty alleged in the complaint.

The United States Court of Appeals for the Sixth Circuit handled essentially the same case -- a class action against Sears for defective washing machines -- in In re Whirlpool Corp. Front-Loading Washing Products Liability Litigation, 678 F.3d 409 (6th Cir. 2012), and also elected to certify the mold-based claim.[20]

> [W]e have no difficulty affirming the district court's finding that common questions predominate over individual ones and that the class action mechanism is the superior method to resolve these claims fairly and efficiently. This is especially true since class members are not likely to file individual actions because the cost of litigation would dwarf any potential recovery. See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 617 (1997)(finding that in drafting Rule 23(b)(3), "the Advisory Committee had dominantly in mind vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all'"). Further, [as] the district court observed, any class member who wishes to control his or her own litigation may opt out of the class under Rule 23(b)(3)(A).

In re Whirlpool Corp. Front-Loading Washing Prods. Liab. Litig., 678 F.3d at 421 (citation omitted). That case was also vacated after Comcast Corp. v. Behrend, and, like the Seventh Circuit, the Sixth Circuit reaffirmed its prior decision, fleshing out the predominance inquiry in more detail than it had done in its prior opinion:

> Whirlpool does not point to any "fatal dissimilarity" among the members of the certified class that would render the class action mechanism unfair or inefficient

---

> Furthermore and fundamentally, the district court in our case, unlike Comcast, neither was asked to decide nor did decide whether to determine damages on a class-wide basis. As we explained in McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 672 F.3d 482, 491-92 (7th Cir. 2012), a class action limited to determining liability on a class-wide basis, with separate hearings to determine -- if liability is established -- the damages of individual class members, or homogeneous groups of class members, is permitted by Rule 23(c)(4) and will often be the sensible way to proceed.

Butler v. Sears, Roebuck & Co., 727 F.3d at 799-800 (emphasis in Butler v. Sears, Roebuck & Co. but not Comcast Corp. v. Behrend, except as noted)(citations omitted).

[20]The Sixth Circuit's class "did not involve the other claim in [the Seventh Circuit's] case, the control unit claim." Butler v. Sears, Roebuck & Co., 727 F.3d at 802.

for decision-making.  Instead, Whirlpool points to "a fatal similarity --[an alleged] failure of proof as to an element of the plaintiffs' cause of action."  That contention, the Supreme Court instructs, "is properly addressed at trial or in a ruling on a summary-judgment motion.  The allegation should not be resolved in deciding whether to certify a proposed class."  Tracking the Supreme Court's reasoning, we conclude here that common questions predominate over any individual ones.  Simply put, this case comports with the "focus of the predominance inquiry" -- it is "sufficiently cohesive to warrant adjudication by representation."

In re Whirlpool Corp. Front-Loading Washing Prods. Liab. Litig., 722 F.3d 838, 859 (7th Cir. 2013)(citations omitted).  The Seventh Circuit and Sixth Circuit, thus, define predominance in much the same way: if the district court can design a mechanism for trying the case that is fair to the defendants and more efficient than individual litigation of the same dispute, then predominance is satisfied.  See Butler v. Sears, Roebuck & Co., 727 F.3d at 802.  This styling of the predominance inquiry is in keeping with that given, many years earlier, by a leading class-action treatise:

> [A] court addressing predominance must determine whether the evidence about the putative class representative's circumstances and the opposing evidence from the defense will enable a jury to make across-the-board "yes" or "no" factual determinations that fairly resolve the claims of the entire class. Where the right to recover for each class member would "turn . . . on facts particular to each individual plaintiff," class treatment makes little sense.  If the resolution of the common issues devolves into an unmanageable variety of individual issues, then the lack of increased efficiency will prohibit certification of the class.
>
> The predominance and efficiency criteria are of course intertwined.  When there are predominant issues of law or fact, resolution of those issues in one proceeding efficiently resolves those issues with regard to all claimants in the class.  When there are no predominant issues of law or fact, however -- as in the instant case -- class treatment would be either singularly inefficient, as one court attempts to resolve diverse claims from around the country in its own courtroom, or unjust, as the various factual and legal nuances of particular claims are lost in the press to clear the lone court's docket.

McLaughlin on Class Actions § 5:23 (11th ed. 2016)(omission in original)(footnotes omitted).

Although the Seventh Circuit and the Sixth Circuit may agree about the definition of predominance, the Third Circuit, Tenth Circuit, and United States Court of Appeals for the Eleventh Circuit stake out a different test.

