IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

LISA A. KENNICOTT, LISA A. GARCIA,
SUE C. PHELPS, and JUDI DOOLITTLE, on
behalf of themselves and a class of those
similarly situated,

       Plaintiffs,

vs.                                                                                  No. CIV 17-0188 JB\GJF

SANDIA CORPORATION d/b/a SANDIA
NATIONAL LABORATORIES,

       Defendant.

**MEMORANDUM OPINION AND ORDER**

     **THIS MATTER** comes before the Court on Plaintiffs' Letter from Anne B. Shaver, Lieff,

Cabraser, Heimann & Bernstein, LLP, to the Court (dated December 6, 2018), filed December 6,

2018 (Doc. 194)("Letter").  The Court held a hearing on December 11, 2018.  See Clerk's Minutes

at 1, filed December 11, 2018 (Doc. 198).  The primary issues are: (i) whether the Court should

order Defendant Sandia Corporation d/b/a Sandia National Laboratories ("Sandia Labs") to

produce discovery on its current -- post-April, 2017 -- employment policies and practices; and

(ii) whether the Court should order Sandia Labs to produce data on its employees' prior pay.  In

the Letter from Krissy A. Katzenstein, Morgan Lewis, to the Court (dated December 10, 2018),

filed December 10, 2018 (Doc. 196)("Letter Response"), Sandia Labs concedes that it will produce

discovery on the prior pay data.  See Letter Response at 4.  Accordingly, the Court need not order

Sandia Labs to produce such information.  Because discovery postdating April, 2017, is relevant

to the Plaintiffs'[1] claims and because the Court can order Sandia Labs to produce discovery that is

proportional to the Plaintiffs' needs, the Court will order Sandia Labs to produce its 2018, policy

documents and electronically stored information ("ESI") related to the "vice president of human

resources post-transition" -- now "associate laboratory director of human resources" (hereinafter,

"vice president" or "vice president of human resources").  Draft Transcript of Hearing at 20:11-13

---

[1]"Plaintiffs" refers to the named Plaintiffs -- Lisa A. Kennicott, Lisa A. Garcia, Sue C.
Phelps, and Judi Doolittle -- and similarly situated individuals "employed by Sandia in the United
States at any time from February 20, 2014 through the resolution of this action."   See First
Amended Class Action Complaint at 1, filed July 5, 2018 (Doc. 146); id. ¶ 41, at 9.

(taken December 11, 2018)(Levin-Gesundheit)("Tr."); id. at 22:8 (Levin-Gesundheit).[2]   The

Court, therefore, grants the Plaintiffs' requests in part and denies them in part.

## FACTUAL BACKGROUND

The Court recited this case's facts and early procedural history in its Memorandum Opinion

and Order at 2-3, 2018 WL 6069635, at *1, filed November 20, 2018 (Doc. 190)("MOO").   The

Court incorporates that recitation here.

> Plaintiffs Lisa A. Kennicott, Lisa A. Garcia, Sue C. Phelps, and Judi
> Doolittle allege that Sandia Labs, "a federally-funded research and development
> contractor operating under contract for the Department of Energy and managed by
> Sandia Corporation," First Amended Class Action Complaint ¶ 1, at 1, filed July 5,
> 2018 (Doc. 146)("First Amended Complaint"), has "policies, patterns, and
> practices," which result in female employees earning lower compensation and
> fewer promotions than "their male counterparts," First Amended Complaint ¶ 3, at
> 2.  According to the Plaintiffs, Sandia Labs applies uniform policies in its offices
> throughout the United States of America.  See First Amended Complaint ¶¶ 22-23,
> at 5-6.  The Plaintiffs allege that Sandia Labs' employee performance evaluation
> process, see First Amended Complaint ¶¶ 26-30, at 6-7, initial salary calculations,
> see First Amended Complaint ¶¶ 31-35, at 7-8, and promotion system, see First
> Amended Complaint ¶¶ 36-40, at 8-9, disadvantage women, see First Amended
> Complaint ¶¶ 26-40, at 6-9.

MOO at 2, 2018 WL 6069635, at *1.

## PROCEDURAL BACKGROUND

> Kennicott, Garcia, and Phelps sue Sandia Labs on behalf of themselves and
> a class of those similarly situated.  See Class Action Complaint, filed February 7,
> 2017 (Doc. 1)("Complaint").[3]  Doolittle joined Kennicott, Garcia, and Phelps as a
> named plaintiff when the Plaintiffs amended their Complaint.  See First Amended
> Complaint at 1.  In the First Amended Complaint, the Plaintiffs assert: (i) that
> Sandia Labs engages in intentional discrimination, violating Title VII of the Civil
> Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-15 ("Title VII"); and (ii) that
> Sandia Labs engages in disparate impact discrimination in violation of Title VII.
> See Amended Complaint ¶¶ 85-99, at 21-23.  Kennicott asserts individual Title VII
> claims against Sandia Labs for retaliation and constructive discharge.
> See Amended Complaint ¶¶ 100-08, at 23-24.

MOO at 2, 2018 WL 6069635, at *1.  In the MOO, the Court issues an updated case schedule:

---

[2]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

[3]The Court dismissed the Plaintiffs' state-law claims -- the Complaint's Counts III, IV, V, and VII -- under the federal enclave doctrine.  See Order at 1, filed March 31, 2018 (Doc. 106).  For the Court's reasoning for the dismissal, see generally Memorandum Opinion, 314 F. Supp. 3d 1142, filed May 14, 2018 (Doc. 113).

| Event | Original Deadline |
|---|---|
| Stipulated discovery stay ends | November 26, 2018 |
| Sandia [Labs] completes production of ESI, including final privilege log | January 15, 2019 |
| Pre-class certification discovery deadline | March 11, 2019 |
| Plaintiffs submit motion for class certification and expert reports | March 25, 2019 |
| Sandia [Labs] submits opposition to class certification and expert reports | May 16, 2019 |
| Plaintiffs submit reply motion and expert reports | June 18, 2019 |
| Class certification hearing | July 1, 2019 |

MOO at 66, 2018 WL 6069635, at *27.  On December 6, 2018, the Plaintiffs filed the letter, requesting the Court's assistance with discovery disputes so that the parties can meet the case deadlines.  See Letter at 1.

1.     **The Letter.**

The Plaintiffs notify the Court of two discovery disputes.  See Letter at 1.  The Plaintiffs first complain that Sandia Labs refuses to produce discovery on policies and practices that postdate April, 2017.  See Letter at 1.  The Plaintiffs explain that, on May 1, 2017, "management of Sandia National Laboratories . . . transferred from Sandia Corporation, a subsidiary of Lockheed Martin Corporation, to National Technology and Engineering Solutions of Sandia ('NTESS'), LLC, a subsidiary of Honeywell International, Inc."  Letter at 1-2 (citing Corporate Disclosure Statement at 1-2, filed March 17, 2017 (Doc. 16)).  According to the Plaintiffs, Sandia Labs has taken the position that its policies and practices postdating the transfer are not relevant.  See Letter at 2.  The Plaintiffs, however, contend that their Complaint and Amended Compliant allege "*ongoing* violations of Title VII."  Letter at 2 (emphasis in original).  The Plaintiffs request that the Court order Sandia Labs to produce the requested discovery for the period from May, 2017, through December, 2018.  See Letter at 3.

The Plaintiffs next aver that Sandia Labs has withheld information regarding its employees' prior pay data.  See Letter at 3.  The Plaintiffs describe that they requested information on employees' "compensation histories" in May, 2017, Letter at 3 (quoting Defendant's Objections and Responses to Plaintiffs' First Set of Requests for Production of Documents, Request No. 5, at 8, filed March 19, 2018 (Doc. 100-1)), and, according to the Plaintiffs,

compensation from prior employers is "an essential component of this information" and relevant to the Plaintiffs' claims.  Letter at 3.  The Plaintiffs request that the Court order that Sandia Labs produce the requested information within one week so that the Plaintiffs may analyze the information before the deadline for their class certification motion.  See Letter at 4.

      **2.**    **The Letter Response.**

      Sandia Labs responds in a letter dated December 10, 2018.  See Letter Response at 1-5. Sandia Labs first contends that it did not refuse to provide prior pay data; rather, according to Sandia Labs, it told the Plaintiffs that they had not requested production of such documents. See Letter Response at 2.  Sandia Labs quotes the Plaintiffs' discovery request and emphasizes that the Plaintiffs desired "***prior job history within and outside of Sandia***."  Letter Response at 2 (emphasis in Letter Response)(quoting Defendant's Objections and Responses to Plaintiffs' First Set of Requests for Production of Documents, Request No. 5, at 8).  Sandia Labs explains that, in July, 2018, it provided the Plaintiffs information on its employees' job histories, such as "prior employers, prior employment dates, and positions held," and that the Plaintiffs did not indicate, at that time, any problems with the production.  Letter Response at 3.  Sandia Labs explains that, in October, 2018, the Plaintiffs requested the prior pay data about which they now complain. See Letter Response at 3.  According to Sandia Labs, after it informed the Plaintiffs that they had not previously requested such information, the Plaintiffs served a request for production seeking information on: "compensation in dollar terms, whether in terms of annual salary, hourly wage, bonus compensation AND/OR any other form of compensation, previously received or requested prior to hire AND/OR offer of employment for DEFENDANT's EMPLOYEES AND applicants." Letter Response at 3 (quoting Plaintiffs' Fourth Set of Requests for Production of Documents, Request No. 39, at 5, filed December 10, 2018 (Doc. 196-3)(capitalization in Plaintiffs' Fourth Set of Requests for Production of Documents)).  Sandia Labs concedes that, despite its complaints, it will produce to the Plaintiffs the requested information.  See Letter at 4.

      Sandia Labs next contends that the Plaintiffs cannot ground their claims on policies and practices that postdate the transition from Sandia Corporation to National Technology and Engineering Solutions of Sandia ("National Technology").  See Letter at 4.  Sandia Labs first avers that, because Sandia Labs primarily employed the named Plaintiffs during Sandia Corporation's management, the Plaintiffs cannot base a class claim on later policies and practices.  See Letter

Response at 4.  Second, Sandia Labs argues that, to the extent that the Plaintiffs base their claims on their starting pay, any policy or practice postdating April, 2017, is irrelevant, because Sandia Labs hired each named Plaintiff at least ***thirteen years*** before the transition date."   Letter Response at 4 (emphasis in original).  Last, Sandia Labs protests that it has already produced documentation on thousands of Sandia Labs' employees, and so, if the Plaintiffs cannot develop a theory from that discovery, no theory exists.  See Letter Response at 4-5.

### 3.    **The Letter Reply.**

Also on December 10, 2018, the Plaintiffs replied to the Letter Response.  See Letter from Anne B. Shaver, Lieff, Cabraser, Heimann & Bernstein, LLP, to the Court (dated December 10, 2018), filed December 10, 2018 (Doc. 196)("Letter Reply").   The Plaintiffs first consider the dispute about discovery postdating April, 2017.  See Letter Reply at 1.  The Plaintiffs argue that their claims do not rest solely on Sandia Labs' policies and practices, and that three of the four named Plaintiffs continued working for Sandia Labs after the transition to National Technology. See Letter Reply at 1.  Further, the Plaintiffs note that designing injunctive relief "to Sandia's human resources practices" requires knowledge about current policies and practices.  Letter Reply at 1.  The Plaintiffs additionally comment that, although Sandia Labs has produced considerable discovery already, they require information about employment procedures under National Technology to determine whether Sandia Labs' policies and practices changed.  See Letter Reply at 1.  The Plaintiffs concede that, because Sandia Labs agreed to produce employees' compensation histories, the dispute regarding "prior pay data" is moot.  Letter Reply at 2.  The Plaintiffs conclude by noting that Sandia Labs mischaracterizes their claims.  See Reply Letter at 2.  According to the Plaintiffs, "Plaintiffs' allegation regarding the role of prior pay in salary setting at hire does not represent the sum of Plaintiffs' claims," and the Plaintiffs argue, moreover, that "reliance on prior pay to set salaries at the time of hire may cause gender disparities in compensation for years after an employee was initially hired."  Reply Letter at 2.

### 4.    **The Hearing.**

At the hearing on December 11, 2018, the Court began by clarifying whether the parties had resolved their dispute about the prior pay data.  See Tr. at 4:7-15 (Court).  The Plaintiffs affirmed the Court's assessment, see Tr. at 4:19-20 (Levin-Gesundheit), with the caveat that Sandia Labs produce the prior pay data "by the end of this year so we have plenty [of] opportunity

to review it, analyze it[,] and prepare for the class certification briefing and expert report deadlines," Tr. at 4:20-23 (Levin-Gesundheit).   In response to the Court's prompting about a possible deadline, Sandia Labs confirmed that it could produce the discovery in the requested time. See Tr. at 5:4-10 (Court, Katzenstein).

The Plaintiffs turned to the dispute about documents postdating April, 2017, and reiterated their Letter's arguments.   See Tr. at 6:5-11 (Levin-Gesundheit).   The Plaintiffs requested that Sandia Labs produce updated policy documents, updated internal complaints for 2018, employee's checks for 2018, see Tr. at 9:11-17 (Levin-Gesundheit), and "documents collected from the agreed upon custodians through the end of December 2018," Tr. at 19-20 (Levin-Gesundheit).   In response to a question from the Court regarding the April, 2017, date, the Plaintiffs explained that they did not attach much significance to the date, but, that near that date, Sandia Labs' management changed.   See Tr. at 10:7-17 (Levin-Gesundheit).   According to the Plaintiffs, they filed their Complaint "a couple months prior" to the transition, Tr. at 17-18 (Levin-Gesundheit), and the Amended Complaint in July, 2018, see Tr. at 10:18-19 (Levin-Gesundheit).   The Plaintiffs explained that National Technology undertook Sandia Corporations' liabilities, see Tr. at 10:19-11:5 (Levin-Gesundheit), and, according to the Plaintiffs, although some upper-level management changed in the transition, many managers retained their original positions, see Tr. at 11:5-9 (Levin-Gesundheit).   The Plaintiffs concluded that, "at least with respect to policy" documents, Tr. at 11:22 (Levin-Gesundheit), they do not seek voluminous production, and believe that their discovery request "is proportional," Tr. at 12:5 (Levin-Gesundheit).   See id. at 11:21-12:8 (Levin-Gesundheit).

Sandia Labs responded by indicating that the First Amended Complaint's core focuses on events occurring before May, 2017.   See Tr. at 12:13-16:22 (Katzenstein).   Sandia Labs first reiterated the arguments from its Letter Response.   See Tr. at 12:21-13:17 (Katzenstein).   Sandia Labs contended that the Plaintiffs cannot form a class on events after April, 2017, because the named Plaintiffs and others in the proposed class did not work long, if at all, under National Technology.   See Tr. at 13:18-24 (Katzenstein).   Further, according to Sandia Labs, under National Technology, new management -- unconnected to the actions of which the Plaintiffs complain -- entered Sandia Labs.   See Tr. at 23:19-25 (Katzenstein).

Sandia Labs further argued that rule 23 of the Federal Rules of Civil Procedure allows limited discovery to prepare for class certification, and that the discovery relating to the five-and-a-half years preceding May, 2017, should satisfy that requirement. See Tr. at 14:5-15:21 (Katzenstein). Sandia Labs asserted that, although the Plaintiffs request a small number of policy documents, the ESI requested involves thousands of documents and poses a substantial burden for Sandia Labs. See Tr. at 15:22-16:22 (Katzenstein). For the ESI, Sandia Labs must pull emails from the ESI custodians, run searches for relevant information, and review the documents recovered. See Tr. at 18:7-24 (Katzenstein).

The Court asked the Plaintiffs whether they seek ten to twelve documents or thousands of documents. See Tr. at 18:20-21 (Court). The Plaintiffs responded that they seek around twelve policy documents. See Tr. at 18:23 (Levin-Gesundheit). According to the Plaintiffs, at the core, they seek Sandia Labs' policy documents, and the Plaintiffs noted that Sandia Labs had, for months, opposed the discovery on relevance grounds and had only just raised arguments about the discovery's burden. See Tr. at 18:23-19:6 (Levin-Gesundheit). The Plaintiffs, however, admitted that they desire ESI discovery and believe it foundational to their case, because ESI may reveal management's knowledge about discriminatory actions. See Tr. at 19:16-13 (Levin-Gesundheit). The Plaintiffs indicated that, to show their good faith, they would limit their ESI request to a request for information from the "vice president." Tr. at 20:11-13 (Levin-Gesundheit). The Court asked how many documents the Plaintiffs seek from the vice president. See Tr. at 20:14-17 (Court). The Plaintiffs stated that they do not have an exact number. See Tr. at 20:18-21:1 (Levin-Gesundheit). The Court asked what, beyond policy documents, the Plaintiffs seek from the vice-president, see Tr. at 21:14-21 (Court), and the Plaintiffs asserted that they desired ESI, because the vice president is "intimately involved in administering, supervising the implementation of Sandia's human resource policies," Tr. at 21:24-22:1 (Levin-Gesundheit). See id. at 22:4-13 (Levin-Gesundheit).