> "Whether an issue predominates can only be determined after considering what value the resolution of the class-wide issue will have in each class member's underlying cause of action." Common issues of fact and law predominate if they "'ha[ve] a direct impact on every class member's effort to establish liability' *that is more substantial than the impact of individualized issues* in resolving the claim or claims of each class member." If "after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, [their] claims are not suitable for class certification under Rule 23(b)(3)."

Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Serv., Inc., 601 F.3d 1159, 1170 (11th Cir. 2010)(emphasis in original)(citations omitted).[21]   The Eleventh Circuit, however,

---

[21]The Eleventh Circuit first adopted this test -- relying on district court decisions -- in 2004 in Klay v. Humana, Inc., 382 F.3d 1241 (11th Cir. 2004), and gave renewed articulations of the test in 2009 in Vega v. T-Mobile USA, Inc., 564 F.3d 1256 (11th Cir. 2009), and in 2010, in Sacred Heart Health Systems, Inc. v. Humana Healthcare Services, Inc. In each case, the Eleventh Circuit made some reference to additionally adopting a United States Court of Appeals for the Fifth Circuit rule-of-thumb test:

> An alternate formulation of this test was offered in Alabama v. Blue Bird Body Co., 573 F.2d 309 (5th Cir. 1978). In that case, we observed that if common issues truly predominate over individualized issues in a lawsuit, then "the addition or subtraction of any of the plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of evidence offered." Put simply, if the addition of more plaintiffs to a class requires the presentation of significant amounts of new evidence, that strongly suggests that individual issues (made relevant only through the inclusion of these new class members) are important. Alabama v. Blue Bird Body Co., 573 F.2d at 322 ("If such addition or subtraction of plaintiffs does affect the substance or quantity of evidence offered, then the necessary common question might not be present."). If, on the other hand, the addition of more plaintiffs leaves the quantum of evidence introduced by the plaintiffs as a whole relatively undisturbed, then common issues are likely to predominate.

imposes a different, more rigorous, second step: the district court's trial plan must spend more time

adjudicating the common questions than it does adjudicating the individual questions.   The

Eleventh Circuit's test may not be the greatest -- the Court sees little reason why negative-value

cases that can be fairly and efficiently adjudicated via class action should not be certified[22] -- but

---

Klay v. Humana, Inc., 382 F.3d at 1255.  See Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Serv., Inc., 601 F.3d at 1170 ("In practical terms, while '[i]t is not necessary that all questions of fact or law be common,' 'the addition or subtraction of any of the plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of evidence offered.'"); Vega v. T-Mobile USA, Inc., 564 F.3d at 1270 (quoting the above portion of Klay v. Humana, Inc.).

The Fifth Circuit, however, was not setting forth a test for when predominance is satisfied so much as a test for when an issue is common versus individualized.  The Fifth Circuit's full quote -- without the Eleventh Circuit's alterations -- is:

> We only point out that in a situation wherein one seeks to represent a nationwide class in order to obtain redress for harm done from a nationwide conspiracy consideration should be given to whether the addition or subtraction of any of the plaintiffs to or from the class will have a substantial effect on the substance or quantity of evidence offered.  If such addition or subtraction of plaintiffs does affect the substance or quantity of evidence offered, then the necessary common question might not be present.

Alabama v. Blue Bird Body Co., 573 F.2d at 322 (footnote omitted).

[22]In fairness to the Eleventh Circuit, Judge Posner's test merges the predominance and superiority inquiries -- effectively reading out predominance -- in negative-value cases.  Thus, the Eleventh Circuit's test is truer to rule 23's text than Judge Posner's.  "Predominate," the word that rule 23 uses, means "[t]o be of greater power, importance, or quantity; be most important or outstanding."  The American Heritage Dictionary of the English Language, supra, at 1032.  Rule 23's text thus arguably suggests a direct comparison of common and individual issues, and not -- as Judge Posner suggests -- an indirect comparison that decides the predominance question on the basis of a fancy economic analysis.  There are, however, two other rule 23 provisions whose impact on predominance is not often discussed: (i) the issue class-action clause, see Fed. R. Civ. P. 23(c)(4) ("When appropriate, an action may be brought or maintained as a class action with respect to particular issues."); and (ii) the subclassification clause, see Fed. R. Civ. P. 23(c)(5) ("When appropriate, a class may be divided into subclasses that are each treated as a class under this rule.").  These provisions are unfortunate for those who wish to read rule 23 as containing the seeds of its own destruction.  Rule 23(c)(4) allows for adjudication of common issues, even if these issues do not add up to a common claim.  Rule 23(c)(5) allows for collective adjudication, even if it falls short of being completely "classwide" adjudication.  Judge Posner's test explicitly admits of