The Court returned to Sandia Labs to ask how many documents Sandia Labs would expect to produce in ESI limited to the vice president of human resources. See Tr. at 22:14-18 (Court). Sandia Labs could not estimate a number, and, when the Court inquired about the burden Sandia Labs' anticipated in producing the policy documents and ESI, Sandia Labs replied that it considered any discovery to impose a burden and that it still disputed the discovery's relevance.

See Tr. at 23:3-24:3 (Katzenstein).  The Court concluded that it could not limit discovery as Sandia

Labs proposed, because the First Amended Complaint discusses Sandia Labs' current activities.

See Tr. at 24:4-14 (Court).  The Court stated that it would order Sandia Labs to produce the policy

documents and ESI related to the vice president of human resources, and that it would grant the

Plaintiffs' request as modified.  See Tr. at 24:15-23 (Court).

## LAW REGARDING DISCOVERY

Rule 34 governs discovery requests for tangible objects and states:

A party may serve on any other party a request within the scope of Rule 26(b):

> **(1)** to produce and permit the requesting party or its representative to inspect, copy, test, or sample the following items in the responding party's possession, custody, or control:
>
> > **(A)** any designated documents or electronically stored information -- including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations -- stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form; or
> >
> > **(B)** any designated tangible things; or
>
> **(2)** to permit entry onto designated land or other property possessed or controlled by the responding party, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

Fed. R. Civ. P. 34(a).  Discovery's proper scope is "any nonprivileged matter that is relevant to

any party's claim or defense and proportional to the needs of the case. . . ."  Fed. R. Civ. P.

26(b)(1).  The factors that bear upon proportionality are: "the importance of the issues at stake in

the action, the amount in controversy, the parties' relative access to relevant information, the

parties' resources, the importance of the discovery in resolving the issues, and whether the burden

or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(1).

Discovery's scope under rule 26 is broad.  See Gomez v. Martin Marietta Corp., 50 F.3d

1511, 1520 (10th Cir. 1995);  Sanchez v. Matta, 229 F.R.D. 649, 654 (D.N.M.

2004)(Browning, J.)("The federal courts have held that the scope of discovery should be broadly

and liberally construed to achieve the full disclosure of all potentially relevant information.").  The

federal discovery rules reflect the courts' and Congress' recognition that "mutual knowledge of all

the relevant facts gathered by both parties is essential to proper litigation."  Hickman v. Taylor,

329 U.S. 495, 507 (1947).  A district court is not, however, "required to permit plaintiff to engage

in a 'fishing expedition' in the hope of supporting his claim." McGee v. Hayes, 43 F. App'x 214,

217 (10th Cir. 2002)(unpublished)(quoting Munoz v. St. Mary-Corwin Hosp., 221 F.3d 1160, 1169

(10th Cir. 2000)).[4]  "Discovery . . . is not intended to be a fishing expedition, but rather is meant

to allow the parties to flesh out allegations for which they initially have at least a modicum of

objective support."  Rivera v. DJO, LLC, No. CIV 11-1119 JB/RHS, 2012 WL 3860744, at *1

(D.N.M. Aug. 27, 2012)(Browning, J.)(internal quotation marks omitted)(quoting Tottenham v.

Trans World Gaming Corp., No. Civ. 00-7697 (WK), 2002 WL 1967023, at *2 (S.D.N.Y.

2002)(Knapp, J.)).  "[B]road discovery is not without limits and the trial court is given wide

discretion in balancing the needs and rights of both plaintiff and defendant."  Gomez v. Martin

Marietta Corp., 50 F.3d at 1520 (internal quotation marks omitted)(quoting Scales v. J.C. Bradford

& Co., 925 F.2d 901, 906 (6th Cir. 1991)).

    The 2000 amendments to rule 26(b)(1) began narrowing discovery's substantive scope and

injected courts deeper into the discovery process.  See Simon v. Taylor, No. CIV 12-0096

JB/WPL, 2015 WL 2225653, at *23 (D.N.M. April 30, 2015)(Browning, J.).  Before the 2000

amendments, rule 26(b)(1) defined the scope of discovery as follows:

> Parties may obtain discovery regarding any matter, not privileged, which is relevant
> to the subject matter involved in the pending actions, whether it relates to the claim
> or defense of the party seeking discovery or to the claim or defense of any other
> party, including the existence, description, nature, custody, condition and location
> of any books, documents, or other tangible things and the identity and location of
> persons having knowledge of any discoverable matter.  The information sought
> need not be admissible at the trial if the information sought appears reasonably
> calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b)(1) (1996).  The 2000 amendments made the following changes, shown here

with the deleted language stricken and the added material underlined:

> Parties may obtain discovery regarding any matter, not privileged, that which is
> relevant to the subject matter involved in the pending actions, whether it relates to

---

    [4]McGee v. Hayes is an unpublished Tenth Circuit opinion, but the Court can rely on an
unpublished Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case
before it.  See 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited
for their persuasive value.").  The Tenth Circuit has stated: "In this circuit, unpublished orders are
not binding precedent, . . . and . . . citation to unpublished opinions is not favored. . . .  However,
if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and
would assist the court in its disposition, we allow a citation to that decision."  United States v.
Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that McGee v. Hayes, Nard
v. City of Oklahoma City, 153 F. App'x 529, 534 n.4 (10th Cir. 2005)(unpublished), Douglas v.
Norton, 167 F. App'x 698 (10th Cir. 2006), Rhoads v. Miller, 352 F. App'x 289 (10th Cir. 2009),
and Hamilton v. Water Whole International Corp., 302 F. App'x 789 (10th Cir. 2008), have
persuasive value with respect to material issues, and will assist the Court in its preparation of this
Memorandum Opinion and Order.

the claim or defense of ~~the party seeking discovery or to the claim or defense of~~ any ~~other~~ party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter.  For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action.  Relevant ~~The~~ information ~~sought~~ need not be admissible at the trial if discovery the ~~information sought~~ appears reasonably calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b)(1).  Putting aside the last sentence's changes -- which the advisory committee's notes make clear was a housekeeping amendment to clarify that inadmissible evidence must still be relevant to be discoverable -- the 2000 amendments have two effects: (i) they narrow discovery's substantive scope in the first sentence; and (ii) they inject courts into the process in the entirely new second sentence.

In 1978, the Committee published for comment a proposed amendment, suggested by the Section of Litigation of the American Bar Association, to refine the scope of discovery by deleting the "subject matter" language.  This proposal was withdrawn, and the Committee has since then made other changes in the discovery rules to address concerns about overbroad discovery.  Concerns about costs and delay of discovery have persisted nonetheless, and other bar groups have repeatedly renewed similar proposals for amendment to this subdivision to delete the "subject matter" language.  Nearly one-third of the lawyers surveyed in 1997 by the Federal Judicial Center endorsed narrowing the scope of discovery as a means of reducing litigation expense without interfering with fair case resolutions. [Federal Judicial Center, Thomas Willging, John Shapard, Donna Stienstra, & Dean Miletich, Discovery and Disclosure Practice, Problems, and Proposals for Change] 44-45 (1997).  The Committee has heard that in some instances, particularly cases involving large quantities of discovery, parties seek to justify discovery requests that sweep far beyond the claims and defenses of the parties on the ground that they nevertheless have a bearing on the "subject matter" involved in the action.

The amendments proposed for subdivision (b)(1) include one element of these earlier proposals but also differ from these proposals in significant ways.  The similarity is that the amendments describe the scope of party-controlled discovery in terms of matter relevant to the claim or defense of any party.  The court, however, retains authority to order discovery of any matter relevant to the subject matter involved in the action for good cause.  The amendment is designed to involve the court more actively in regulating the breadth of sweeping or contentious discovery.  The Committee has been informed repeatedly by lawyers that involvement of the court in managing discovery is an important method of controlling problems of inappropriately broad discovery.  Increasing the availability of judicial officers to resolve discovery disputes and increasing court management of discovery were both strongly endorsed by the attorneys surveyed by the Federal Judicial Center.  *See* *Discovery and Disclosure Practice*, supra, at 44.  Under the amended provisions, if there is an objection that discovery goes beyond material relevant to the parties' claims or defenses, the court would become involved to determine whether the discovery is relevant to the claims or defenses and, if not, whether good cause exists for authorizing it so long as it is relevant to the subject matter of the action.  The good-cause standard warranting broader discovery is meant to be flexible.

The Committee intends that the parties and the court focus on the actual claims and defenses involved in the action.  The dividing line between information relevant to the claims and defenses and that relevant only to the subject matter of the action cannot be defined with precision.  A variety of types of information not

directly pertinent to the incident in suit could be relevant to the claims or defenses raised in a given action.  For example, other incidents of the same type, or involving the same product, could be properly discoverable under the revised standard. Information about organizational arrangements or filing systems of a party could be discoverable if likely to yield or lead to the discovery of admissible information. Similarly, information that could be used to impeach a likely witness, although not otherwise relevant to the claims or defenses, might be properly discoverable.  In each instance, the determination whether such information is discoverable because it is relevant to the claims or defenses depends on the circumstances of the pending action.

The rule change signals to the court that it has the authority to confine discovery to the claims and defenses asserted in the pleadings, and signals to the parties that they have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings.  In general, it is hoped that reasonable lawyers can cooperate to manage discovery without the need for judicial intervention.  When judicial intervention is invoked, the actual scope of discovery should be determined according to the reasonable needs of the action.  The court may permit broader discovery in a particular case depending on the circumstances of the case, the nature of the claims and defenses, and the scope of the discovery requested.

The amendments also modify the provision regarding discovery of information not admissible in evidence.  As added in 1946, this sentence was designed to make clear that otherwise relevant material could not be withheld because it was hearsay or otherwise inadmissible.  The Committee was concerned that the "reasonably calculated to lead to the discovery of admissible evidence" standard set forth in this sentence might swallow any other limitation on the scope of discovery.  Accordingly, this sentence has been amended to clarify that information must be relevant to be discoverable, even though inadmissible, and that discovery of such material is permitted if reasonably calculated to lead to the discovery of admissible evidence.  As used here, "relevant" means within the scope of discovery as defined in this subdivision, and it would include information relevant to the subject matter involved in the action if the court has ordered discovery to that limit based on a showing of good cause.

Finally, a sentence has been added calling attention to the limitations of subdivision (b)(2)(i), (ii), and (iii).  These limitations apply to discovery that is otherwise within the scope of subdivision (b)(1).  The Committee has been told repeatedly that courts have not implemented these limitations with the vigor that was contemplated.  *See 8 Federal Practice & Procedure* § 2008.1 at 121.  This otherwise redundant cross-reference has been added to emphasize the need for active judicial use of subdivision (b)(2) to control excessive discovery.  *Cf. Crawford-El v. Britton*, [523 U.S. 574] (1998)(quoting Rule 26(b)(2)(iii) and stating that "Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly").

Fed. R. Civ. P. 26 advisory committee's notes.

The Court gets the impression from reading the advisory committee's notes that the amendment is not intended to exclude a delineable swath of material so much as it is intended to send a signal to district judges to become more hands-on in the process of regulating -- mostly limiting -- discovery on relevance grounds alone.  The "two effects" of the 2000 amendments might, thus, be only one effect: directing district judges to roll up their sleeves and manage discovery, and to do so on a relevance basis.  The change in substantive scope from "subject

matter," to "claim or defense," would, therefore, seem to "add teeth" to the relevance standard instead of narrowing that standard.  Fed. R. Civ. P. 26 advisory committee's notes.  It is not surprising that the Supreme Court of the United States and the United States Congress would want to increase judicial presence: "relevance" is a liberal concept in the context of trial.  Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.").

Of course, regardless of the Court's musings about the rules, courts should also seek to give substantive content to amendments.  Read literally, the rule does not permit parties to discover information relevant only to the claim or defense of another party; they must use discovery only to investigate their own claims and defenses.  More problematically, however, the rule may prevent using the Federal Rules' compulsory discovery process to obtain "background" information not specifically relevant to any one claim or defense -- e.g., a plaintiff naming a pharmaceutical company as a defendant and then using discovery to educate itself generally about medicine, biochemistry, and the drug industry by using the defendant's expertise.

In In re Cooper Tire & Rubber Co., 568 F.3d 1180 (10th Cir. 2009), the United States Court of Appeals for the Tenth Circuit clarified that the 2000 Amendments to rule 26 "implemented a two-tiered discovery process; the first tier being attorney-managed discovery of information relevant to any claim or defense of a party, and the second being court-managed discovery that can include information relevant to the subject matter of the action."  568 F.3d at 1188.  The Tenth Circuit further stated that,

> when a party objects that discovery goes beyond that relevant to the claims or defenses, "the court would become involved to determine whether the discovery is relevant to the claims or defenses and, if not, whether good cause exists for authorizing it so long as it is relevant to the subject matter of the action."  This good-cause standard is intended to be flexible. When the district court does intervene in discovery, it has discretion in determining what the scope of discovery should be.  "[T]he actual scope of discovery should be determined according to the reasonable needs of the action.  The court may permit broader discovery in a particular case depending on the circumstances of the case, the nature of the claims and defenses, and the scope of the discovery requested."

568 F.3d at 1188-89 (quoting the advisory committee's notes (citations and footnote omitted)(alteration in original)).

The 2015 amendments to rule 26(b)(1) continued narrowing discovery's substantive scope and injecting courts further into the discovery process.  The 2015 amendment made notable deletions and additions, both of which emphasized the need to make discovery proportional to the

needs of the case and are noted in the quotation below.  See Fed. R. Civ. P. 26(b)(1).  Rule 26(b)(1),

provides:

> (1)     Scope in General. Unless otherwise limited by court order, the scope of
> discovery is as follows: Parties may obtain discovery regarding any
> nonprivileged matter that is relevant to any party's claim or defense
> ~~including the existence, description, nature, custody, condition and location
> of any documents or other tangible things and the identity and location of
> persons who know of any discoverable matter.  For good cause, the court
> may order discovery of any matter relevant to the subject matter involved
> in the action.  Relevant information need not be admissible at the trial if the
> discovery appears reasonably calculated to lead to the discovery of
> admissible evidence.  All discovery is subject to the limitations imposed by
> Rule 26(b)(2)(C)~~ <u>and proportional to the needs of the case, considering the
> importance of the issues at stake in the action, the amount in controversy,
> the parties' relative access to relevant information, the parties' resources,
> the importance of the discovery in resolving the issues, and whether the
> burden or expense of the proposed discovery outweighs its likely benefit.
> Information within this scope of discovery need not be admissible in
> evidence to be discoverable.</u>

Fed. R. Civ. P. 26(b)(1) (alterations added).

　　　The advisory advisory committee's notes state that the first deletion does not make a

substantive change.  Rather, the deletion was made because "[d]iscovery of such matters is so

deeply entrenched" in standard discovery that including it would be "clutter."  Fed. R. Civ. P.

26(b) advisory committee's notes.[5]

　　　On the second deletion, the advisory committee's notes explain that the former provision

for discovery of relevant but inadmissible information that appears "reasonably calculated to lead

to the discovery of admissible evidence" is also deleted.  Fed. R. Civ. P. 26(b) advisory

committee's note.

> The phrase has been used by some, incorrectly, to define the scope of discovery.
> As the Committee Note to the 2000 amendments observed, use of the "reasonably
> calculated" phrase to define the scope of discovery "might swallow any other
> limitation on the scope of discovery."  The 2000 amendments sought to prevent
> such misuse by adding the word "Relevant" at the beginning of the sentence,
> making clear that "'relevant' means within the scope of discovery as defined in this

_____

[5]The Court regrets this deletion.  Moving things out of the statute's text often creates
mischief, especially for courts that rely heavily on the text's plain language.  The drafters might
be astonished how often the Court sees objections to interrogatories and requests that seek basic
information about documents.  The rule is well-established because the deleted language was in
the rule; now that the language is not in the rule, the rule may be eroded or, more likely, ignored
or overlooked by those who do not spend time in the advisory committee's notes' thicket.  What
the advisory comments describe as "clutter" is a simple instruction to practitioners who do not
practice in federal court every day for every case.  This deletion might incrementally increase
unnecessary litigation rather than shorten it.  Some of the amendments seem designed to help the
nation's large corporations, represented by some of the nation's most expensive law firms, cut
down expenses rather than to help courts and practitioners in more routine cases.

subdivision. . . ." The "reasonably calculated" phrase has continued to create problems, however, and is removed by these amendments. It is replaced by the direct statement that "Information within this scope of discovery need not be admissible in evidence to be discoverable." Discovery of nonprivileged information not admissible in evidence remains available so long as it is otherwise within the scope of discovery.