subclasses and issue classes.  Even if it had not allowed for these classes, their impact in Judge Posner's analysis would be obvious: the district court uses the tools of subclassification and issue classification -- along with other management tools, such as polyfurcation -- to design a class-action management plan, and then decide whether the plan is more or less efficient than separate trials.

The impact that these provisions have on the Eleventh Circuit's approach is less clear.  The Eleventh Circuit's best discussion of subclasses comes from <u>Sacred Heart Health Systems, Inc. v. Humana Military Healthcare Services, Inc.</u>:

> [W]e cannot accept the district court's proposal to use subclasses corresponding to the hospitals' six categories of payment clauses.  We recognize the long and venerated practice of creating subclasses as a device to manage complex class actions, but the six subclasses proposed here mask a staggering contractual variety.  The sixth proposed subclass -- a miscellaneous residue of numerous payment clauses that are insusceptible of ready classification -- alone is fatal to predominance.  When this "potpourri" subclass, as Humana has termed it, is broken down into its disparate component parts, the illusion of uniformity gives way to nearly thirty subclasses.

> Common sense tells us that "[t]he necessity of a large number of subclasses may indicate that common questions do not predominate," <u>Manual for Complex Litigation</u> § 21.23 (4th ed. 2004); <u>see also</u> <u>Harding v. Tambrands Inc.</u>, 165 F.R.D. 623, 630 (D. Kan. 1996)("The potential for numerous different subclasses weighs against a finding of predominance of common issues.").  Here, the necessary recourse to a "miscellaneous" subclass readily indicates the lack of a predominant question.

> Ultimately, after examining the many individualized payment clauses contained in the network agreements, we perceive a "distinct possibility that there was a breach of contract with some class members, but not with other class members."  Subclasses are no answer to this problem, meaning that the efficiency of a class action will be lost entirely unless the hospitals are allowed "to stitch together the strongest contract case based on language from various [contracts], with no necessary connection to their own contract rights.  The hospitals, however, may not lawfully "amalgamate" their disparate claims in the name of convenience.  The Rules Enabling Act, 28 U.S.C. § 2072 -- and due process -- prevents the use of class actions from abridging the substantive rights of any party.  Yet, from the record before us, an abridgment of the defendant's rights seems the most likely result of class treatment.  By glossing over the striking differences in the material terms of the agreements, the district court created an "unnecessarily high risk," of such unlawful results, and thereby abused its discretion.

601 F.3d at 1176 (citations omitted).  These statements imply that, but for the sixth "category" of payment clauses -- really a catchall for all contracts that did not fit into one of the five real

categories -- the class would be certifiable. The only "abridgement of the defendant's rights" that the district court's plan would produce would be the "'amalgamat[ion]'" of different contractual language into a single category -- the sixth category. 601 F.3d at 1176. That case, thus, leaves open the question whether subclassification and issue certification can aid in satisfying predominance, or if these techniques are separate from the predominance inquiry.

The Fifth Circuit staked out a clear answer to this question in its much-discussed <u>Castano v. American Tobacco Company</u>, 84 F.3d 734 (5th Cir. 1996) case, deciding the issue in a way one might expect:

> Severing the defendants' conduct from reliance under rule 23(c)(4) does not save the class action. A district court cannot manufacture predominance through the nimble use of subdivision (c)(4). The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial. Reading rule 23(c)(4) as allowing a court to sever issues until the remaining common issue predominates over the remaining individual issues would eviscerate the predominance requirement of rule 23(b)(3); the result would be automatic certification in every case where there is a common issue, a result that could not have been intended.