Fed. R. Civ. P. 26 advisory committee's note. The deletion, therefore, did not necessarily change discovery's scope, but clarified it.[6] Accordingly, "[r]elevance is still to be 'construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on' any party's claim or defense." State Farm Mut. Auto. Ins. v. Fayda, No. CIV 14-9792 WHP/JCF, 2015 WL 7871037, at *2 (S.D.N.Y. Dec. 3, 2015)(Francis IV, M.J.)(quoting Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978)).

The most notable addition to rule 26(b) is the proportionality concept. Rule 26(b)(2)(C)(iii) has always limited overly burdensome discovery and required proportionality. See Fed. R. Civ. P. 26(b)(2)(C)(iii) (pre-2015 version). The proportionality requirement was relocated to 26(b)(1) to address the "explosion"[7] of information that "has been exacerbated by the advent of e-discovery."[8] Fed. R. Civ. P. 26(b) advisory committee's note. Describing how e-discovery is the driving factor in the 2015 amendment, the advisory committee's notes state:

_____

[6]Arguably, older lawyers will have to learn a new vocabulary and ignore the one they have used for decades. If the changes were not made to change the scope of discovery, it is unclear what the benefit of all this change is.

[7]It is unclear to the Court whether the "explosion" of e-discovery has made discovery harder or easier. In many situations, algorithms and search engines have replaced associates and paralegals, and brought greater accuracy and efficiency to discovery. Searching warehouses of documents by reviewing papers one-by one may have been a bigger burden then today's e-discovery.

[8]This relocation -- rather than substantive change -- is one reason that the Court is skeptical that the 2015 amendments will make a considerable difference in limiting discovery or cutting discovery costs. Courts were bringing common sense and proportionality to their discovery decisions long before the 2015 amendments. See Aguayo v. AMCO Ins., 59 F. Supp. 3d 1225, 1275 (D.N.M. 2014)(Browning, J.)("[T]he Court expects that discovery and motion practice bear some proportionality to the case's worth."); Cabot v. Wal-Mart Stores, Inc., No. CIV 11-0260 JB, 2012 WL 592874, at *11-12 (D.N.M. Feb. 16, 2012)(Browning, J.)(limiting the scope of discovery because it was unduly burdensome in relation to the relevance and need). The real import of the rule is that it will likely lead to more "proportionality" objections and more disputes that the district courts will have to resolve, which is what the drafters apparently intended. It is unclear how more judicial involvement in discovery can be squared with a federal court docket that is at a breaking point already. It is also unclear what was wrong with the old goal of having discovery be largely self-executing. The new rules require attorneys to learn the new vocabulary of "proportionality," delete old stock legal sections from their briefs, and rewrite new sections to use the correct language. Older lawyers must be particularly alert to read and learn the new rules, read the comments, and understand the thrust of the drafting. Finally, given that "proportionality" is a very

> The burden or expense of proposed discovery should be determined in a realistic way.  This includes the burden or expense of producing electronically stored information.  Computer-based methods of searching such information continue to develop, particularly for cases involving large volumes of electronically stored information.  Courts and parties should be willing to consider the opportunities for reducing the burden or expense of discovery as reliable means of searching electronically stored information become available.

Fed. R. Civ. P. 26(b) advisory committee's note.

The 2015 Year-End Report on the Federal Judiciary written by the Honorable John Roberts, Chief Justice of the Supreme Court of the United States, indicates that the addition of proportionality to rule 26(b) "crystalizes the concept of reasonable limits on discovery through increased reliance on the common-sense concept of proportionality."[9]  Chief Justice John Roberts,

---

subjective standard, it will be hard for any court to sanction any attorney for raising this objection. In sum, the rules are just as likely to increase the costs of discovery as to decrease it.

[9]The Rules Enabling Act, 28 U.S.C. §§ 2071-2077, empowers the federal courts to prescribe rules for the conduct of their business.  See 28 U.S.C. § 2071.  The Judicial Conference - - the policy making body of the federal judiciary -- has overall responsibility for formulating those rules.  See Chief Justice John Roberts, 2015 Year-End Report on the Federal Judiciary at 6, Supreme Court of the United States, available at https://www.supremecourt.gov/publicinfo/year-end/year-endreports.aspx (last visited Jan. 11, 2019)("2015 Year-End Report").  The Chief Justice leads the Judicial Conference.  The Judicial Conference's Committee on Rules of Practice and Procedure, known as the Standing Committee, solicits guidance from advisory committees and conferences to draft proposed rules and amendments for the Judicial Conference's consideration. See 2015 Year-End Report, at 5-6.  Chief Justice Roberts, a former clerk for the Honorable William Rehnquist, former-Chief Justice of the Supreme Court of the United States, appointed the Honorable David Campbell, United States District Judge for the District of Arizona, also a former Justice Rehnquist clerk and President George W. Bush appointee, to chair the Civil Rules Advisory Committee.  Judge Campbell and David Levi -- then-Dean of the Duke University School of Law and now President of the American Legal Institute, Professor at Duke University School of Law, and Director of the Bolch Judicial Institute; a former clerk to the Honorable Lewis Powell, former-associate Justice of the Supreme Court of the United States, and former Chief Judge of the United States District Court for the Eastern District of California; appointed as United States Attorney by President Ronald Reagan and appointed to the Eastern District of California by President George W. Bush -- led the effort to increase proportionality and hands-on judicial case management in the 2015 amendments.  See Report to the Standing Committee at 4, Advisory Committee on Civil Rules (May 8, 2013), https://www.uscourts.gov/rules-policies/archives/committee-reports/advisory-committee-rules-civil-procedure-may-2013 (last visited Jan. 11, 2019).  After the Judicial Conference concurred on the 2015 amendments, it sent the proposed rules and amendments to the Supreme Court, which approved them.  Chief Justice Roberts submitted the proposed rules to Congress for its examination.  See 2015 Year-End Report at 6.  Because Congress did not intervene by December 1, the new rules took effect.  See 28 U.S.C. § 2074.  Some scholars have noted that the rules reflect the conservative nature of those who have participated in drafting the amendments.  See generally Edward A. Purcell, Jr., From the Particular to the General: Three Federal Rules and the Jurisprudence of the Rehnquist and Roberts Courts, 162 U. Pa. L. Rev. 1731 (2014); Corey Ciocchetti, The Constitution, The Roberts Court, and Business: The Significant Business Impact of the 2011-2012 Supreme Court Term, 4 Wm. & Mary Bus. L. Rev. 385 (2013).  In particular, the New Mexico Trial Lawyer published an article asserting that the amendments favored corporate defendants, which was partially the result of Chief Justice Roberts' appointment of "corporate-minded judges to the Rules Advisory Committee that drafted the amendments."  Ned Miltenberg & Stuart Ollanik, The Chief Umpire is Changing the Strike Zone at 1, The New Mexico Trial Lawyer (Jan./Feb. 2016).  The Court shares some of the concerns with

2015 Year-End Report on the Federal Judiciary at 6, Supreme Court of the United States, available at https://www.supremecourt.gov/publicinfo/year-end/year-endreports.aspx (last visited Jan. 11, 2019)("2015 Year-End Report")  He states that the proportionality concept seeks to "eliminate unnecessary or wasteful discovery," and to impose "careful and realistic assessment of actual need."  2015 Year-End Report at 7.  This assessment may, as a practical matter, require "judges to be more aggressive in identifying and discouraging discovery overuse by emphasizing the need to analyze proportionality before ordering production of relevant information."  State Farm Mut. Auto. Ins. v. Fayda, 2015 WL 7871037, at *2 (internal quotation marks omitted)(quoting Fed. R. Civ. P. 26(b)(1) advisory committee's notes).  The burden of demonstrating relevance remains on the party seeking discovery, and the newly revised rule "does not place on the party seeking discovery the burden of addressing all proportionality considerations."  Fed. R. Civ. P. 26(b)(1) advisory committee's notes.  See Dao v. Liberty Life Assurance Co. of Boston, No. CIV 14-4749-SI (EDL), 2016 WL 796095, at *3 (N.D. Cal. Feb. 23, 2016)(LaPorte, M.J.)(observing that the 2015 amendment "reinforces the Rule 26(g) obligation of the parties to consider these factors in making discovery requests, responses or objections"); Williams v. U.S. Envtl. Servs., LLC, Civil Action No. 15-0168-RLB, 2016 WL 617447, at *1 n.2 (M.D. La. Feb. 16, 2016)(Bourgeois, M.J.). In general, "the parties' responsibilities . . . remain the same" as they were under the rule's earlier iteration so that the party resisting discovery has the burden of showing undue burden or expense. Fed. R. Civ. P. 26(b)(1) advisory committee's notes.  See Dao v. Liberty Life Assurance Co. of Boston, 2016 WL 796095, at *3 (noting that, "while the language of the Rule has changed, the amended rule does not actually place a greater burden on the parties with respect to their discovery obligations").

    Like with the 2000 amendments, it is unsurprising that the drafters are unable to articulate precise language narrowing the discovery's substantive scope.  Instead of being Aristotelian and trying to draft rules, the drafters largely opted to make federal judges Plato's enlightened guardians.  They have decided that no single general rule can adequately take into account the infinite number of possible permutations of different claims, defenses, parties, attorneys, resources of parties and attorneys, information asymmetries, amounts in controversy, availabilities of

---

the new amendments being pro-business and giving corporations new tools to limit plaintiffs' discovery.

information by other means, and other factors.  They have dropped all discovery disputes into judges' laps.  The drafters have decided that this determination requires the individualized judgment of someone on the scene, and that presence is what the rulemakers want when they: (i) encourage district judges to take a firmer grasp on the discovery's scope; and (ii) put their thumbs on the scale in favor of narrower discovery in the rule's definition of the scope of discovery.

Rule 34 allows a party to serve requests to produce certain items "on any other party . . . in the responding party's possession, custody, or control."  Fed. R. Civ. P. 34(a)(1) (emphasis added). See Hickman v. Taylor, 329 U.S. at 504 (explaining that rule 34 "is limited to parties to the proceeding, thereby excluding their counsel or agents").  Applying this standard, courts have found that corporations control documents in their subsidiaries' hands, clients control case files in their attorneys' hands, and patients control health records in their healthcare providers' hands. See Simon v. Taylor, No. CIV 12-0096 JB/WPL, 2014 WL 6633917, at *35 (D.N.M. Nov. 18, 2014)(Browning, J.)(citing United States v. Stein, 488 F. Supp. 2d 350, 360-62 (S.D.N.Y. 2007)(Kaplan, J.)); CSI Inv. Partners II, L.P. v. Cendant Corp., No. CIV. 00-1422 (DAB) (DF), 2006 WL 617983, at *6 (S.D.N.Y. March 13, 2006)(Eaton, M.J.)(compelling a client's attorney to disclose documents in the attorney's possession regarding the attorney's representation of that particular client, but only insofar as the documents were relevant)).   An employee's or corporation's ability to access the documents in the normal course of business weighs in favor of finding control.  See, e.g., Gerling Int'l Ins. v. Comm'r of Internal Revenue, 839 F.2d 131, 1441 (3d Cir. 1988)(stating that where "agent-subsidiary can secure documents of the principal-parent to meet its own business needs . . . the courts will not permit the agent-subsidiary to deny control for purposes of discovery"); Camden Iron & Metal v. Marubeni Am. Corp., 138 F.R.D. 438, 442 (D.N.J. 1991)(Simandle, M.J.)(including "demonstrated access to documents in the ordinary course of business" in list of factors to be considered in determining control).  Applying that standard, the Court, in Simon v. Taylor, determined that a racing commission had legal control over test samples from horses, because the commission "has the legal right to have those horses' samples tested upon demand."  2014 WL 6633917, at *35.  In another case, the Court concluded that an oil company had control over the payroll records a third-party payroll company possessed, because the oil company had the practical ability to request that payroll company, with which it

contracted, to produce those payroll records on demand.  See Landry v. Swire Oilfield Servs. LLC,

323 F.R.D. 360, 397 (D.N.M. 2018)(Browning, J.).

Courts have specifically considered whether clients control information in their attorneys'

hands.  Because a client has the right "to obtain copies of documents gathered or created by its

attorneys pursuant to their representation of that client, such documents are clearly within the

client's control."  Am. Soc'y For Prevention of Cruelty to Animals v. Ringling Bros. and Barnum

& Bailey Circus, 233 F.R.D. 209, 212 (D.D.C. 2006)(Facciola, M.J.).  See Poppino v. Jones Store

Co., 1 F.R.D. 215, 219 (W.D. Mo. 1940)(Otis, J.)("It is quite true that if an attorney for a party

comes into possession of a document as attorney for that party his possession of the document is

the possession of the party." (emphasis in original)).  Consequently, a party may be required to

produce a document that it has given to its attorney when the document relates to the attorney's

representation of that client on a specific matter.  See Ruppert v. Repper (In re Ruppert), 309 F.2d

97, 98 (6th Cir. 1962)(per curiam); Hanson v. Garland S.S. Co., 34 F.R.D. 493, 495-96 (N.D. Ohio

1964)(Connell, J.)(concluding that witness statements taken by a party's attorney in preparation of

the case were within the party's control and subject to production under rule 34 on a proper

showing);   Kane   v.   News   Syndicate   Co.,   1   F.R.D.   738,   738-39   (S.D.N.Y.

1941)(Mandelbaum, J.)(determining that a plaintiff in an action for copyright infringement could

require the defendants' attorneys to produce a document from which the plaintiff hoped to ascertain

whether material had been obtained from his copyrighted works).

> The mere fact, however, that the attorney for a party has possession of a document
> does not make his possession of the document the possession of the party.  The
> paper may be one of his private papers which he had before the relation of attorney
> and client was established.  It is inconceivable that he should be required to produce
> such a paper for the inspection of his client's adversary.  The paper which he has in
> his possession may be the property of some other client.  It is inconceivable that he
> should be compelled to produce the document belonging to another client because
> the adversary of one of his clients demands it.

Poppino v. Jones Store Co., 1 F.R.D. at 219.  See Hobley v. Burge, 433 F.3d 946, 949-52 (7th Cir.

2006)(observing that a party may not have had control over its former attorney's documents);

Ontario Inc. v. Auto Enters., Inc., 205 F.R.D. 195 (E.D. Mich. 2000)(Duggan, J.).  Simply put, if

a person, corporation, or a person's attorney or agent can pick up a telephone and secure the

document, that individual or entity controls it.  See Simon v. Taylor, 2014 WL 6633917, at *34

("Control is defined as the legal right to obtain documents upon demand.").

## LAW REGARDING RULE 12(b)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994). The Complaint's sufficiency is a question of law, and, when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the nonmoving party, and draw all reasonable inferences in the plaintiff's favor. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a MTD [(motion to dismiss)]."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." (citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006))).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 550 U.S. at 555.

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient;

the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood

of mustering factual support for these claims."  Ridge at Red Hawk, LLC v. Schneider, 493 F.3d

1174, 1177 (10th Cir. 2007)(emphasis omitted).  The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a
> complaint: if they are so general that they encompass a wide swath of conduct,
> much of it innocent, then the plaintiffs "have not nudged their claims across the line
> from conceivable to plausible."  The allegations must be enough that, if assumed to
> be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(citations omitted)(quoting Bell Atl.

Corp. v. Twombly, 550 U.S. at 570).  See Gallegos v. Bernalillo Cty. Bd. of Cty. Comm'rs, 278

F. Supp. 3d 1245, 1259 (D.N.M. 2017)(Browning, J.).

    "When a party presents matters outside of the pleadings for consideration, as a general rule

'the court must either exclude the material or treat the motion as one for summary judgment.'"

Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d 1081, 1103 (10th Cir.

2017)(quoting Alexander v. Oklahoma, 382 F.3d 1206, 1214 (10th Cir. 2004)).  There are three

limited exceptions to this general principle: (i) documents that the complaint incorporates by

reference, see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322; (ii) "documents

referred to in the complaint if the documents are central to the plaintiff's claim and the parties do

not dispute the documents' authenticity," Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th

Cir. 2002); and (iii) "matters of which a court may take judicial notice," Tellabs, Inc. v. Makor

Issues & Rights, Ltd., 551 U.S. at 322.  See Brokers' Choice of Am., Inc. v. NBC Universal, Inc.,

861 F.3d at 1103 (holding that the district court did not err by reviewing a seminar recording and

a television episode on a rule 12(b)(6) motion, which were "attached to or referenced in the

amended complaint," central to the plaintiff's claim, and "undisputed as to their accuracy and

authenticity").  "[T]he court is permitted to take judicial notice of its own files and records, as well

as facts which are a matter of public record."  Van Woudenberg v. Gibson, 211 F.3d 560, 568

(10th Cir. 2000), abrogated on other grounds by McGregor v. Gibson, 248 F.3d 946, 955 (10th

Cir. 2001).