84 F.3d at 745 n.21 (citations omitted). This logic is hardly unassailable. Namely, the result of reading rules 23(c)(4) and (c)(5) as bearing on the predominance inquiry would <u>not</u> be "automatic certification in every case where there is a common issue," because superiority must still be satisfied. <u>Castano v. Am. Tobacco Co.</u>, 84 F.3d at 745 n.21. If a proposed class action is superior -- <u>e.g.</u>, if it lacks the value to be brought on an individual basis -- and individual issues can be pared away via rules 23(c)(4) and (c)(5) then it is not clear why certification "could not have been intended" by the rule. <u>Castano v. Am. Tobacco Co.</u>, 84 F.3d at 745 n.21. Moreover, it is a poor reading of the rule's text. Presumably, even if rules 23(c)(4) and (c)(5) are mere "housekeeping rule[s]," they would still alleviate "likely difficulties in managing a class action." <u>Castano v. Am. Tobacco Co.</u>, 84 F.3d at 745 n.21; Fed. R. Civ. P. 23(b)(3)(D). Because rule 23 directs that "[t]he matters pertinent to these findings [predominance and superiority] include: . . . the likely difficulties in managing a class action," the Court, if it were writing on a clear slate would think that rules 23(c)(4) and (c)(5) would play a part in the predominance determination, Fed. R. Civ. P. 23(b)(3), and that this result thus "could not have been intended." <u>Castano v. Am. Tobacco Co.</u>, 84 F.3d at 745 n.21. The Fifth Circuit's approach attracted the adherence of a revered jurist on the Fourth Circuit -- although not the Fourth Circuit itself. The Honorable Paul V. Niemeyer, United States Circuit Judge for the Fourth Circuit, endorsed the Fifth Circuit's view in an opinion concurring in part and dissenting in part from an opinion in which the Fourth Circuit adopted the opposing view:

> Despite the overwhelming predominance of these individualized issues and claims over the common issue that the majority now certifies for class treatment, the majority has adopted an inventive approach to Rule 23 that allows certification

of a class where the predominance requirement of Rule 23(b)(3) is admittedly unmet in the context of the case as a whole. According to the majority, to require the certified issue in this case to predominate over the individualized issues in the action as a whole ignores Rule 23(c)(4)(A), which it appears to view as a fourth avenue for class certification, on equal footing with Rules 23(b)(1), 23(b)(2), and 23(b)(3). In doing so, the majority glorifies Rule 23(c)(4)(A) -- a housekeeping rule that authorizes a court to certify for class treatment "particular issues" in a case that otherwise satisfies Rule 23(a) and 23(b) -- with the effect of materially rewriting Rule 23 such that Rule 23(b)(3)'s requirements no longer need be applied to "[a]n action," see Fed. R. Civ. P. 23(b), but rather to any single issue, no matter how small.

Not only does the majority's approach expand Rule 23 beyond its intended reach, but it also creates a direct conflict with the Fifth Circuit which has held:

> A district court cannot manufacture predominance through the nimble use of subdivision (c)(4). The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) in that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial.

Castano v. American Tobacco Co., 84 F.3d [at ]745 n.21 . . . .

Gunnells v. Healthplan Servs., Inc., 348 F.3d 417, 446-47 (4th Cir. 2003)(Niemeyer, J., concurring in part and dissenting in part). Despite Judge Niemeyer's concern with creating a circuit split, the United States Court of Appeals for the Second Circuit, the United States Court of Appeals for the Ninth Circuit, and, of course, the Seventh Circuit have all held that subclasses can be used to satisfy predominance concerns since at least 2001, two years before Gunnells v. Healthplan Services, Inc. See Zinser v. Accufix Research Inst., Inc. 253 F.3d 1180, 1189-90, 1192 n.8 (9th Cir. 2001). See Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 167-69 (2d Cir. 2001); Jefferson v. Ingersoll Int'l Inc., 195 F.3d 894, 898 (7th Cir. 1999).

The Eleventh Circuit has refrained from taking a side on this question:

> Some have been critical of the piecemeal certification of class action status for claims within a case. See Gunnells v. Healthplan Servs., Inc., 348 F.3d 417, 446-47 (4th Cir. 2003)(Niemeyer, J., dissenting)(arguing that the predominance requirement in Fed. R. Civ. P. 23(b) applies to the action as a whole, not to individual subclasses or claims); Castano v. Am. Tobacco Co., 84 F.3d . . . 745 n.21 . . . ("The proper interpretation of the interaction between [Fed. R. Civ. P. 23] subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that

it is commendable in that it is a test that district courts can use, rather than yet another meaningless recitation, see CGC Holding Co. v. Broad & Cassel, 773 F.3d 1076, 1087 (10th Cir. 2014)("[T]he predominance prong 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation defeating, individual issues." (quoting William B. Rubenstein, Newberg on Class Actions § 4:49 (5th ed. 2017)("Newberg"))), circular axiom, see, e.g., Amchem Prods., Inc. v. Windsor, 521 U.S. at 623 ("The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."), obvious guidepost, see Reed v. Bowen, 849 F.2d at 1309 ("Each case must be decided on its own facts, on the basis of 'practicalities and prudential considerations.'"), self-evident comparison, see Monreal v. Potter, 367 F.3d at 1237 ("[T]he predominance criterion of Rule 23(b)(3) [i]s 'far more demanding' tha[n] the Rule 23(a) commonality requirement[.]" (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. at 623-24)), or