    In Gee v. Pacheco, 627 F.3d 1178 (10th Cir. 2010), the defendants "supported their motion

with numerous documents, and the district court cited portions of those motions in granting the

[motion to dismiss]."  627 F.3d at 1186.  The Tenth Circuit held that "[s]uch reliance was

improper" and that, even if "the district court did not err initially in reviewing the materials, the

court improperly relied on them to refute Mr. Gee's factual assertions and effectively convert the motion to one for summary judgment." 627 F.3d at 1186-87.  In other cases, the Tenth Circuit has emphasized that, "[b]ecause the district court considered facts outside of the complaint . . . it is clear that the district court dismissed the claim under Rule 56(c) and not Rule 12(b)(6)."  Nard v. City of Okla. City, 153 F. App'x 529, 534 n.4 (10th Cir. 2005)(unpublished).  In Douglas v. Norton, 167 F. App'x 698 (10th Cir. 2006)(unpublished), the Tenth Circuit addressed an untimely filed charge with the Equal Employment Opportunity Commission -- which the Tenth Circuit analogized to a statute of limitations -- and concluded that, because the requirement was not jurisdictional, the district court should have analyzed the question under rule 12(b)(6), and "because the district court considered evidentiary materials outside of Douglas' complaint, it should have treated Norton's motion as a motion for summary judgment."  167 F. App'x at 704-05.

The Court has previously ruled that, when a plaintiff references and summarizes defendants' statements in a complaint, the Court cannot rely on documents containing those statements that the defendants attach in their briefing.  See Mocek v. City of Albuquerque, No. CIV 11-1009 JB/KBM, 2013 WL 312881, at *50-51 (D.N.M. Jan. 14, 2013)(Browning, J.).  The Court reasoned that the statements were neither incorporated by reference nor central to the plaintiff's allegations in the complaint, because the plaintiff cited the statements only to attack the defendant's reliability and truthfulness.  See 2013 WL 312881, at *50-51.  The Court has also previously ruled that, when determining whether to toll a statute of limitations in an action alleging fraud and seeking subrogation from a defendant, the Court may not use interviews and letters attached to a motion to dismiss, which show that a plaintiff was aware of the defendant's alleged fraud before the statutory period expired.  See Great Am. Co. v. Crabtree, No. CIV 11-1129 JB/KBM, 2012 WL 3656500, at *3, *22-23 (D.N.M. Aug. 23, 2012)(Browning, J.)("Crabtree"). The Court in Crabtree determined that the documents did not fall within any of the Tenth Circuit's exceptions to the general rule that a complaint must rest on the sufficiency of its contents alone, as the complaint did not incorporate the documents by reference or refer to the documents. See 2012 WL 3656500, at *22-23; Mocek v. City of Albuquerque, 2013 WL 312881, at *50 (refusing to consider statements that were not "central to [the plaintiff's] claims").

On the other hand, in a securities class action, the Court has ruled that a defendant's operating certification, to which plaintiffs refer in their complaint, and which was central to whether the plaintiffs adequately alleged a loss, falls within an exception to the general rule, so the Court may consider the operating certification when ruling on the defendant's motion to dismiss without converting the motion into one for summary judgment.  See Genesee Cty. Emps.' Ret. Sys. v. Thornburg Mortg. Secs. Tr. 2006-3, 825 F. Supp. 2d 1082, 1150-51 (D.N.M. 2011)(Browning, J.).  See also Sec. & Exch. Comm'n v. Goldstone, 952 F. Supp. 2d 1060, 1217-18 (D.N.M. 2013)(Browning, J.)(considering, on a motion to dismiss, electronic mail transmissions referenced in the complaint as "documents referred to in the complaint," which are "central to the plaintiff's claim" and whose authenticity the plaintiff did not challenge); Mata v. Anderson, 760 F. Supp. 2d 1068, 1101 (D.N.M. 2009)(Browning, J.)(relying on documents outside of the complaint because they were "documents that a court can appropriately view as either part of the public record, or as documents upon which the Complaint relies, and the authenticity of which is not in dispute").

## LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'"  Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)("Celotex").

> Before the court can rule on a party's motion for summary judgment, the moving party must satisfy its burden of production in one of two ways: by putting evidence into the record that affirmatively disproves an element of the nonmoving party's case, or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Celotex, 477 U.S. at 323-25.  On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment."  Cardoso v. Calbone, 490 F.3d 1194, 1197 (10th Cir. 2007).

Plustwik v. Voss of Nor. ASA, No. CIV 11-0757 DS, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.).  "If the *moving* party will bear the burden of persuasion at trial, that party must

support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial." Celotex, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[10]  Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)("Liberty Lobby").  In American Mechanical Solutions, LLC v. Northland Process Piping, Inc., 184 F. Supp. 3d 1030 (D.N.M. 2016)(Browning, J.), the Court confronted a situation in which the movant did not offer evidence disproving the nonmovant's allegations, but, rather, argued, under the second option in Celotex, that the nonmovant lacked evidence to establish an element of its claim.  See 184 F. Supp. 3d at 1075.  The Court granted summary judgment for the movant, because the nonmovant -- the plaintiff -- did not offer expert evidence supporting causation or proximate causation for its breach-of-contract or breach-of-the-implied-warranty-of-merchantability claims as New Mexico law required for those elements.  184 F. Supp. 3d at 1075. The Court concluded that Celotex applied to the situation, and that, without the requisite evidence, the nonmovant failed to prove "an essential element of the . . . case."  184 F. Supp. 3d at 1075 (quoting Plustwik v. Voss of Nor. ASA, 2013 WL 1945082, at *1).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)(quoting Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc., 912 F.2d at 1241)).  Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations

_____

[10]Although the Honorable William J. Brennan, Jr., Associate Justice of the Supreme Court of the United States, dissented in Celotex, this sentence is widely understood to be an accurate statement of the law.  See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

(including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." Liberty Lobby, 477 U.S. at 256.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried." (internal quotation marks omitted)(quoting Coleman v. Darden, 595 F.2d, 533, 536 (10th Cir. 1979)).

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation."  Colony Nat'l Ins. v. Omer, No. CIV 07-2123 JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Fed. R. Civ. P. 56(e); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"  Colony Nat'l Ins. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Liberty Lobby, 477 U.S. at 248).  Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party.  See Liberty Lobby, 477 U.S. at 251 (citing Vitkus v. Beatrice Co., 11 F.3d at 1539; Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)).  "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted."  Liberty Lobby, 477 U.S. at 249 (citations omitted)(citing First Nat. Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 290 (1968); Dombrowski v. Eastland, 387 U.S. 82, 87 (1967)).  Where a rational trier of fact, considering the record as a

whole, cannot find for the nonmoving party, there is no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Liberty Lobby, 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability."  Liberty Lobby, 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor, and construe all evidence in the light most favorable to the nonmoving party.  See Liberty Lobby, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."); Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999).  Fourth, the court cannot decide any issues of credibility.  See Liberty Lobby, 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts.  This doctrine developed most robustly in the qualified immunity arena.  In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court concluded that summary judgment is appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts.  550 U.S. at 378-81.  The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.  Fed. Rule Civ. Proc. 56(c).  As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus[.] Co. v. Zenith Radio Corp., 475 U.S. [at] 586-587 . . . (footnote omitted).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. [at] 247-248 . . . .  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.
>
> That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life.  Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.  The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (emphasis in original).

The Tenth Circuit applied this doctrine in <u>Thomson v. Salt Lake County</u>, 584 F.3d 1304 (10th Cir. 2009), and explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts." <u>York v. City of Las Cruces</u>, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting <u>Scott</u>[ <u>v. Harris</u>], 550 U.S. at 380); <u>see also</u> <u>Estate of Larsen ex rel. Sturdivan v. Murr</u>, 511 F.3d 1255, 1258 (10th Cir. 2008).

<u>Thomson v. Salt Lake Cty.</u>, 584 F.3d at 1312 (brackets omitted).  "The Tenth Circuit, in <u>Rhoads v. Miller</u>, 352 F. App'x 289 [, 291] (10th Cir. 2009) . . . [(unpublished),] explained that the blatant contradictions of the record must be supported by more than other witnesses' testimony[.]" <u>Lymon v. Aramark Corp.</u>, 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.), <u>aff'd</u>, 499 F. App'x 771 (10th Cir. 2012).

## **LAW REGARDING CLASS CERTIFICATION UNDER RULE 23**

Rule 23 sets forth the requirements for certifying a class action under the Federal Rules of Civil Procedure.  <u>See</u> Fed. R. Civ. P. 23.  All classes must satisfy: (i) all the requirements of rule 23(a); and (ii) one of the three sets of requirements under rule 23(b), where the three sets of requirements correspond to the three categories of classes that a court may certify.  <u>See</u> Fed. R. Civ. P. 23(a)-(b).  The plaintiff[11] bears the burden of showing that the requirements are met, <u>see</u> <u>Rex v. Owens ex rel. Okla.</u>, 585 F.2d 432, 435 (10th Cir. 1978); <u>Pueblo of Zuni v. United States</u>, 243 F.R.D. 436, 444 (D.N.M. 2007)(Johnson, J.), but, in doubtful cases, class certification is favored, <u>see</u> <u>Esplin v. Hirschi</u>, 402 F.2d 94, 101 (10th Cir. 1968)("[T]he interests of justice require that in a doubtful case, . . . any error, if there is to be one, should be committed in favor of allowing the class action."); <u>Eisen v. Carlisle & Jacquelin</u>, 391 F.2d 555, 563 (2d Cir. 1968)("[W]e hold that . . . rule [23] should be given a liberal rather than a restrictive interpretation, and that [denying certification] is justified only by a clear showing to that [end]. . . .").  In ruling on a class certification motion, the Court need not accept either party's representations, but must

---

[11]Technically, it is the party seeking certification, <u>i.e.</u>, the movant, who bears the burden of proof, and defendants may also move for class certification.  <u>See</u> William B. Rubenstein, <u>Newberg on Class Actions</u> § 7:20 (5th ed. 2017)("<u>Newberg</u>").  As a practical matter, however, motions for class certification are made almost exclusively by plaintiffs.

independently find the relevant facts by a preponderance of the evidence.[12]  See Rutstein v. Avis

Rent-A-Car Sys., Inc., 211 F.3d at 1234 ("Going beyond the pleadings is necessary, as a court

must understand the claims, defenses, relevant facts, and applicable substantive law in order to

make a meaningful determination of the certification issues.").  "In determining the propriety of a

class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or

will prevail on the merits, but rather whether the requirements of Rule 23 are met."  Anderson v.

City of Albuquerque, 690 F.2d at 799.  See Vallario v. Vandehey, 554 F.3d at 1267 ("We, of

course, adhere to the principle that class certification does not depend on the merits of a suit.").

Still, the Court must conduct a rigorous analysis of the rule 23 requirements, even if the facts that

the Court finds in its analysis bear on the merits of the suit:

> Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate his compliance with the Rule -- that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc.  We recognized in [General Telephone Co. of the Southwest v.] Falcon[, 457 U.S. 147 (1982)] that "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," and that certification is proper only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.    Actual, not presumed, conformance with Rule 23(a) remains indispensable."  Frequently that "rigorous analysis" will entail some overlap with the merits of the plaintiff's underlying claim.  That cannot be helped.  The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.  Nor is there anything unusual about that consequence: The necessity of touching aspects of the merits in order to resolve preliminary matters, e.g., jurisdiction and venue, is a familiar feature of litigation.

---

[12]As the Court has previously noted, Tenth Circuit precedent suggests that the Court must show some level of deference to the Complaint's factual allegations when ruling on a rule 23 motion: "The Court must accept a plaintiff's substantive allegations as true," but it "need not blindly rely on conclusory allegations which parrot Rule 23," and "may consider the legal and factual issues presented by plaintiff's complaints."  In re Thornburg Mortg., Inc. Sec. Litig., 912 F. Supp. 2d 1178, 1120 (D.N.M. 2012)(Browning, J.)(citing Shook v. El Paso Cty., 386 F.3d 963, 968 (10th Cir. 2004); J.B. v. Valdez, 186 F.3d 1280, 1290 n.7 (10th Cir. 1999); Eisen v. Carlisle & Jacquelin, 417 U.S. at 178).  Since the Court's statement in In re Thornburg Mortgage, Inc. Securities Litigation, however, the Tenth Circuit issued an opinion stating that district courts should apply a "strict burden of proof" to class certification issues.  Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc., 725 F.3d 1213, 1218 (10th Cir. 2013).  This request is consistent with the general trend in the federal judiciary toward using an ordinary preponderance standard to find facts at the class certification stage.  See, e.g., Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc., 546 F.3d 196, 202 (2d Cir. 2008); In re Hydrogen Peroxide Litig., 552 F.3d 305, 318-20 (3d Cir. 2008); Newberg § 7.21 (tracing the shift in the case law from deferring to plaintiffs' representations to adopting an ordinary preponderance standard, and disclaiming the Court's statement from In re Thornburg Mortgage, Inc. Securities Litigation -- a statement that earlier versions of the treatise espoused).  Thus, although the Tenth Circuit has not yet explicitly adopted the preponderance standard for fact-finding in class certification analyses, it most likely will, and the Court will employ that standard here.

Wal-Mart, 564 U.S. at 350-52 (citations omitted).   In a subsequent, seemingly contradictory admonition, however, the Supreme Court cautioned district courts not to decide the case's merits at the class certification stage:

> Although we have cautioned that a court's class-certification analysis must be "rigorous" and may "entail some overlap with the merits of the plaintiff's underlying claim," Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent -- but only to the extent -- that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.

Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 465-66 (2013)(citations omitted).   To reconcile these two directives, the Court will find facts for the purposes of class certification by the preponderance of the evidence, but will allow the parties to challenge these findings during the subsequent merits stage of this case.   This approach is analogous to preliminary injunction practice, and many Courts of Appeals have endorsed it.   See Abbott v. Lockheed Martin Corp., 725 F.3d 803, 810 (7th Cir. 2013); In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 313 (3d Cir. 2008); Gariety v. Grant Thornton, LLP, 368 F.3d 356, 366 (4th Cir. 2004).   Because of the res judicata effect a class judgment has on absent parties, a court may not simply accept the named parties' stipulation that class certification is appropriate, but must conduct its own independent rule 23 analysis.   See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620-22 (1997).   In taking evidence on the question of class certification, the Federal Rules of Evidence apply, albeit in a relaxed fashion.   See Anderson Living Tr. v. WPX Energy Prod. LLC, 306 F.R.D. 312, 378 n.39 (D.N.M. 2015)(Browning, J.).

       1.     **Rule 23(a).**

All classes must satisfy the prerequisites of rule 23(a):

    **(a)**     **Prerequisites**.   One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

          **(1)**     the class is so numerous that joinder of all members is impracticable;

          **(2)**     there are questions of law or fact common to the class;

          **(3)**     the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

          **(4)**     the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).   "A party seeking to certify a class is required to show . . . that all the requirements of [rule 23(a)] are clearly met."   Reed v. Bowen, 849 F.2d 1307, 1309 (10th Cir.

1988).  "Although the party seeking to certify a class bears the burden of proving that all the requirements of Rule 23 are met, the district court must engage in its own 'rigorous analysis' of whether 'the prerequisites of Rule 23(a) have been satisfied.'"  Shook v. El Paso Cty., 386 F.3d 963, 968 (10th Cir. 2004)(quoting Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S. at 161, and citing Reed v. Bowen, 849 F.2d at 1309).  These four requirements are often referenced as numerosity, commonality, typicality, and adequacy, respectively.  See Fed. R. Civ. P. 23(a).

Rule 23(a)(2) requires that "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Even "factual differences in the claims of the individual putative class members should not result in a denial of class certification where common questions of law exist."  In re Intelcom Grp. Sec. Litig., 169 F.R.D. 142, 148 (D. Colo. 1996)(Daniel, J.).  See Adamson v. Bowen, 855 F.2d 668, 676 (10th Cir. 1988)("That the claims of individual putative class members may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the application of a common policy.");  Lopez v. City of Santa Fe, 206 F.R.D. 285, 289 (D.N.M. 2002)(Vázquez, J.)("Commonality requires only a single issue common to the class, and the fact that 'the claims of individual putative class members may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the application of a common policy.'" (citations omitted)(citing In re Am. Med. Sys., Inc., 75 F.3d 1069, 1080 (6th Cir. 1996); Adamson v. Bowen, 855 F.2d at 676)).  A single common question will suffice to satisfy rule 23(a)(2), but the question must be one "that is central to the validity of each one of the claims."  Wal-Mart, 564 U.S. at 349.  "Where the facts as alleged show that Defendants' course of conduct concealed material information from an entire putative class, the commonality requirement is met."  In re Oxford Health Plans, Inc. Sec. Litig., 191 F.R.D. 369, 374 (S.D.N.Y. 2000)(Brieant, J.).