---

allows courts to sever the common issues for a class trial."). We did not directly address the propriety of such partial certification in Klay.

Borrero v. United Healthcare of N.Y., Inc., 610 F.3d 1296, 1310 n.5 (11th Cir. 2010)(alterations in original). The Tenth Circuit also appears to have refrained from taking a side:

Plaintiffs urge us to consider a "hybrid" certification whereby the liability stage might be certified for class treatment under Rule 23(b)(2) even if the damages stage does not qualify for such treatment. See Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 167-69 (2d Cir. 2001). Compare Lemon v. Int'l Union of Operating Engr's, Local No. 139, AFL-CIO, 216 F.3d 577, 581 (7th Cir. 2000), and Jefferson v. Ingersoll Int'l Inc., 195 F.3d 894, 898 (7th Cir. 1999), with Allison v. Citgo Petroleum Corp., 151 F.3d 402, 420-22 (5th Cir. 1998). We do not need to rule on a hybrid possibility because in the instant case, the liability stage does not satisfy either Rules 23(b)(2) or 23(b)(3). The district court's ruling that plaintiffs did not allege a sufficient policy, practice or pattern of discrimination to warrant class treatment for liability determination is not an abuse of discretion.

Monreal v. Potter, 367 F.3d at 1237 n.12.

worthless slogan, see Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 600 (3d Cir.

2012)(exhorting district courts to examine claims "'through the prism' of Rule 23(b)(3)").

The Tenth Circuit followed the Eleventh Circuit's approach in CGC Holding Co., LLC v.

Broad and Cassel.

> Predominance regularly presents the greatest obstacle to class certification, especially in fraud cases. Accordingly, the issues disputed in this case are not unusual. And given our obligation to ensure that the district court did not err in conducting its rigorous analysis, we must *characterize* the issues in the case as common or not, and then *weigh* which issues predominate. Here, that task requires us to survey the elements of the class's RICO claims to consider (1) which of those elements are susceptible to generalized proof, and (2) whether those that are so susceptible predominate over those that are not. Stated another way, consideration of how the class intends to answer factual and legal questions to prove its claim -- and the extent to which the evidence needed to do so is common or individual -- will frequently entail some discussion of the claim itself.

> In this context, it is worth reiterating that our review on appeal is limited. For the purposes of class certification, our primary function is to ensure that the requirements of Rule 23 are satisfied, not to make a determination on the merits of the putative class's claims. But it is impractical to construct "an impermeable wall" that will prevent the merits from bleeding into the class certification decision to some degree. So, although class certification does not depend on the merits of the suit, "[e]valuation of many of the questions entering into determination of class action questions is intimately involved with the merits of the claims."

> With these legal principles in mind, "[c]onsidering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." For this limited purpose, we consider the proposed class's claim for a RICO conspiracy.

CGC Holding Co., LLC v. Broad and Cassel, 773 F.3d at 1087-88.

## ANALYSIS

The Court will address the MTD at or after the class certification hearing, and so the Court

will deny the Plaintiffs' and Sandia Labs' invitations to consider the MTD at this point. After

considering both the Plaintiffs' and Sandia Labs' proposed case schedules, the Court concludes

that it will provide the parties with a case schedule varying slightly from both proposed case schedules. The Court will modify the Joint Proposed Case Schedule as follows:

| Event | Original Deadline |
|---|---|
| Stipulated discovery stay ends | November 26, 2018 |
| Sandia completes production of ESI, including final privilege log | January 15, 2019 |
| Pre-class certification discovery deadline | March 11, 2019 |
| Plaintiffs submit motion for class certification and expert reports | March 25, 2019 |
| Sandia submits opposition to class certification and expert reports | May 16, 2019 |
| Plaintiffs submit reply motion and expert reports | June 18, 2019 |
| Class certification hearing | July 1, 2019 |

The Court recognizes that condensing the case schedule to accommodate a July 1, 2019, class certification hearing challenges both parties. The parties have expressed their concerns about shortened deadlines: Sandia Labs worries about completing ESI production, see Letter Response at 2; the Plaintiffs have concerns about completing discovery, litigating discovery issues, and preparing the class certification motion and expert reports, see Letter at 4; and both proposed case schedules reflect attempts to maximize the parties' time to respond to class certification and expert briefings, see Letter at 2, Letter Response at 2.