The commonality requirement was widely perceived to lack teeth before the Supreme Court's decision in Wal-Mart, which grafted the following requirements onto rule 23(a)(2): (i) that the common question is central to the validity of each claim that the proposed class brings; and (ii) that the common question is capable of a common answer.  See Wal-Mart, 564 U.S. at 348-52. In that case, a proposed class of about 1.5 million current and former Wal-Mart employees sought damages under Title VII for Wal-Mart's alleged gender-based discrimination.  See 564 U.S. at 342.  Wal-Mart, however, had no centralized company-wide hiring or promotion policy, instead opting to leave personnel matters to the individual store managers' discretion.  See 564 U.S. at

343-45.  The plaintiffs argued that, although no discriminatory formal policy applied to all proposed class members, "a strong and uniform 'corporate culture' permits bias against women to infect, perhaps subconsciously, the discretionary decisionmaking of each one of Wal-Mart's thousands of managers -- thereby making every [proposed class member] the victim of one common discriminatory practice."  564 U.S. at 345.  The Supreme Court disagreed that such a theory constitutes a common question under rule 23(a)(2).

> The crux of this case is commonality -- the rule requiring a plaintiff to show that "there are questions of law or fact common to the class."  Rule 23(a)(2).  That language is easy to misread, since "[a]ny competently crafted class complaint literally raises common 'questions.'"  Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 131-132 (2009).  For example: Do all of us plaintiffs indeed work for Wal-Mart?  Do our managers have discretion over pay?  Is that an unlawful employment practice?  What remedies should we get?  Reciting these questions is not sufficient to obtain class certification.  Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury," [Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S. at 157].  This does not mean merely that they have all suffered a violation of the same provision of law.  Title VII, for example, can be violated in many ways -- by intentional discrimination, or by hiring and promotion criteria that result in disparate impact, and by the use of these practices on the part of many different superiors in a single company.  Quite obviously, the mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once.  Their claims must depend upon a common contention -- for example, the assertion of discriminatory bias on the part of the same supervisor.  That common contention, moreover, must be of such a nature that it is capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

> What matters to class certification . . . is not the raising of common "questions" -- even in droves -- but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.  Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

Wal-Mart, 564 U.S. at 349-50 (emphasis in original)(quoting Nagareda, supra, at 132).  In EQT Production Co. v. Adair, 764 F.3d 347 (4th Cir. 2011), the United States Court of Appeals for the Fourth Circuit stated:

> We first review the aspects of the district court's analysis that apply to all five royalty underpayment classes.

> At bottom, the district court believed that both the commonality and predominance requirements of Rule 23 were satisfied by the same basic fact: the defendants employed numerous uniform practices related to the calculation and payment of CBM [coalbed methane gas] royalties.  These common practices are not irrelevant to Rule 23(b)'s predominance requirement.  But we hold that the district court abused its discretion by failing to consider the significance of this common conduct to the broader litigation.

The district court identified numerous common royalty payment practices. For example, it noted that EQT sells all of the CBM it produces in Virginia to an affiliate, EQT Energy, and that "all royalty owners within the same field have been paid royalties based on the same sales price for the CBM." With respect to CNX, it noted that CNX "has uniform policies and procedures which governed its calculation of CBM revenues," and that "it has deducted severance and license taxes when calculating royalties since January 1, 2004."

That the defendants engaged in numerous common practices may be sufficient for commonality purposes. As noted above, the plaintiffs need only demonstrate one common question of sufficient importance to satisfy Rule 23(a)(2).

764 F.3d at 366 (citations omitted).

In Wal-Mart, the Honorable Antonin Scalia, former Associate Justice of the Supreme Court of the United States, stated: "Wal-Mart is entitled to individualized determinations of each employee's eligibility for backpay." 564 U.S. at 366. From this observation, he then concluded:

Because the Rules Enabling Act forbids interpreting Rule 23 to "abridge, enlarge or modify any substantive right," 28 U.S.C. § 2072(b), a class cannot be certified on the premise that Wal-Mart will not be entitled to litigate its statutory defenses to individual claims. And because the necessity of that litigation will prevent backpay from being "incidental" to the classwide injunction, respondents' class could not be certified even assuming, arguendo, that "incidental" monetary relief can be awarded to a 23(b)(2) class.

Wal-Mart, 131 U.S. at 367. Thus, the common question or questions cannot be "incidental," nor can the plaintiff submit a long list of "incidental" questions or issues, and say that they predominate over the real issues to be used.

## 2. **Rule 23(b).**

Once the court concludes that the threshold requirements have been met, "it must then examine whether the class falls within at least one of three categories of suits set forth in Rule 23(b)." Adamson v. Bowen, 855 F.2d at 675. See DG ex rel. Stricken v. Devaughn, 594 F.3d 1188, 1199 (10th Cir. 2010)("In addition to satisfying Rule 23(a)'s requirements, the class must also meet the requirements of one of the types of classes described in subsection (b) of Rule 23."). Rule 23(b) provides that a class action is appropriate if the threshold requirements are satisfied, and the case falls into one or more of three categories:

(b) **Types of Class Actions.** A class action may be maintained if Rule 23(a) is satisfied and if:

(1) prosecuting separate actions by or against individual putative class members would create a risk of:

(A) inconsistent or varying adjudications with respect to individual putative class members

- 31 -

> that would establish incompatible standards of conduct for the party opposing the class; or
>
> **(B)**   adjudications with respect to individual putative class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;
>
> **(2)**   the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or
>
> **(3)**   the court finds that the questions of law or fact common to putative class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The matters pertinent to these findings include:
>
> **(A)**   the putative class members' interests in individually controlling the prosecution or defense of separate actions;
>
> **(B)**   the extent and nature of any litigation concerning the controversy already begun by or against putative class members;
>
> **(C)**   the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> **(D)**   the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b).  "Only one of rule 23(b)'s subdivisions must be satisfied to meet the class-action requirements."  <u>Gonzales v. City of Albuquerque</u>, No. CIV 09-0520 JB/RLP, 2010 WL 4053947, at *11 (D.N.M. Aug. 21, 2010)(Browning, J.)(citing <u>Carpenter v. Boeing, Co.</u>, 456 F.3d 1183, 1187 (10th Cir. 2006)(stating that the district court must determine whether a suit "falls within one of the categories of actions maintainable as class actions")).

The three categories of class actions -- really four, as rule 23(b)(1) contains two subcategories, known as (b)(1)(A) and (b)(1)(B) class actions -- are not of equal utility.  Class actions under (b)(1) can be certified only in very particular circumstances.  Class actions under (b)(2) are broadly available, but are only capable of seeking injunctive or declaratory relief, and not damages.  Far and away the most controversial class action category, (b)(3), can be brought for class-wide damages, injunctive relief, declaratory relief, or any combination thereof.  Class

actions under (b)(3) always require notice to all proposed class members of certification of the class, and those individuals must be given the opportunity to opt out if they so desire.  See Fed. R. Civ. P. 23(c)(2)(B); Phillips Petrol. Co. v. Shutts, 472 U.S. 797, 812 (1985)("[W]e hold that due process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an 'opt out' or 'request for exclusion' form to the court.").  The other class action categories, however, are ordinarily mandatory, and neither notice nor opportunity to opt out needs to be given.  See Fed. R. Civ. P. 23(c)(2)(B); Phillips Petrol. Co. v. Shutts, 472 U.S. at 811 n.3 (limiting the constitutional requirement of an opt-out notice "to those class actions which seek to bind known plaintiffs concerning claims wholly or predominately for money judgments").  The Court will focus on the most important form of class action, the (b)(3) damages class action.[13]

---

[13]The Court will briefly address the other class-action types. Rule 23(b)(1) contains two subcategories of class action, (b)(1)(A) actions and (b)(1)(B) actions; a class need satisfy the requirements of only one to be certified.  See Fed. R. Civ. P. 23(b)(1).  Class actions under (b)(1)(A) are designed to avoid the situation in which a defendant subject to suit by multiple plaintiffs is ordered to undertake incompatible courses of conduct as a result of the non-centralized nature of the adjudication.  See Fed. R. Civ. P. 23(b)(1)(A).  "Incompatible" means more than simply inconsistent.  A situation in which, for example, a defendant was ordered to pay ten thousand dollars to a plaintiff in one case, was ordered to pay ten million dollars to another plaintiff in an identical or similar case, and was found to not be at fault at all in yet another case, may be inconsistent, but it does not create "incompatible standards of conduct for the party opposing the class."  Fed. R. Civ. P. 23(b)(1)(A).  Such alleged inconsistency is a normal and expected part of the system of individualized adjudication used by the judiciary to apply a uniform set of laws to varied factual settings.  What (b)(1)(A) is designed to avoid is injunctive or declaratory "whipsawing," in which, e.g., one court orders a school district to close an underperforming inner-city school and bus its students to suburban schools, and another court orders the district to keep the school open and bus suburban students in to the school.  Class actions under (b)(1)(B) serve a similar role, but apply when varying adjudications would result in practically -- rather than legally -- incompatible judgments.  See Fed. R. Civ. P. 23(b)(1)(B).  Rule 23(b)(1)(B) applies when the defendant has possession or control of a res -- a pot of money or thing that constitutes the relief that the proposed class seeks -- and the relief sought by all the individual members of the proposed class would more than exhaust the res.  For example, if a Ponzi scheme operator took ten billion dollars of investors' money, and, upon law enforcement's discovery of the scheme, had only six billion dollars remaining, then the individual investors' claims to recover their rightful share would add up to four billion dollars more than existed in the res.  Thus, the court might certify a (b)(1)(B) class action to ensure that the custodian of the res does not pay out the entire res to the first investors to file suit, but, instead, distributes the res fairly among all investors.

The two subcategories of (b)(1) class action have other things in common as well.  Both exist, in a sense, for the benefit of the defendant -- at least relative to (b)(2) and (b)(3) class actions -- and are rarely brought, in part because plaintiffs have little incentive to bring them.  In the (b)(1)(B) example, each investor hopes to recover the full value of his or her investment, not a sixty-percent value, and thus is incentivized to file as an individual.  In the (b)(1)(A) example, the plaintiff seeking to close down the school (i) does not care about the inconsistent obligations of the school district, and (ii) would rather not be joined in a class action with plaintiffs who want to keep the school open.  Last, (b)(1) class actions, along with (b)(2) class actions, are mandatory: if certified, no person covered under the class definition may opt out of it or pursue his or her own individual claim.  As such, no notice needs to be given to the class members that they are part of

ongoing litigation, although the certifying court may elect to direct notice in appropriate circumstances. See Fed. R. Civ. P. 23(c)(2)(A). Class actions under (b)(2) provide for injunctive or declaratory relief when a defendant has "acted or refused to act on grounds that apply generally to the class." Fed. R. Civ. P. 23(b)(2).

> The key to the (b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted -- the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." Nagareda, supra, at 132. In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant. Similarly, it does not authorize class certification when each class member would be entitled to an individualized award of monetary damages.

Wal-Mart, 564 U.S. at 360-61 (emphasis in original). The (b)(2) class action was invented for the purpose of facilitating civil rights suits, and much of its use is in that field today. See Newberg § 4:26. The (b)(2) class action allows civil rights litigants to advocate on behalf of all similarly situated individuals, such as a disenfranchised black voter representing a class of all black voters within an unconstitutionally drawn district or a jail inmate representing all inmates in an overcrowding case. Anyone familiar with the nation's seminal civil rights cases, however, knows that many of them are not brought as class actions, which raises a question:

> [W]hy would anyone ever bring one? . . . Th[is] inquiry is generated because if an individual litigant pursues an individual case for injunctive relief and prevails, she can generally get all of the remedy she needs without going through the hurdles of certifying a class. For example, to return to Brown v. Board of Education, once Linda Brown prevailed on her race discrimination claim, her remedy -- a desegregated school -- was hers to pursue. Although that remedy would affect many other persons not a part of her litigation, hence making class certification appropriate, there is no requirement that to secure that remedy, she had to file a class action.
>
> Nonetheless, social change advocates tend to pursue class certification under Rule 23(b)(2) for several reasons. First, and perhaps most importantly, Linda Brown will likely graduate from school long before her case ends; if hers is simply an individual action, it will become moot and risk dismissal. Class certification, however, constitutes an exception to the mootness doctrine in certain circumstances. Second, the scope of the plaintiff's relief is likely augmented by certifying a class. It is arguable that all that Linda Brown would have been able to secure as a remedy for her individual claim was a desegregated school for herself, not for students throughout the entire school district; there is some relationship between the scope of the class and the scale of the remedy. Third, it is often the case that the attorneys pursuing civil rights actions are doing so as public interest lawyers paid by an organization like the NAACP Legal Defense Fund or the American Civil Liberties Union (ACLU); they may therefore have a financial incentive to pursue a class's case rather than a series of individual cases as they have limited resources, and the economies of scale may argue for a class action suit. Most generally, many civil rights cases are brought as class suits because the attorneys and clients pursuing them conceptualize their efforts in group, not individual, terms. Thus, while an individual civil rights plaintiff might be able to secure the relief that she seeks without a (b)(2) class, a series of factors may encourage the pursuit of one.

Newberg § 4:26 (footnotes omitted). Like (b)(1) class actions, (b)(2) class actions are mandatory -- individuals covered under the class definition may not opt out -- and do not require notice to be given to the class. See Fed. R. Civ. P. 23(c)(2)(A).

To satisfy rule 23(b)(3), the court must find "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) provides that "[t]he matters pertinent to these findings include": (i) the class members' interest in individually controlling the prosecution or defense of separate actions; (ii) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (iii) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (iv) the difficulties likely to be encountered in the management of a class action. Fed. R. Civ. P. 23(b)(3)(A)-(D).

Rule 23(b)(3)'s first requirement is that questions common to the class predominate over those that are individualized. See Fed. R. Civ. P. 23(b)(3). A question is common when "the same evidence will suffice for each member to make a prima facie showing," Blades v. Monsanto Co., 400 F.3d 562, 566 (8th Cir. 2005)(citing In re Visa Check/MasterMoney Antitrust Litig., 208 F.3d 124, 136-40 (2d Cir. 2001)), or when the issue is "susceptible to generalized, class-wide proof," In re Nassau Cty. Strip Search Cases, 461 F.3d 219, 227 (2d Cir. 2006). A question is individual when "the members of a proposed class will need to present evidence that varies from member to member." Blades v. Monsanto Co., 400 F.3d at 566. Although a case need not present only common questions to merit certification, and the presence of some individual questions does not destroy predominance, the rule 23(b)(3) predominance requirement is much stricter than the rule 23(a)(1) commonality requirement: the latter requires only that a common question or questions exist; the former requires that the common question or questions predominate over the individual ones. See Amchem Prods., Inc. v. Windsor, 521 U.S. at 623-24; In re Thornburg Mortg., Inc. Sec. Litig., 912 F. Supp. 2d 1178, 1225 (D.N.M. 2012)(Browning, J.)("The predominance criterion of rule 23(b)(3) is 'far more demanding' than rule 23(a)(2)'s commonality requirement."). As the Tenth Circuit, addressing a Title VII claim, put it:

> The myriad discriminatory acts that Plaintiffs allege (e.g., failure to promote, failure to train, unequal pay, disrespectful treatment, etc.) each require independent legal analysis, and similarly challenge the predominance requirement of Rule 23(b)(3) if not also the commonality requirement of Rule 23(a).
>
> . . . .

> Although we do not rest our decision upon Rule 23(a), cases that interpret . . . the commonality requirement of Rule 23(a) illustrate the instant Plaintiffs' inability to satisfy Rule 23(b)(3)'s "far more demanding" requirement that common issues predominate.

Monreal v. Potter, 367 F.3d 1224, 1237 (10th Cir. 2004)(footnote omitted).

The predominance question applies to both macro damages -- the total class damages -- and to micro damages -- the individual damages. In Comcast Corp. v. Behrend, 569 U.S. 27 (2013), the Supreme Court held that it could not accept the regression model which the plaintiffs' expert had developed as evidence that damages were susceptible of measurement across an entire class -- as rule 23(b)(3) requires. The plaintiffs argued four theories of antitrust violations; one theory was that Comcast Corp.'s activities had an antitrust impact, because Comcast Corp.'s activities reduced the level of competition from "overbuilders," companies that build competing cable networks in areas where an incumbent cable company already operates. 569 U.S. at 31. The district court found, among other things, that the damages resulting "from overbuilder-deterrence impact could be calculated on a classwide basis." 569 U.S. at 31-32.