The Court concludes that the revised case schedule will best address its and the parties' concerns. The revised case schedule allows Sandia Labs slightly over six weeks and time after the holidays to complete its ESI production. The Court is disinclined to grant Sandia Labs additional time for ESI production, because the Court hesitates to reduce the time between the ESI production's completion and the pre-class certification discovery, class certification motion, and

expert reports deadlines to a degree that would disallow the Court and the parties time for litigation, which the Plaintiffs have indicated they will seek, about the discovery. See Letter at 4; Letter Reply at 1-2. The Court's experience with Sandia Labs' discovery production has not been the best, and the Court fears it better build in time for and anticipate forthcoming discovery disputes. See generally Memorandum Opinion and Order Overruling the Defendant's Objections and Affirming the Magistrate Judge's Order, 2018 WL 4148423, filed August 30, 2018 (Doc. 160). As the July 1, 2019, class certification hearing deadline responds to the Court's scheduling needs and the Court wants to address discovery litigation before the class certification hearing, the Court's schedule reflects an attempt to leave time for the Court and the parties to address the discovery litigation without interfering with the class certification deadline. Sandia Labs can always withdraw the MTD to relieve pressure on its ESI production; if Sandia Labs withdraws its MTD, the Court has no need to set aside the case schedule to which the parties previously agreed. As long as Sandia Labs insists on keeping its MTD on file, the Court must rule on it before the six-month deadline, and the Court thinks it would be best to rule on it with the Plaintiffs' upcoming class certification motion. The March deadline for the class certification motion and expert reports allows the Plaintiffs over two months for discovery and preparation for the motion and reports. The initial stipulated time between the ESI production completion, and the class certification motion and expert reports deadline was similarly just over two months. See Joint Proposed Case Schedule at 2. The revised case schedule will also reduce Sandia Labs' response time and the Plaintiffs' reply time proportionately, by forty percent, giving Sandia Labs forty-five days to respond to the Plaintiffs' class certification motion and expert reports, and the Plaintiffs thirty days to reply to Sandia Labs' responses. Fairness demands that the parties face equal reductions in their response and reply times.

**IT IS ORDERED** that: (i) the requests in the Plaintiffs' Letter from Anne B. Shaver, Lieff, Cabraser, Heimann & Bernstein, LLP, to the Court (dated November 12, 2018), filed November 12, 2018 (Doc. 187), are granted in part and denied in part; and (ii) the requests in the Defendant's Letter from Krissy A. Katzenstein, Morgan Lewis, to the Court at 1 (dated November 15, 2018), filed November 15, 2018 (Doc. 188), are granted in part and denied in part.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Gretchen Mary Elsner
Elsner Law & Policy, LLC
Santa Fe, New Mexico

--and--

Rachel Bien
Outten & Golden LLP
San Francisco, California

--and--

Adam T. Klein
Cheryl-Lyn D. Bentley
Elizabeth V. Stork
Outten & Golden LLP
New York, New York

--and--

David Lopez
Outten & Golden LLP
Washington, D.C.

--and--

Anne Brackett Shaver
Kelly Maureen Dermody
Lin Yee Chan
Michael Ian Levin-Gesundheit
Shira J. Tevah
Tiseme Gabriella Zegeye
Lieff Cabraser Heimann & Bernstein, LLP
San Francisco, California

     *Attorneys for the Plaintiffs*

Justin E. Poore
Cindy Jean Lovato-Farmer
Sandia Corporation
Albuquerque, New Mexico

--and--

Michael S. Burkhardt
Grace E. Speights
Krissy A. Katzenstein
Morgan, Lewis & Bockius LLP
Washington, D.C.

--and--

Scott D. Gordon
Theresa W. Parrish
Jeffrey L. Lowry
Paola Viviana Jaime
Stephanie L. Latimer
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

     *Attorneys for the Defendant*