> To establish such damages, [the plaintiffs relied] solely on the testimony of Dr. James McClave. Dr. McClave designed a regression model comparing actual cable prices in the Philadelphia [Designated Market Area] with hypothetical prices that would have prevailed but for [Comcast Corp.'s] allegedly anticompetitive activities. The model calculated damages of $875,576,662.00 for the entire class. As Dr. McClave acknowledged, however, the model did not isolate damages resulting from any one theory of antitrust impact. The district court nonetheless certified the class.

569 U.S. at 31-32 (citations omitted).

The United States Court of Appeals for the Third Circuit affirmed the district court decision. The Third Circuit concluded that the plaintiffs "provided a method to measure and quantify damages on a classwide basis," finding it unnecessary to decide "whether the methodology was a just and reasonable inference or speculation." 569 U.S. at 32 (quoting 655 F.3d 182, 206 (3d Cir. 2011)). The Supreme Court granted certiorari on the question of "[w]hether a district court may certify a class action without resolving whether the plaintiff class had introduced admissible evidence, including expert testimony, to show that the case is susceptible to awarding damages on a class-wide basis." 569 U.S. at 39. Justice Scalia criticized the Third Circuit's reluctance to entertain arguments against the plaintiffs' damages model "simply because those arguments would also be pertinent to the merits determination." 569 U.S. at 34. Justice Scalia said that

> it is clear that, under the proper standard for evaluating certification, respondents'
> model falls far short of establishing that damages are capable of measurement on a
> classwide basis.   Without presenting another methodology, respondents cannot
> show Rule 23(b)(3) predominance: Questions of individual damage calculations
> will inevitably overwhelm questions common to the class.

569 U.S. at 34.   Justice Scalia stated that, under the Third Circuit's logic, "at the class-certification

stage, *any* method of measurement is acceptable so long as it can be applied classwide, no matter

how arbitrary the measurements may be.   Such a proposition would reduce rule 23(b)(3)'s

predominance requirement to a nullity."   569 U.S. at 35 (emphasis in original).

It is clear that <u>Comcast Corp. v. Behrend</u> applies to classwide damages.   It is less clear that

<u>Comcast Corp. v. Behrend</u>'s language applies to the determination of individual damages.   There

are three ways that the Court could deal with <u>Comcast Corp. v. Behrend</u> and the determination of

individual damage awards.   First, the Court could decide that <u>Comcast Corp. v. Behrend</u> applies

only to classwide damages and is not controlling at all in the determination of individual damages.

Second, the Court could decide that everything that Justice Scalia said about classwide damages

also applies to the determination of individual damages.   Third, the Court could decide that Justice

Scalia said some things relating to the determination of individual damages, but not the same things

that apply to classwide damages.   As to the first option, while much could be said of limiting

Justice Scalia's opinion to classwide damages -- even from the language of the opinion and from

the wording of the question presented -- the Court is reluctant to say that it has nothing to say that

might be relevant to the determination of individual damages awards.   Some of Justice Scalia's

concerns about admissible evidence to determine damages -- whether classwide or individual

damage awards -- still seem relevant to whether damages are classwide or individual.   While

Justice Scalia was not addressing the determination of individual damage awards, some of what

he said -- and how he said it -- causes the Court to be cautious in determining a methodology for

calculating individual damage awards.   On the other hand, the Court is not convinced that it should

or even can apply <u>Comcast Corp. v. Behrend</u>'s language to the individual determination of

damages as it does to classwide damages.   The dissent stated that "[r]ecognition that individual

damages calculations do not preclude class certification under Rule 23(b)(3) is well nigh

universal."   569 U.S. at 42 (Ginsburg, J., dissenting).   Justice Scalia did not refute this proposition,

and the Court has no reason to think the dissent's statement -- which is accurate -- does not remain

good law.   Accordingly, just because each plaintiff and class member may get a different amount

and there has to be a separate calculation of each plaintiff's damages does not defeat class certification.

What the Court thinks that Comcast Corp. v. Behrend says that is relevant to the individual determination of damages is threefold. First, at the class certification stage, the Court cannot ignore how individual damages, if any are appropriate, are to be decided. In other words, the Court cannot ignore the possible complexities of the individual damages determinations in making the predominance calculation. A class can have individual damage calculations, but the Court has to look at the issues of individual damages calculations at the class certification stage. Second, the methodology for all class members needs to be common or, if there are different methodologies for some plaintiffs and class members, the Court must take these differences into account at the class certification stage in the predominance analysis. In other words, if the Court is going to use different methodologies for different class members, it must decide: (i) whether these differences create questions affecting only individual members; and (ii) whether these individual questions predominate over the questions of law or fact common to the class. Third, even if the methodology is common to the class, the Court must decide whether it will operate in a consistent way for each individual class member. The law and methodology may be the same, but when applied to the class, they may create issues for one class member or group of class members that they do not create for other class members or groups. The predominance analysis must identify precisely the common issues and uncommon issues that application of the class methodology or methodologies raise, and then determine whether, in the total issue mix, the common issues predominate over the individual ones.

A defendant's desire to assert individual counterclaims[14] does not typically defeat predominance. See Phillips Petrol. Co. v. Shutts, 472 U.S. at 810; Allapattah Servs., Inc. v. Exxon Corp., 333 F.3d 1248, 1260 (11th Cir. 2003). A defendant's desire to assert individual affirmative defenses also often does not defeat predominance, see Smilow v. Sw. Bell Mobile Sys., Inc., 323 F.3d 32, 39 (1st Cir. 2003)("Courts traditionally have been reluctant to deny class action status

---

[14]Generally speaking, counterclaims, even common ones, are not permitted against absent class members at all. See Fager v. CenturyLink Commc'ns, LLC, 854 F.3d 1167, 1172 (10th Cir. 2016)("[A]bsent plaintiff class members . . . are almost never subject to counterclaims or cross-claims . . . ." (quoting Phillips Petroleum Co. v. Shutts, 472 U.S. at 810)).

under Rule 23(b)(3) simply because affirmative defenses may be available against individual members."), but this statement is less true after Wal-Mart.[15]  Other recurring individual issues present more serious challenges to predominance, such as: (i) the prima facie element of reliance or due diligence in common-law fraud and other cases;[16] (ii) differences in the applicable law in a

---

[15]Limitations defenses are an especially common breed of affirmative defense.  Limitations defenses generally present common questions, rather than individual ones, because a limitations defense's merits rest on two facts: (i) the date on which the claim accrued; and (ii) the date on which the action was filed.  Fact (ii) is a common issue in virtually every class action, because the entire class gets credit for the filing date of the class action complaint.  Fact (i) may not be truly common, but it might be, if, for example, the discovery rule delays accrual of a claim until the cause of action is discovered, and all class members' causes of action are discovered at the same time, or if a single act by the defendant breached contracts with all class members at once.  Even if the question is individual -- for example, if a class is defined as only encompassing preexisting filed claims, or if the discovery rule might delay the accrual of the claim for some class members but not others -- it still typically does not defeat predominance.

> Although a necessity for individualized statute-of-limitations determinations invariably weighs against class certification under Rule 23(b)(3), we reject any per se rule that treats the presence of such issues as an automatic disqualifier.  In other words, the mere fact that such concerns may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones.  As long as a sufficient constellation of common issues binds class members together, variations in the sources and application of statutes of limitations will not automatically foreclose class certification under Rule 23(b)(3).  Predominance under Rule 23(b)(3) cannot be reduced to a mechanical, single-issue test.

Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 296 (1st Cir. 2000)(citing 5 James W. Moore et al., Moore's Federal Practice ¶ 23.46[3] (3d ed. 1999)).  See Newberg § 4:57 (confirming that the above passage "reflects the law in most circuits" (footnote omitted)).

[16]The advisory committee's notes to rule 23 state that

> a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class.  On the other hand, although having some common core, a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed.

Fed. R. Civ. P. 23 advisory committee's notes (citing Miller v. Nat'l City Bank of N.Y., 166 F.2d 723 (2d Cir. 1948); Oppenheimer v. F. J. Young & Co., Inc., 144 F.2d 387 (2d Cir. 1944)).

> Despite the generalized concern about the individual nature of the misrepresentations and/or reliance inquiry in fraud cases, there are at least three recurring situations in which courts have found common issues predominant in fraud cases: (1) those in which reliance is common across the class; (2) those in which courts have excused a showing of individual reliance; and (3) those in which the underlying law does not require a showing of individual reliance.

Newberg § 4:58.  Reliance may be a common issue when the same misrepresentation is made to the entire class; some Courts of Appeals have held that written misrepresentations may be common issues while oral misrepresentations are presumed to be individualized.  See, e.g., Moore v. PaineWebber, Inc., 306 F.3d 1247, 1253 (2d Cir. 2002)("[T]he Third, Fourth, Fifth, Sixth, and

multi-state, state-law-based class actions,[17] see Castano v. Am. Tobacco Co., 84 F.3d 734, 741

(5th Cir. 1996); and (iii) the need to determine individual personal injury damages, which presents

---

Seventh Circuits . . . have held that oral misrepresentations are presumptively individualized."); In re Prudential Ins. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 319 (3d Cir. 1998)(certifying class where alleged misrepresentations were written and uniform); Spencer v. Hartford Fin. Servs. Grp., Inc., 256 F.R.D. 284, 297 (D. Conn. 2009)(Hall, J.)(certifying class where class definition was narrowed to include only those who had received written communications from defendant). The requirement that plaintiffs show reliance is most often presumed or excused in so-called fraud-on-the-market securities cases, in which class members -- investors in the defendant company -- are presumed to be rational, fully informed actors who use all of the information available to the general public, but are also presumed to not possess insider information.

> We have found a rebuttable presumption of reliance in two different circumstances. First, if there is an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance. Second, under the fraud-on-the-market doctrine, reliance is presumed when the statements at issue become public. The public information is reflected in the market price of the security. Then it can be assumed that an investor who buys or sells stock at the market price relies upon the statement.

Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 159 (2008)(citing Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153 (1972); Basic Inc. v. Levinson, 485 U.S. 224, 245 (1988)).

[17]In In re Bridgestone/Firestone, Inc., 288 F.3d 1012 (7th Cir. 2002), the Honorable Frank H. Easterbrook, United States Circuit Judge for the Seventh Circuit, in an opinion that predates Wal-Mart and Comcast, stated:

> No class action is proper unless all litigants are governed by the same legal rules. Otherwise the class cannot satisfy the commonality and superiority requirements of Fed. R. Civ. P. 23(a), (b)(3). Yet state laws about theories such as those presented by our plaintiffs differ, and such differences have led us to hold that other warranty, fraud, or products-liability suits may not proceed as nationwide classes

288 F.3d at 1015. Judge Easterbrook then discussed how variations in tires defeat class treatment:

> Because these claims must be adjudicated under the law of so many jurisdictions, a single nationwide class is not manageable. Lest we soon see a Rule 23(f) petition to review the certification of 50 state classes, we add that this litigation is not manageable as a class action even on a statewide basis. About 20% of the Ford Explorers were shipped without Firestone tires. The Firestone tires supplied with the majority of the vehicles were recalled at different times; they may well have differed in their propensity to fail, and this would require sub-subclassing among those owners of Ford Explorers with Firestone tires. Some of the vehicles were resold and others have not been; the resales may have reflected different discounts that could require vehicle-specific litigation. Plaintiffs contend that many of the failures occurred because Ford and Firestone advised the owners to underinflate their tires, leading them to overheat. Other factors also affect heating; the failure rate (and hence the discount) may have been higher in Arizona than in Alaska. Of those vehicles that have not yet been resold, some will be resold in the future (by which time the tire replacements may have alleviated or eliminated any discount) and some never will be resold. Owners who wring the last possible mile out of their vehicles receive everything they paid for and have claims that differ from owners who sold their Explorers to the second-hand market during the height of the publicity in 2000. Some owners drove their SUVs off the road over rugged

such a challenge to predominance that class certification of mass tort claims is now exceedingly rare, see Amchem Prods., Inc. v. Windsor, 521 U.S. at 625.  There is little uniform guidance on how to assess when common issues predominate over individual ones, and the Court's statements to this point have, obviously, done more to disavow various tempting but fallacious rules than they have to set forth a usable standard.

There is currently a split of authority between the United States Courts of Appeals over the proper way to analyze predominance.  The Honorable Richard A. Posner, former United States Circuit Judge for the United States Court of Appeals for the Seventh Circuit, concluded that the predominance inquiry boils down to "a question of efficiency."  Butler v. Sears, Roebuck & Co., 702 F.3d 359, 362 (7th Cir. 2012), vacated, 569 U.S. 1015 (2013).  Judge Posner poses the

---

terrain, while others never used the "sport" or "utility" features; these differences also affect resale prices.

Firestone's tires likewise exhibit variability; that's why fewer than half of those included in the tire class were recalled.  The tire class includes many buyers who used Firestone tires on vehicles other than Ford Explorers, and who therefore were not advised to underinflate their tires.

. . . .

When courts think of efficiency, they should think of market models rather than central-planning models.

Our decision in Rhone-Poulenc Rorer made this point, and it is worth reiterating: only "a decentralized process of multiple trials, involving different juries, and different standards of liability, in different jurisdictions" (51 F.3d at 1299) will yield the information needed for accurate evaluation of mass tort claims.

. . . .

No matter what one makes of the decentralized approach as an original matter, it is hard to adopt the central-planner model without violence not only to Rule 23 but also to principles of federalism.  Differences across states may be costly for courts and litigants alike, but they are a fundamental aspect of our federal republic and must not be overridden in a quest to clear the queue in court.  See BMW v. Gore, 517 U.S. [559, 568-73 (1996)]; Szabo[v. Bridgeport Machs., Inc., 249 F.3d 672 (7th Cir. 2001)](reversing a nationwide warranty class certification); Spence v. Glock, Ges.m.b.H., 227 F.3d 308 (5th Cir. 2000)(reversing a nationwide tort class certification); Larry Kramer, Choice of Law in Complex Litigation, 71 N.Y.U. L. Rev. 547, 579 (1996); Linda S. Mullenix, Mass Tort Litigation and the Dilemma of Federalization, 44 DePaul L. Rev. 755, 781 (1995); Robert A. Sedler, The Complex Litigation Project's Proposal for Federally-Mandated Choice of Law in Mass Torts Cases: Another Assault on State Sovereignty, 54 La. L .Rev. 1085 (1994).  Tempting as it is to alter doctrine in order to facilitate class treatment, judges must resist so that all parties' legal rights may be respected.

In re Bridgestone/Firestone, Inc., 288 F.3d at 1018-20.

predominance question as: "Is it more efficient, in terms both of economy of judicial resources

and of the expense of litigation to the parties, to decide some issues on a class basis or all issues in

separate trials?"  Butler v. Sears, Roebuck & Co., 702 F.3d at 362.  In Butler v. Sears, Roebuck &

Co., the Seventh Circuit reversed a district court's denial of certification of a class of washing-

machine owners who alleged that Sears' washing machines were prone to cultivate mold and

affirmed the district court's certification of the same class to pursue a claim that the machines'

control units were defective.  See 702 F.3d at 360-61.  The Seventh Circuit denied certification of

the class -- which spanned six states -- to pursue its mold claim under state breach-of-warranty

law:

> A class action is the more efficient procedure for determining liability and damages
> in a case such as this, involving a defect that may have imposed costs on tens of
> thousands of consumers yet not a cost to any one of them large enough to justify
> the expense of an individual suit.  If necessary a determination of liability could be
> followed by individual hearings to determine the damages sustained by each class
> member (probably capped at the cost of replacing a defective washing machine --
> there doesn't seem to be a claim that the odors caused an illness that might support
> a claim for products liability as distinct from one for breach of warranty).  But
> probably the parties would agree on a schedule of damages based on the cost of
> fixing or replacing class members' mold-contaminated washing machines.  The
> class action procedure would be efficient not only in cost, but also in efficacy, if
> we are right that the stakes in an individual case would be too small to justify the
> expense of suing, in which event denial of class certification would preclude any
> relief.
>
> . . . .
>
> [T]he district court will want to consider whether to create different subclasses of
> the control unit class for the different states.  That should depend on whether there
> are big enough differences among the relevant laws of those states to make it
> impossible to draft a single, coherent set of jury instructions should the case ever
> go to trial before a jury.

Butler v. Sears, Roebuck & Co., 702 F.3d at 362.  Along with numerous other class actions pending

appeal before the Supreme Court, the Supreme Court vacated Butler v. Sears, Roebuck & Co., and

remanded it to the Seventh Circuit "for reconsideration in light of Comcast Corp. v. Behrend."

Butler v. Sears, Roebuck & Co., 727 F.3d 796, 797 (7th Cir. 2013).  On reconsideration, the

Seventh Circuit reaffirmed its prior decision, again in an opinion that Judge Posner wrote:

> Sears thinks that predominance is determined simply by counting noses:
> that is, determining whether there are more common issues or more individual
> issues, regardless of relative importance.  That's incorrect.  An issue "central to the
> validity of each one of the claims" in a class action, if it can be resolved "in one
> stroke," can justify class treatment.  [Wal-Mart, 564 U.S. at 338].  That was said in
> the context of Rule 23(a)(2), the rule that provides that class actions are permissible
> only when there are issues common to the members of the class (as of course there
> are in this case).  But predominance requires a qualitative assessment too; it is not
> bean counting.  In Amgen Inc. v. Connecticut Retirement Plans & Trust Funds,

[568 U.S. at 468], the Court said that the requirement of predominance is not satisfied if "individual questions . . . overwhelm questions common to the class," and in Amchem Products, Inc. v. Windsor, 521 U.S. . . . [at] 623 . . . , it said that the "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." And in In re Inter-Op Hip Prosthesis Liability Litigation, 204 F.R.D. 330, 345 (N.D. Ohio 2001), we read that "common issues need only predominate, not outnumber individual issues." . . .

As we noted in Carnegie v. Household Int'l., Inc., 376 F.3d 656, 661 (7th Cir. 2004), "the more claimants there are, the more likely a class action is to yield substantial economies in litigation. It would hardly be an improvement to have in lieu of this single class 17 million suits each seeking damages of $15 to $30. . . . The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30" (emphasis in original). The present case is less extreme: tens of thousands of class members, each seeking damages of a few hundred dollars. But few members of such a class, considering the costs and distraction of litigation, would think so meager a prospect made suing worthwhile.

There is a single, central, common issue of liability: whether the Sears washing machine was defective. Two separate defects are alleged, but remember that this class action is really two class actions. In one the defect alleged involves mold, in the other the control unit. Each defect is central to liability. Complications arise from the design changes and from separate state warranty laws, but can be handled by the creation of subclasses. See, e.g., Johnson v. Meriter Health Services Employee Retirement Plan, 702 F.3d [364,] 365[ 7th Cir. 2012] (10 subclasses).

Butler v. Sears, Roebuck & Co., 727 F.3d at 801-02 (emphasis in original).[18]

_____

[18]In addition to articulating the Seventh Circuit's construction of the predominance inquiry, Judge Posner addressed Comcast Corp. v. Behrend's impact on the Seventh Circuit's case:

So how does the Supreme Court's Comcast decision bear on the rulings . . . in our first decision?

Comcast holds that a damages suit cannot be certified to proceed as a class action unless the damages sought are the result of the class-wide *injury* that the suit alleges. Comcast was an antitrust suit, and the Court said that "if [the plaintiffs] prevail on their claims, they would be entitled only to damages resulting from reduced overbuilder competition, since that is the only theory of antitrust impact accepted for class-action treatment by the District Court. It follows that a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory. If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." "[A] methodology that identifies damages *that are not the result of the wrong*" is an impermissible basis for calculating class-wide damages. [569 U.S. at 37](emphasis added). "For all we know, cable subscribers in Gloucester County may have been overcharged because of petitioners' alleged elimination of satellite competition (*a theory of liability that is not capable of classwide proof*)." And on the next page of its opinion the Court quotes approvingly from Federal Judicial Center, Reference Manual on Scientific Evidence 432 (3d ed. 2011), that "the first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact *of that event*." (emphasis the [Supreme] Court's). None of the parties had even challenged the district court's ruling that class certification required "that the damages resulting from . . . [the antitrust violation] were measurable 'on a class-wide basis' through use of a 'common methodology.'"

The United States Court of Appeals for the Sixth Circuit handled essentially the same case -- a class action against Sears for defective washing machines -- in In re Whirlpool Corp. Front-Loading Washing Products Liability Litigation, 678 F.3d 409 (6th Cir. 2012), and also elected to certify the mold-based claim.[19]

> [W]e have no difficulty affirming the district court's finding that common questions predominate over individual ones and that the class action mechanism is the superior method to resolve these claims fairly and efficiently. This is especially true since class members are not likely to file individual actions because the cost of litigation would dwarf any potential recovery. See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 617 (1997)(finding that in drafting Rule 23(b)(3), "the Advisory Committee had dominantly in mind vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all'"). Further, [as] the district court observed, any class member who wishes to control his or her own litigation may opt out of the class under Rule 23(b)(3)(A).

---

> Unlike the situation in Comcast, there is no possibility in this case that damages could be attributed to acts of the defendants that are not challenged on a class-action basis; all members of the mold class attribute their damages to mold and all members of the control-unit class to a defect in the control unit.

> Sears argues that Comcast rejects the notion that efficiency is a proper basis for class certification, and thus rejects our statement that "predominance" of issues common to the entire class, a requirement of a damages class action under Rule 23(b)(3), "is a question of efficiency." But in support of its argument Sears cites only the statement in the dissenting opinion in Comcast that "economies of time and expense" favor class certification, -- a statement that the majority opinion does not contradict. Sears is wrong to think that anything a dissenting opinion approves of the majority must disapprove of.

> Sears compares the design changes that may have affected the severity of the mold problem to the different antitrust liability theories in Comcast. But it was not the existence of multiple theories in that case that precluded class certification; it was the plaintiffs' failure to base all the damages they sought on the antitrust impact -- the injury -- of which the plaintiffs were complaining. In contrast, any buyer of a Kenmore washing machine who experienced a mold problem was harmed by a breach of warranty alleged in the complaint.

> Furthermore and fundamentally, the district court in our case, unlike Comcast, neither was asked to decide nor did decide whether to determine damages on a class-wide basis. As we explained in McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 672 F.3d 482, 491-92 (7th Cir. 2012), a class action limited to determining liability on a class-wide basis, with separate hearings to determine -- if liability is established -- the damages of individual class members, or homogeneous groups of class members, is permitted by Rule 23(c)(4) and will often be the sensible way to proceed.

Butler v. Sears, Roebuck & Co., 727 F.3d at 799-800 (emphasis in Butler v. Sears, Roebuck & Co. but not Comcast Corp. v. Behrend, except as noted)(citations omitted).

[19]The Sixth Circuit's class "did not involve the other claim in [the Seventh Circuit's] case, the control unit claim." Butler v. Sears, Roebuck & Co., 727 F.3d at 802.

In re Whirlpool Corp. Front-Loading Washing Prods. Liab. Litig., 678 F.3d at 421 (citation omitted).  That case was also vacated after Comcast Corp. v. Behrend, and, like the Seventh Circuit, the Sixth Circuit reaffirmed its prior decision, fleshing out the predominance inquiry in more detail than it had done in its prior opinion:

> Whirlpool does not point to any "fatal dissimilarity" among the members of the certified class that would render the class action mechanism unfair or inefficient for decision-making.  Instead, Whirlpool points to "a fatal similarity -- [an alleged] failure of proof as to an element of the plaintiffs' cause of action."  That contention, the Supreme Court instructs, "is properly addressed at trial or in a ruling on a summary-judgment motion.  The allegation should not be resolved in deciding whether to certify a proposed class."  Tracking the Supreme Court's reasoning, we conclude here that common questions predominate over any individual ones.  Simply put, this case comports with the "focus of the predominance inquiry" -- it is "sufficiently cohesive to warrant adjudication by representation."

In re Whirlpool Corp. Front-Loading Washing Prods. Liab. Litig., 722 F.3d 838, 859 (7th Cir. 2013)(citations omitted).  The Seventh Circuit and Sixth Circuit, thus, define predominance in much the same way: if the district court can design a mechanism for trying the case that is fair to the defendants and more efficient than individual litigation of the same dispute, then predominance is satisfied.  See Butler v. Sears, Roebuck & Co., 727 F.3d at 802.  This styling of the predominance inquiry is in keeping with that given, many years earlier, by a leading class-action treatise:

> [A] court addressing predominance must determine whether the evidence about the putative class representative's circumstances and the opposing evidence from the defense will enable a jury to make across-the-board "yes" or "no" factual determinations that fairly resolve the claims of the entire class.  Where the right to recover for each class member would "turn . . . on facts particular to each individual plaintiff," class treatment makes little sense.  If the resolution of the common issues devolves into an unmanageable variety of individual issues, then the lack of increased efficiency will prohibit certification of the class.
>
> > The predominance and efficiency criteria are of course intertwined.  When there are predominant issues of law or fact, resolution of those issues in one proceeding efficiently resolves those issues with regard to all claimants in the class.  When there are no predominant issues of law or fact, however -- as in the instant case -- class treatment would be either singularly inefficient, as one court attempts to resolve diverse claims from around the country in its own courtroom, or unjust, as the various factual and legal nuances of particular claims are lost in the press to clear the lone court's docket.

McLaughlin on Class Actions § 5:23 (11th ed. 2016)(omission in original)(footnotes omitted).

Although the Seventh Circuit and the Sixth Circuit may agree about the definition of predominance, the Third Circuit, Tenth Circuit, and United States Court of Appeals for the Eleventh Circuit stake out a different test.

> "Whether an issue predominates can only be determined after considering what value the resolution of the class-wide issue will have in each class member's underlying cause of action."  Common issues of fact and law predominate if they "'ha[ve] a direct impact on every class member's effort to establish liability' *that is more substantial than the impact of individualized issues* in resolving the claim or claims of each class member."  If "after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, [their] claims are not suitable for class certification under Rule 23(b)(3)."

Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Serv., Inc., 601 F.3d 1159, 1170

(11th Cir. 2010)(emphasis in original)(citations omitted).[20]   The Eleventh Circuit, however,

---

[20]The Eleventh Circuit first adopted this test -- relying on district court decisions -- in 2004 in Klay v. Humana, Inc., 382 F.3d 1241 (11th Cir. 2004), and gave renewed articulations of the test in 2009 in Vega v. T-Mobile USA, Inc., 564 F.3d 1256 (11th Cir. 2009), and in 2010, in Sacred Heart Health Systems, Inc. v. Humana Healthcare Services, Inc.  In each case, the Eleventh Circuit made some reference to additionally adopting a United States Court of Appeals for the Fifth Circuit rule-of-thumb test:

> An alternate formulation of this test was offered in Alabama v. Blue Bird Body Co., 573 F.2d 309 (5th Cir. 1978).  In that case, we observed that if common issues truly predominate over individualized issues in a lawsuit, then "the addition or subtraction of any of the plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of evidence offered."  Put simply, if the addition of more plaintiffs to a class requires the presentation of significant amounts of new evidence, that strongly suggests that individual issues (made relevant only through the inclusion of these new class members) are important.  Alabama v. Blue Bird Body Co., 573 F.2d at 322 ("If such addition or subtraction of plaintiffs does affect the substance or quantity of evidence offered, then the necessary common question might not be present.").  If, on the other hand, the addition of more plaintiffs leaves the quantum of evidence introduced by the plaintiffs as a whole relatively undisturbed, then common issues are likely to predominate.

Klay v. Humana, Inc., 382 F.3d at 1255.  See Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Serv., Inc., 601 F.3d at 1170 ("In practical terms, while '[i]t is not necessary that all questions of fact or law be common,' 'the addition or subtraction of any of the plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of evidence offered.'"); Vega v. T-Mobile USA, Inc., 564 F.3d at 1270 (quoting the above portion of Klay v. Humana, Inc.).
The Fifth Circuit, however, was not setting forth a test for when predominance is satisfied so much as a test for when an issue is common versus individualized.  The Fifth Circuit's full quote -- without the Eleventh Circuit's alterations -- is:

> We only point out that in a situation wherein one seeks to represent a nationwide class in order to obtain redress for harm done from a nationwide conspiracy consideration should be given to whether the addition or subtraction of any of the plaintiffs to or from the class will have a substantial effect on the substance or quantity of evidence offered.  If such addition or subtraction of plaintiffs does affect the substance or quantity of evidence offered, then the necessary common question might not be present.

Alabama v. Blue Bird Body Co., 573 F.2d at 322 (footnote omitted).

imposes a different, more rigorous, second step: the district court's trial plan must spend more time adjudicating the common questions than it does adjudicating the individual questions. The Eleventh Circuit's test may not be the greatest -- the Court sees little reason why negative-value cases that can be fairly and efficiently adjudicated via class action should not be certified[21] -- but

---

[21]In fairness to the Eleventh Circuit, Judge Posner's test merges the predominance and superiority inquiries -- effectively reading out predominance -- in negative-value cases. Thus, the Eleventh Circuit's test is truer to rule 23's text than Judge Posner's. "Predominate," the word that rule 23 uses, means "[t]o be of greater quantity or importance; preponderate." Predominate, The American Heritage Dictionary of the English Language, (5th ed. 2019), https://www.ahdictionary.com/word/search.html?q=predominate (last visited January 22, 2019). Rule 23's text thus arguably suggests a direct comparison of common and individual issues, and not -- as Judge Posner suggests -- an indirect comparison that decides the predominance question on the basis of a fancy economic analysis. There are, however, two other rule 23 provisions whose impact on predominance is not often discussed: (i) the issue class-action clause, see Fed. R. Civ. P. 23(c)(4) ("When appropriate, an action may be brought or maintained as a class action with respect to particular issues."); and (ii) the subclassification clause, see Fed. R. Civ. P. 23(c)(5) ("When appropriate, a class may be divided into subclasses that are each treated as a class under this rule."). These provisions are unfortunate for those who wish to read rule 23 as containing the seeds of its own destruction. Rule 23(c)(4) allows for adjudication of common issues, even if these issues do not add up to a common claim. Rule 23(c)(5) allows for collective adjudication, even if it falls short of being completely "classwide" adjudication. Judge Posner's test explicitly admits of subclasses and issue classes. Even if it had not allowed for these classes, their impact in Judge Posner's analysis would be obvious: the district court uses the tools of subclassification and issue classification -- along with other management tools, such as polyfurcation -- to design a class-action management plan, and then decide whether the plan is more or less efficient than separate trials.

The impact that these provisions have on the Eleventh Circuit's approach is less clear. The Eleventh Circuit's best discussion of subclasses comes from Sacred Heart Health Systems, Inc. v. Humana Military Healthcare Services, Inc.:

> [W]e cannot accept the district court's proposal to use subclasses corresponding to the hospitals' six categories of payment clauses. We recognize the long and venerated practice of creating subclasses as a device to manage complex class actions, but the six subclasses proposed here mask a staggering contractual variety. The sixth proposed subclass -- a miscellaneous residue of numerous payment clauses that are insusceptible of ready classification -- alone is fatal to predominance. When this "potpourri" subclass, as Humana has termed it, is broken down into its disparate component parts, the illusion of uniformity gives way to nearly thirty subclasses.

> Common sense tells us that "[t]he necessity of a large number of subclasses may indicate that common questions do not predominate," Manual for Complex Litigation § 21.23 (4th ed. 2004); see also Harding v. Tambrands Inc., 165 F.R.D. 623, 630 (D. Kan. 1996)[(Theis, J.)]("The potential for numerous different subclasses weighs against a finding of predominance of common issues."). Here, the necessary recourse to a "miscellaneous" subclass readily indicates the lack of a predominant question.

> Ultimately, after examining the many individualized payment clauses contained in the network agreements, we perceive a "distinct possibility that there was a breach of contract with some class members, but not with other class members." Subclasses are no answer to this problem, meaning that the efficiency of a class action will be lost entirely unless the hospitals are allowed "to stitch together the strongest contract case based on language from various [contracts], with no necessary connection to their own contract rights. The hospitals, however,

> may not lawfully "amalgamate" their disparate claims in the name of convenience. The Rules Enabling Act, 28 U.S.C. § 2072 -- and due process -- prevents the use of class actions from abridging the substantive rights of any party. Yet, from the record before us, an abridgment of the defendant's rights seems the most likely result of class treatment. By glossing over the striking differences in the material terms of the agreements, the district court created an "unnecessarily high risk," of such unlawful results, and thereby abused its discretion.

<u>Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.</u>, 601 F.3d at 1176 (citations omitted). These statements imply that, but for the sixth "category" of payment clauses -- really a catchall for all contracts that did not fit into one of the five real categories -- the class would be certifiable. The only "abridgement of the defendant's rights" that the district court's plan would produce would be the "amalgamat[ion]" of different contractual language into a single category -- the sixth category. 601 F.3d at 1176 (internal quotation marks omitted). That case, thus, leaves open the question whether subclassification and issue certification can aid in satisfying predominance, or if these techniques are separate from the predominance inquiry.

The Fifth Circuit staked out a clear answer to this question in its much-discussed <u>Castano v. American Tobacco Company</u>, 84 F.3d 734 (5th Cir. 1996), case, deciding the issue in a way one might expect:

> Severing the defendants' conduct from reliance under rule 23(c)(4) does not save the class action. A district court cannot manufacture predominance through the nimble use of subdivision (c)(4). The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial. Reading rule 23(c)(4) as allowing a court to sever issues until the remaining common issue predominates over the remaining individual issues would eviscerate the predominance requirement of rule 23(b)(3); the result would be automatic certification in every case where there is a common issue, a result that could not have been intended.

84 F.3d at 745 n.21 (citations omitted). This logic is hardly unassailable. Namely, the result of reading rules 23(c)(4) and (c)(5) as bearing on the predominance inquiry would <u>not</u> be "automatic certification in every case where there is a common issue," because superiority must still be satisfied. <u>Castano v. Am. Tobacco Co.</u>, 84 F.3d at 745 n.21. If a proposed class action is superior -- <u>e.g.</u>, if it lacks the value to be brought on an individual basis -- and individual issues can be pared away via rules 23(c)(4) and (c)(5) then it is not clear why certification "could not have been intended" by the rule. <u>Castano v. Am. Tobacco Co.</u>, 84 F.3d at 745 n.21. Moreover, it is a poor reading of the rule's text. Presumably, even if rules 23(c)(4) and (c)(5) are mere "housekeeping rule[s]," they would still alleviate "likely difficulties in managing a class action." <u>Castano v. Am. Tobacco Co.</u>, 84 F.3d at 745 n.21; Fed. R. Civ. P. 23(b)(3)(D). Because rule 23 directs that "[t]he matters pertinent to these findings [predominance and superiority] include: . . . the likely difficulties in managing a class action," the Court, if it were writing on a clear slate would think that rules 23(c)(4) and (c)(5) would play a part in the predominance determination, Fed. R. Civ. P. 23(b)(3), and that this result thus "could not have been intended." <u>Castano v. Am. Tobacco Co.</u>, 84 F.3d at 745 n.21. The Fifth Circuit's approach attracted the adherence of a revered jurist on the Fourth Circuit -- although not the Fourth Circuit itself. The Honorable Paul V. Niemeyer, United States Circuit Judge for the Fourth Circuit, endorsed the Fifth Circuit's view in an opinion concurring in part and dissenting in part from an opinion in which the Fourth Circuit adopted the opposing view:

> Despite the overwhelming predominance of these individualized issues and claims over the common issue that the majority now certifies for class treatment, the majority has adopted an inventive approach to Rule 23 that allows certification of a class where the predominance requirement of Rule 23(b)(3) is admittedly unmet in the context of the case as a whole. According to the majority, to require the certified issue in this case to predominate over the individualized issues in the

action as a whole ignores Rule 23(c)(4)(A), which it appears to view as a fourth avenue for class certification, on equal footing with Rules 23(b)(1), 23(b)(2), and 23(b)(3).  In doing so, the majority glorifies Rule 23(c)(4)(A) -- a housekeeping rule that authorizes a court to certify for class treatment "particular issues" in a case that otherwise satisfies Rule 23(a) and 23(b) -- with the effect of materially rewriting Rule 23 such that Rule 23(b)(3)'s requirements no longer need be applied to "[a]n action," see Fed. R. Civ. P. 23(b), but rather to any single issue, no matter how small.

Not only does the majority's approach expand Rule 23 beyond its intended reach, but it also creates a direct conflict with the Fifth Circuit which has held:

A district court cannot manufacture predominance through the nimble use of subdivision (c)(4).  The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) in that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial.

Castano v. Am. Tobacco Co., 84 F.3d [at ]745 n.21 . . . .

Gunnells v. Healthplan Servs., Inc., 348 F.3d 417, 446-47 (4th Cir. 2003)(Niemeyer, J., concurring in part and dissenting in part).  Despite Judge Niemeyer's concern with creating a split among the Courts of Appeals, the United States Court of Appeals for the Second Circuit, the United States Court of Appeals for the Ninth Circuit, and, of course, the Seventh Circuit have all held that subclasses can be used to satisfy predominance concerns since at least 2001, two years before Gunnells v. Healthplan Services, Inc.  See Zinser v. Accufix Research Inst., Inc. 253 F.3d 1180, 1189-90, 1192 n.8 (9th Cir. 2001).  See Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 167-69 (2d Cir. 2001); Jefferson v. Ingersoll Int'l Inc., 195 F.3d 894, 898 (7th Cir. 1999).

The Eleventh Circuit has refrained from taking a side on this question:

Some have been critical of the piecemeal certification of class action status for claims within a case.  See Gunnells v. Healthplan Servs., Inc., 348 F.3d . . . 446-47 . . . (arguing that the predominance requirement in Fed. R. Civ. P. 23(b) applies to the action as a whole, not to individual subclasses or claims); Castano v. Am. Tobacco Co., 84 F.3d . . . 745 n.21 . . . ("The proper interpretation of the interaction between [Fed. R. Civ. P. 23] subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial.").  We did not directly address the propriety of such partial certification in Klay.

Borrero v. United Healthcare of N.Y., Inc., 610 F.3d 1296, 1310 n.5 (11th Cir. 2010)(alterations in original).  The Tenth Circuit also appears to have refrained from taking a side:

Plaintiffs urge us to consider a "hybrid" certification whereby the liability stage might be certified for class treatment under Rule 23(b)(2) even if the damages stage does not qualify for such treatment.  See Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 167-69 (2d Cir. 2001).  Compare Lemon v. Int'l Union of Operating Engr's, Local No. 139, AFL-CIO, 216 F.3d 577, 581 (7th Cir. 2000), and Jefferson v. Ingersoll Int'l Inc., 195 F.3d 894, 898 (7th Cir. 1999), with Allison v. Citgo Petroleum Corp., 151 F.3d 402, 420-22 (5th Cir. 1998).  We do not need to rule on a hybrid possibility because in the instant case, the liability stage does not satisfy either Rules 23(b)(2) or 23(b)(3).  The district court's ruling that plaintiffs did not allege a sufficient policy, practice or pattern of discrimination to warrant class treatment for liability determination is not an abuse of discretion.

Monreal v. Potter, 367 F.3d at 1237 n.12.

it is commendable in that it is a test that district courts can use, rather than yet another meaningless recitation, see CGC Holding Co. v. Broad & Cassel, 773 F.3d 1076, 1087 (10th Cir. 2014)("[T]he predominance prong 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation defeating, individual issues.'" (quoting William B. Rubenstein, Newberg on Class Actions § 4:49 (5th ed. 2017)("Newberg"))), circular axiom, see, e.g., Amchem Prods., Inc. v. Windsor, 521 U.S. at 623 ("The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."), obvious guidepost, see Reed v. Bowen, 849 F.2d at 1309 ("Each case must be decided on its own facts, on the basis of 'practicalities and prudential considerations.'"), self-evident comparison, see Monreal v. Potter, 367 F.3d at 1237 ("[T]he predominance criterion of Rule 23(b)(3) [i]s 'far more demanding' tha[n] the Rule 23(a) commonality requirement." (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. at 623-24)), or worthless slogan, see Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 600 (3d Cir. 2012)(exhorting district courts to examine claims "'through the prism' of Rule 23(b)(3)" (quoting In re DVI, Inc. Sec. Litig., 639 F.3d 623, 630 (3d Cir. 2011)).

The Tenth Circuit followed the Eleventh Circuit's approach in CGC Holding Co., LLC v. Broad and Cassel.

> Predominance regularly presents the greatest obstacle to class certification, especially in fraud cases.  Accordingly, the issues disputed in this case are not unusual.  And given our obligation to ensure that the district court did not err in conducting its rigorous analysis, we must *characterize* the issues in the case as common or not, and then *weigh* which issues predominate.  Here, that task requires us to survey the elements of the class's RICO claims to consider (1) which of those elements are susceptible to generalized proof, and (2) whether those that are so susceptible predominate over those that are not.  Stated another way, consideration of how the class intends to answer factual and legal questions to prove its claim -- and the extent to which the evidence needed to do so is common or individual -- will frequently entail some discussion of the claim itself.

> In this context, it is worth reiterating that our review on appeal is limited.  For the purposes of class certification, our primary function is to ensure that the requirements of Rule 23 are satisfied, not to make a determination on the merits of the putative class's claims.  But it is impractical to construct "an impermeable wall" that will prevent the merits from bleeding into the class certification decision to some degree.  So, although class certification does not depend on the merits of the suit, "[e]valuation of many of the questions entering into determination of class action questions is intimately involved with the merits of the claims."

> With these legal principles in mind, "[c]onsidering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action."  For this limited purpose, we consider the proposed class's claim for a RICO conspiracy.

CGC Holding Co., LLC v. Broad and Cassel, 773 F.3d at 1087-88.

## ANALYSIS

The Court will grant the requests in the Plaintiffs' Letter in part and deny them in part. The parties indicated that they have resolved the dispute about the prior pay data, and so the Court will not order that Sandia Labs produce such information. See Tr. at 4:19-23 (Levin-Gesundheit); id. at 5:4-10 (Court, Katzenstein). Rule 26 limits discovery's scope to "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case. . . ." Fed. R. Civ. P. 26(b)(1). The Court will order Sandia Labs to produce policy documents from 2018 and ESI related to the vice president of human resources, because the discovery is relevant and proportional. Fed. R. Civ. P. 26(b)(1).

The Court first concludes that discovery post-dating April, 2017, is relevant. Before a class certification decision, a party generally may seek "controlled discovery into the 'merits,' limited to those aspects relevant to making the certification decision on an informed basis." Rule 23 (c)(1)(A) advisory committee's notes. As the First Amended Complaint evidences, the Plaintiffs bring claims against Sandia Labs' current practices. See, e.g., First Amended Complaint ¶¶ 20-40, at 5-9. Throughout the First Amended Complaint, the Plaintiffs write their allegations in the present tense, which suggests that the discriminatory activities did not cease at the transition. See, e.g., First Amended Complaint ¶ 26, at 6 ("Sandia uses common procedures for evaluating employee performance that apply to all employees in all Divisions."); id. ¶ 34, at 8 ("Sandia assigns merit increases and bonuses within centrally-prescribed ranges based on uniform criteria that fail to credit performance and disadvantage women. Sandia thus gives male employees larger merit increases and bonuses than similarly-situated female employees . . . ."); id. ¶ 38, at 8 ("Employee cannot apply for a level promotion. Instead, an employee's manager must nominate him or her for a promotion. The promotion must then be affirmatively approved by the employee's Group Senior Manager, Center Director, and Division Vice President."). The Plaintiffs similarly describe their grounds for relief in the present tense. See, e.g., First Amended Complaint ¶ 95, at 23 ("Sandia's reliance on illegitimate and unvalidated systems and criteria to set compensation, select individuals for promotion, and determine other terms and conditions of employment, have an adverse impact on female employees in violation of Title VII and are not, and cannot be, justified by business necessity."). Moreover, the Plaintiffs seek to enjoin the ongoing

discrimination of which they complain.  See First Amended Complaint ¶ 108(d), at 25.  As an injunction cannot affect past and terminated practices, the demand illustrates the Plaintiffs' foci on current and continuing practices.  Because the Plaintiffs allege ongoing discrimination, Sandia Labs' current policies and practices relate to and are relevant to the Plaintiffs' claims.  See State Farm Mut. Auto. Ins. v. Fayda, 2015 WL 7871037, at *2 ("Relevance is still to be 'construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on' any party's claim or defense." (quoting Oppenheimer Fund, Inc. v. Sanders, 437 U.S. at 351)).

Sandia Labs' arguments for the discovery's irrelevancy do not convince the Court.  See Tr. at 23:5-7 (Katzenstein).  Sandia Labs contends that the named Plaintiffs did not work long, if at all, under National Technology, and that other women from "2014 forward," Tr. at 13:12 (Katzenstein) -- the dates by which the Plaintiffs define their class[22] -- never worked under National Technology.  See Tr. at 12:21-15:15 (Katzenstein).  These facts trouble Sandia Labs, because it contends that National Technology's management lacked connections to the alleged discriminatory actions.  See Tr. at 23:19-25 (Katzenstein).  In Sandia Labs' view, the Plaintiffs cannot draw connections between employment under Sandia Corporation and under National Technology.  See Tr. at 13:18-24 (Katzenstein).  Three of the named Plaintiffs, however, worked for some time under National Technology, and the Plaintiffs attack Sandia Labs' practice of using prior pay data to set initial salaries -- a practice which continues to effect individuals throughout their careers.  See Reply at 1-2.  Moreover, in their pursuit to define a class -- particularly a class seeking injunctive relief, the Plaintiffs likely need to identify whether Sandia Labs' discriminatory activities continue under National Technology.  See Reply at 1.  The Court concludes, therefore, that Sandia Labs' current policies and practices are relevant to the Plaintiffs' allegations.

Second, the Court addresses whether the discovery is proportional.  Sandia Labs contends that the Plaintiffs seek burdensome discovery.  See Tr. at 15:22-16:22 (Katzenstein).  The Court, however, concludes that the solution developed at the hearing does not disproportionately burden Sandia Labs.  Rule 26(b)(1) advises courts to consider in determining discovery's proportionality:

---

[22]The Plaintiffs describe the class as "all female employees employed by Sandia in the United States at any time from February 20, 2014 through the resolution of this action."  See  First Amended Class Action Complaint ¶ 41, at 9.

"[(i)] the importance of the issues at stake in the action, [(ii)] the amount in controversy, [(iii)] the parties' relative access to relevant information, [(iv)] the parties' resources, [(v)] the importance of the discovery in resolving the issues, and [(vi)] whether the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(1).  Here, first, the Plaintiffs complain about widespread discrimination in Sandia Labs, and, second, the Plaintiffs demand injunctive relief and damages for the class.  See First Amended Complaint ¶¶ 108(a)-(o), at 24-26. Such complaints and damages requests are significant and will effect many people and practices within Sandia Labs.  Third, the Plaintiffs seek information to which they otherwise have no access. Fourth, the desired information may be necessary to determine Sandia Labs' current policies and practices.  Fifth, Sandia Labs, a corporation, likely has access to the resources to complete the discovery.  Sixth, the discovery's burden will likely not outweigh the importance of obtaining accurate information here or the above-mentioned benefits to the Plaintiffs.  Producing ten to twelve policy documents should not significantly burden Sandia Labs.  See Tr. at 18:23 (Levin-Gesundheit).  Sandia Labs did not describe as burdensome the ESI discovery related to the vice president, see Tr. at 23:3-8 (Katzenstein), and the Court does not believe that this more limited discovery should disproportionately burden Sandia Labs.  Accordingly, the Court will grant the Plaintiffs' requests in part and deny them in part.  The Court will order Sandia Labs to produce policy documents from 2018 and ESI related to the vice president of human resources.

**IT IS ORDERED** that: (i) the requests in Plaintiffs' Letter from Anne B. Shaver, Lieff, Cabraser, Heimann & Bernstein, LLP, to the Court (dated December 6, 2018), filed December 6, 2018 (Doc. 194), are granted in part and denied in part; and (ii) Defendant Sandia Corporation d/b/a Sandia National Laboratories will produce policy documents from 2018 and electronically stored information related to the vice president of human resources.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Gretchen Mary Elsner
Elsner Law & Policy, LLC
Santa Fe, New Mexico

--and--

Rachel Bien

Outten & Golden LLP
San Francisco, California

--and--

Adam T. Klein
Cheryl-Lyn D. Bentley
Elizabeth V. Stork
Outten & Golden LLP
New York, New York

--and--

David Lopez
Outten & Golden LLP
Washington, D.C.

--and--

Kelly Maureen Dermody
Anne Brackett Shaver
Lin Yee Chan
Tiseme Gabriella Zegeye
Michael Ian Levin-Gesundheit
Shira J. Tevah
Lieff Cabraser Heimann & Bernstein, LLP
San Francisco, California

       *Attorneys for the Plaintiffs*

Justin E. Poore
Cindy Jean Lovato-Farmer
Sandia Corporation
Albuquerque, New Mexico

--and--

Grace E. Speights
Michael S. Burkhardt
Krissy A. Katzenstein
Morgan, Lewis & Bockius LLP
Washington, D.C.

--and--

Scott D. Gordon
Theresa W. Parrish
Jeffrey L. Lowry
Paola Jaime Saenz
Stephanie L. Latimer
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

       *Attorneys for the Defendant*